

FILED

JAN 20 2023

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

David Stebbins (pro se Plaintiff)
123 W. Ridge Ave.,
APT D
Harrison, AR 72601
(870) 212-4947
acerthorn@yahoo.com

### UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA

DAVID STEBBINS,                                                    PLAINTIFF

VS.

JOHN DOE, d.b.a. SIDALPHA    **CV23-0321** **DMR**    DEFENDANTS



## COMPLAINT FOR DEFAMATION

Comes now, pro se Plaintiff David Stebbins, who hereby submits the following
Complaint against the Defendant John Doe for ten (10) counts of defamation.

### I: IDENTITIES OF THE PARTIES

1.      I am a YouTuber and Twitch streamer who goes by the alias "Acerthorn." My YouTube
channel can be found at the url of www.youtube.com/@acerthorn, and my Twitch channel can be
found at the url of www.twitch.tv/acerthorn.

2.      The defendant is an anonymous man who publishes on YouTube under the alias
SidAlpha. His YouTube channel can be found at the url of www.youtube.com/@SidAlpha. I do
not currently know his name or address, but he is a member of the YouTube Partner Program, so
this information can easily be subpoenaed from YouTube.

### II: JURISDICTION AND VENUE

3.      This Court has subject-matter jurisdiction grounded in diversity of citizenship. I am a
resident of the State of Arkansas, and SidAlpha is almost certainly a resident of a different state,
although I will have to get the subpoena from YouTube to know for sure. If, upon receiving the
subpoena response, it is confirmed that SidAlpha is also a resident of Arkansas, feel free to
dismiss this complaint without prejudice.

4.      This Court has both venue and personal jurisdiction because the Northern District of

-1-                                    Complaint

California is where the defamation primarily occurred. It happened on YouTube, which is a Californian website. Therefore, the defendant has established minimum contacts in the State of California.

5.     If the Court is not convinced yet that it has personal jurisdiction, consider this: Think about how this case would work if the Internet were not a factor. Imagine if SidAlpha created his hour-and-six-long minute video in the form of a documentary, and then reached out to a Californian TV station and solicited them to broadcast the documentary on worldwide television over the course of 2 hours with commercial interruptions. Obviously, such a case would be a slam dunk case for establishing minimum contacts in the state of California. Well, that principle does not change simply because the host in this case was a Californian website rather than a Californian TV station.

6.     Therefore, personal jurisdiction is valid in this court.

### III: FACTS OF THE CASE

### III-1: SidAlpha's smear video about me

7.     On February 12, 2022, SidAlpha posted a video ("the smear video") on his YouTube channel dedicated to smearing me. The video lasted 1 hour and 6 minutes, and can be viewed at the following URL: https://www.youtube.com/watch?v=WB-Xd1qDKIY

8.     This video was filled, almost from cover to cover, with false statements of objective fact about me. He rarely gave his personal, subjective opinion on matters, instead making statements of cast iron, objective fact about me that are either provably false, or are lies by omission, where he failed to disclose extenuating circumstances that severely reduce, and even outright eliminate, my culpability.

### III-2: Defamation #1: Issuing numerous DMCA Takedowns without considering fair use

9.     The most important accusation SidAlpha made against me was that I had issued numerous false DMCA Takedowns. This is the one that, more than any other act of defamation, has caused literally tens of thousands of people to harass and dox me to the point of nearly killing me (more on that in section III-13). Therefore, it is the one I should address first.

10.     All throughout the video, SidAlpha repeatedly stated that I had issued numerous

Complaint

fraudulent DMCA Takedowns against numerous creators. While it is true that I have issued several dozen DMCA Takedowns against numerous online content creators, he also claimed that I had failed to consider fair use before issuing them, and *that* is patently untrue.

11.     Prior to him publishing the video, I made it clear that I did not consider any of these videos to be fair use because the videos were designed solely to harass and dox me, rather than criticize my videos. This, in my opinion, amounted to the legal doctrine of "unclean hands," which, in my opinion, served as a counter defense to fair use. In reaching this conclusion, I did indeed consider fair use; I simply came to a determinate that SidAlpha personally disagreed with.

12.     On numerous occasions, prior to him publishing the video, SidAlpha even publicly admitted on Twitter that he conceded that I subjectively believed in the legitimacy of my own claims, but insisted that I still failed to consider fair use.

13.     It is important to note that SidAlpha was not simply giving his personal opinion on the matter. He was not accusing me of doing something merely shady; he was making the specific accusation that I had run afoul of the legal requirements set forth in 17 USC § 512(f) and Lenz v. Universal Music Corp., 801 F. 3d 1126 (9th Cir. 2015). This is evidenced on numerous occasions throughout the video, with such statements as …

    (a)     "The video *itself* must be designed *solely* to harass you in order to not be fair use" and

    (b)     "[Unclean hands] is certainly something that can come up in court, but it in no way negates the need to consider fair use."

14.     If he were just giving his personal opinion on the ethics and morals of my DMCA Takedowns (e.g. if he were to openly admit that I was acting lawfully but he personally believed I had a moral and ethical duty to make an even deeper consideration into fair use than what the law necessarily required), then his statements could not have been defamation. But then, if he had done that, his efforts to smear me would not have been nearly as successful, because at that point, he would have to abandon all pretense of me being the bad guy. At that point, he would be admitting that I am well within my legal rights, but was instead criticizing me for an alleged failure to follow some arbitrary "code of the boys" whereby he (SidAlpha in particular) gets to be judge, jury, and executioner over me. Very few people would have rallied against me just for

that alone, certainly not enough people to give me a literal life-threatening amount of stress and anxiety (again, more details to come in Section III-13).

15.     The simple bottom line is that I *did consider fair use*. He is simply butthurt that, while considering fair use, I did not come to the ultimate conclusion he, personally, feels I should have. My requirement to consider fair use was handily met in every single DMCA Takedown I have ever issued, literally every single last one of them. In fact, in the next few subsections, I will thoroughly demonstrate, not only why SidAlpha's interpretation of § 512(f) and Lenz v. Universal is inaccurate, but how his version of the law is entirely unworkable when taking the totality of the circumstances into account.

III-2-A: The DMCA only requires me to perform a nominal consideration of fair use.

16.     First, let's get the established law out of the way. In order to be legally clean under fair use, I do not have to provide an exhaustive consideration of fair use. In fact, I don't even have to provide an objectively reasonable one. The case law which establishes the need to consider fair use is Lenz v. Universal Music Corp., 801 F. 3d 1126 (9th Cir. 2015). However, in that case, Universal was not found liable because they performed an *inadequate* consideration of fair use; they were found liable because they made literally no fair use consideration whatsoever. It was a categorical, wholesale failure to consider fair use in any capacity. See Lenz, supra at 1134 ("Here, Lenz presented evidence that Universal did not form any subjective belief about the video's fair use — one way or another — because it failed to consider fair use at all, and knew that it failed to do so").

17.     In order to "consider fair use" in the eyes of the law,  my consideration of fair use need be neither accurate nor thorough. See Lenz, supra at 1134-35 ("If ... a copyright holder forms a subjective *good faith*[1] belief the allegedly infringing material does not constitute fair use, we are in no position to dispute the copyright holder's belief even if we would have reached the opposite conclusion ... a copyright holder's consideration of fair use need not be searching or intensive").

18.     In fact, even if my theory that unclean hands serves as a counter-defense to fair use was patently frivolous (which it's not, for reasons I will get into momentarily), my DMCA Takedowns based on that belief would still not be breaking the law. In fact, Stephanie Lenz

---

1   Emphasis in original

herself argued as much, only for the 9th Circuit Court of Appeals to explicitly shoot it down. See

Lenz, supra at 1134:

> "Though Lenz argues Universal should have known the video qualifies for fair
> use as a matter of law, our court has already decided a copyright holder need only
> form a subjective good faith belief that a use is not authorized. Rossi v. Motion
> Picture Ass'n of Am. Inc., 391 F.3d 1000 (9th Cir.2004). In Rossi, we explicitly
> held that the good faith belief requirement in § 512(c)(3)(A)(v) encompasses a
> **_subjective, rather than objective_** standard. We further held:
>
> In § 512(f), Congress included an expressly limited cause of action for improper
> infringement notifications, imposing liability only if the copyright owner's
> notification is a **_knowing_** misrepresentation. A copyright owner cannot be liable
> simply because an unknowing mistake is made, **_even if the copyright owner
> acted unreasonably in making the mistake_**. Rather, there must be a
> demonstration of some **_actual knowledge_** of misrepresentation on the part of the
> copyright owner.
>
> Neither of these holdings are dictum.
>
> As a result, Lenz's request to impose a subjective standard only with respect to
> factual beliefs and an objective standard with respect to legal determinations is
> untenable. Such a request grafts an objective standard onto § 512(c)(3)(A)(v)
> directly in contravention to Rossi. When enacting the DMCA, Congress could
> have easily incorporated an objective standard of reasonableness. The fact that it
> did not do so indicates an intent to adhere to the subjective standard traditionally
> associated with a good faith requirement."
>
> (emphasis added; quotations and most citations omitted).

19.     There is no two ways about this. The duty to "consider fair use" as outlined by Lenz is so

low of a legal threshold that it is honestly far more difficult to violate this law than it is to

comply with it. Only by utterly ignoring, wholesale, entire sections of **_the very case law_** that

SidAlpha and his followers cite in support of their accusations against me, can they possibly

reach the belief (good faith or otherwise) that I am breaking the law by issuing any of these

DMCA Takedowns!

20.     Therefore, my belief that (A) the individual infringers' videos were designed primarily to

harass and dox me, rather than critique my work, (B) this intent constitutes unclean hands, and

Complaint

(C) unclean hands is a counter-defense to fair use, is fully compliant with § 512(f)'s nominal requirement to consider fair use. Even if my belief was patently frivolous, the fact that I still held the belief in subjective good faith – a fact which SidAlpha has publicly admitted to – means that he is lying when he says that I broke the law when I issued these DMCA Takedowns.

### III-2-B: My belief in unclean hands is not patently frivolous.

21.     But even if the law were to be overturned tomorrow, and replace the subjective good faith standard in Lenz and Rossi with one of objective reasonableness, I still would have met that requirement, because my belief that unclean hands negates fair use as a matter of law is not patently frivolous.

22.     To show you what I mean, I offer one one of the most influential non-binding authorities on the subject of fair use: The legal treatise "Towards a Fair Use Standard" by New York federal district judge Pierre Leval. At one point in this treatise, Leval writes about the at-the-time rising trend in American federal courts that "fair use presupposes good faith and fair dealing."[2] In fact, at one point during that discussion, he even mentions unclean hands in particular! Specifically, on Page 1127, while discussing the history of how good faith came to be seen as a prerequisite to fair use, he explains …

> "A second misleading assumption is that fair use is a creature of equity. From this assumption it would follow that unclean hands and all other equitable considerations are pertinent." See Leval, P. (1990). Toward a Fair Use Standard. Harvard Law Review, 103(5), 1105. doi: 10.2307/1341457.

23.     Whether I, SidAlpha, the Court, or anyone else agrees or disagrees with Leval's interpretation of the law is irrelevant. The bottom line is this: If there was a rising trend in the 1970s and 1980s of federal judges considering bad faith as a counter-defense to fair use to the point where Judge Leval felt the need to publicly comment on this rising trend, then I cannot possibly be "patently frivolous" when I rely in good faith on those exact same trends to inform my actions. To be "frivolous" requires much, much more than just demonstrating that I am wrong.

24.     In fact, SidAlpha even admits publicly that my belief that unclean hands is a counter-

---

2   See Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 US 539, 562 (1985).

Complaint

defense to fair use is *not* patently frivolous. Earlier, in support of my allegation that he was accusing me of breaking the law rather than doing something he personally and subjectively considered to be immoral, I pointed out that he said "[Unclean hands] is certainly something that can come up in court, but it in no way negates the need to consider fair use."

25.     The fact that he admitted that it can "come up" in court (in other words … that it is germane to a copyright infringement lawsuit and a determination of fair use) constitutes an admission that my legal theory is not patently frivolous. Rather, he seems to believe that I am not allowed to consider that counter-defense when issuing a DMCA Takedown specifically, even if I could consider it at any other stage of a copyright infringement dispute.

26.     If any legal theory is patently frivolous, it is this one. First of all, if the court were to adopt this legal theory, it would create an impossible Catch-22 where I could theoretically prevail in a copyright infringement lawsuit but wouldn't be allowed to issue a DMCA Takedown in order to get the ball rolling therein. To the contrary, courts have consistently held that, whenever you prevail in a copyright infringement claim in court, that automatically and necessarily means that you instantly win any corresponding DMCA Misrepresentation claim as well. See Hosseinzadeh v. Klein, 276 F. Supp. 3d 34, 47 (SD NY 2017) (automatically dismissing the plaintiff's § 512(f)(2) claim after finding the defendants prevailed on the copyright infringement claim).

27.     In fact, that transitions to my next point: Earlier, I alluded that I would show that SidAlpha's interpretation of the law is not only wrong, but entirely unworkable. This is the point where I intend to do that.

28.     SidAlpha's interpretation of the law seems to be that, not only am I required to "consider fair use" before issuing a DMCA Takedown, but that I am *actively not allowed* to consider any potential counter-defenses, even if those counter-defenses can be relevant when brought up in court.

29.     This is, in a word, ludicrous, and to show you what I mean, I would like to draw from case law regarding false arrest and probable cause. This is not an unprecedented tactic on my end. For example, in the case of In re Aimster, 334 F. 3d 643, 651 (7th Cir. 2003), the 7th Circuit

Complaint

Court of Appeals pulled from case law concerning prostitution in order to illustrate their point regarding the vicarious liability of product sellers vs. service providers. So there is precedent for this tactic.

30.     In light of this precedent, I pray that the Court will indulge me when I proffer the Eight Circuit precedent of Kuehl v. Burtis, 173 F. 3d 646 (8th Cir. 1999), which held in pertinent part that "[a]n officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists." See id at 650. Much like Lenz, Kuehl only creates liability for those who *knowingly* and *completely* disregard this legal requirement. See id at 649 ("law enforcement officers are entitled to qualified immunity if they arrest a suspect under the mistaken belief that they have probable cause to do so").

31.     In other words, a police officer who is investigating a murder, for example, is required to consider self-defense. On the whole, this seems like a fair and just law, does it not?

32.     Well, imagine if a police officer not only had to consider self defense, but *actively wasn't allowed* to consider any counter-defenses to self defense, such as excessive force or a failure to attempt to retreat. This means that a person could absolutely be legally guilty of murder, and everyone would know it, but the police could not legally arrest the killer due to a technicality, which means he cannot be indicted, which means he cannot be convicted.

33.     Obviously, that's not how it works. In fact, such a legal theory is ludicrous on its face. Even a layman who attempted to argue that would be openly laughed at, and a defense attorney who unironically attempted to argue that in court would likely face sanctions by the judge and even potentially the bar.

34.     And yet, that is basically what SidAlpha unironically argues is the law when he says that I still have to "consider fair use," even when I have a nonfrivolous and objectively reasonable[3] belief that fair use doesn't apply. If anyone's legal theory is frivolous, it's his.

35.     For that matter, the consideration of a counter-defense is indeed consideration of fair use/self defense. To show you what I mean, consider this hypothetical scenario: Imagine if someone sets up an Internet livestream in his basement, where someone is gagged and tied to a

_____

3   By his own admission. See ¶¶ 24-25 of this Complaint.

chair. This man states that this person had broken into his home in order to rob him. He then proceeds to kill his alleged burglar in the slowest and most gruesome manner imaginable, over the course of an entire hour.

36.     When the police confront him about this livestream, he again insists that the victim was breaking into his home. However, a third party witness tells the police that he saw the killer assault the victim, place him in the trunk of his car and drive off just a few minutes before the stream began. So who is telling the truth? The witness, or the killer? Well, in this case, the police might, quite reasonably, determine that *it doesn't matter* who is telling the truth, because even if the killer was right, his actions on stream were still so extreme and over the top that any claim he might have had to self-defense is lost due to the counter-defense of excessive force.

37.     In that case, the police would have made a determination on a counter-defense before making a determination on self defense in the first instance, and yet, nobody in their right mind would legitimately argue that the police had "failed to consider self defense." Sure, some police departments might choose to document self defense in the first instance, for the sake of posterity and thoroughness, but that doesn't mean that citizens have a constitutional right to have it be documented when it is already a foregone conclusion that it won't affect the ultimate outcome of the decision to arrest him or the likelihood that he will be convicted.

38.     Along that same vein, whenever I am contemplating filing a DMCA Takedown, whenever I determine that unclean hands nullifies fair use, that is still legally the equivalent of considering fair use. Any contrary holding is simply unworkable and would actively cause more problems than it would solve.

### III-2-C: The requirement to consider fair use is not absolute.

39.     But for the sake of argument, let's assume that Lenz still creates an affirmative duty to consider fair use. This requirement is clearly not absolute. It is clearly only meant as a default legal requirement, but it is not a rock-solid and impenetrable legal duty. For example, I'm pretty sure that, if someone were to put a gun to my head and force me to issue a DMCA Takedown without considering fair use first, I would be legally exempt from the requirement to consider fair use.

-9-                                                           Complaint

40.     Obviously, that's an extreme example, one that will almost certainly never actually happen in real life. However, by conceding to even that much, you are conceding that the requirement to consider fair use is, in fact, not absolute, and that there are certain circumstances where I would be exempt from this requirement.

41.     One scenario that is reasonably likely to actually happen is when *full* consideration of fair use (the kind which SidAlpha advocates for, as opposed to the *nominal* consideration of fair use that Lenz actually requires) would be a threat to my health. Remember that mental health is still a type of health.

42.     As I have made clear, both in this Complaint and many, many times prior to SidAlpha publishing his smear video, that I have been the victim of widespread harassment, doxxing, and many other cyber attacks. I have also made it clear that the surge of allegedly fair use videos about me were primarily designed to continue this pattern of harassment and dogpiling.

43.     In order for me to make a *full* (as opposed to nominal) consideration of fair use, I would obviously have to watch the videos in question from cover to cover. Otherwise, how could I possibly understand the full context in order to weigh the four factors of fair use?

44.     But in doing so, I have just willingly exposed myself to harassment and threats that would be heavily taxing on any reasonable person's mental health. Historically, this speech has been protected by the First Amendment, despite its ability to harm people's mental health, on the basis that those who don't want to experience the speech can simply avert their eyes and ears away from it. See Cohen v. California, 403 US 15 (1971). However, if I am forced to sit and watch the video in order to "properly" consider fair use, I obviously cannot do that. At that point, I am being held as a captive audience to the harassment, which causes it to lose its First Amendment protection.

45.     So which is it? Do I have to consider fair use no matter what, at which point I am a captive audience to the harassment? Or do I have the duty to avert my eyes and ears away from speech that threatens my mental health, at which point I literally cannot (and therefore should not be required to) consider fair use to the standards that SidAlpha believes are required? Pick your poison.

Complaint

<u>III-2-D: Wrapping up the first count of defamation</u>

46.      To bring the first count of defamation to a close, the defendant defamed me by accusing me of breaking the law. It would have been one thing if he had simply given his pure opinion. But he made it crystal clear that he was accusing me of breaking the law. However, if you're going to accuse someone of that, you have to make sure you get the law right, otherwise it is just as much defamation as if you had gotten the facts wrong. For example, if a widowed woman publicly accuses me of murdering her husband, and insists that it *wasn't* self defense, but her belief that it wasn't self defense is based on an egregious misunderstanding of how self defense law actually works, she is still defaming me. At best, said accusation could be considered a "mixed opinion," which is still actionable as defamation.

47.      Of course, as we will soon see, SidAlpha still misstating many of the facts, as well as the law.

48.      As it stands, SidAlpha had to egregiously lie about my legal obligations in order smear me far more than he would have if he had simply given his opinion about the ethics or morals of my DMCA Takedowns, acknowledged that they were legal but he considered them untenable. If he had done so, he would have been legally protected. But at the same time, only a handful of exceptionally malicious people would have rallied against me for doing that, many of whom don't care about the law at all and are just looking for an excuse (any excuse) to harass or dox someone just because they can, and who are completely indifferent to the risk of committing the felony of cyberstalking in violation of 18 USC § 2261A(2).

49.      This is the count of defamation that has most tarnished my reputation. Therefore, it is the one I spent the most time discussing. All other counts of defamation will be significantly smaller.

**III-3: Defamation #2 - Issuing a false DMCA Takedown against SkibbityDibbity**

50.      This is also one where SidAlpha publicly accused me of filing an illegal DMCA Takedown Notice, but his basis for claiming it was fraudulent is different than me not considering fair use, so it needs to be discussed separately.

51.      On December 18, 2021, I arranged to do a collaborative, livestream debate with another YouTuber who goes by the alias "SkibbityDibbity," or just "Skibbity" for short.

Complaint

52.     During this livestream, Skibbity spoke a lot of lines, but I was the one solely responsible for fixing the debate stream into a tangible medium of expression. This means that I am the sole copyright holder of the stream. See Community for Creative Non-Violence v. Reid, 490 US 730, 737 (1989) ("As a general rule, the author is … the person who translates an idea into a fixed, tangible expression entitled to copyright protection").

53.     After this collaborative livestream concluded, Skibbity contacted me over email, announcing that he was going to post the stream on his own YouTube channel. This email also stated "because I was part of the stream you literally cant do anything to me so dont expect to take it down."

54.     In other words, Skibbity appears to believe that, just because he appears in the video in some capacity, that automatically means the stream was a "joint work," and that he is a co-author, thereby entitling him to distribute the video as he sees fit.

55.     This is not how the law works. See Garcia v. Google, Inc., 786 F. 3d 733, 744 (9th Cir. 2015) (citing Community for Creative Non-Violence v. Reid) ("Garcia's copyright claim faces yet another statutory barrier: She never fixed her acting performance in a tangible medium, as required by [copyright law] … For better or for worse, Youssef and his crew 'fixed' Garcia's performance in the tangible medium … However one might characterize Garcia's performance, she played no role in fixation"). See also https://www.youtube.com/shorts/JIFwhQ0OMB8 ("Just because you're the subject of a [work] doesn't mean that you own the underlying copyright"). So, as you might expect, I promptly issued a DMCA Takedown against him, and the video was taken down by YouTube a short time thereafter.

56.     Despite me explaining this to Skibbity, SidAlpha, and their allies on multiple occasions, and providing the same legal citations as I provided in ¶¶ 52 & 55 (sans the YouTube video, which didn't exist at the time), SidAlpha nonetheless accused me of filing a fraudulent DMCA Takedown against Skibbity during the smear video. During this section of the smear video, he gave the exact same logic and legal arguments that Skibbity gave in ¶¶ 53 & 54, stating that the stream was a joint work, solely by reason of Skibbity being part of the stream, and that this meant that Skibbity had the legal right to upload the video to his own channel.

Complaint

57.     Just like last time, SidAlpha's willful ignorance of the law forms the basis for the defamation claim. This time, however, his inaccurate reciting of the law is even more inexcusable. At least with fair use, the law is a muddy mess of concepts that requires tribunals to look at the totality of the circumstances. But here, the law is as clear and bright-line as anything in the law can reasonably be expected to be. SidAlpha's public accusation against me was made, either knowing that the law was on my side, or actively burying his head in the sand on the issue.

### III-4: Defamation #3 - Falsely overstating the injury I inflicted on xArtemisWolf

58.     While he is defaming me regarding whether or not my DMCA Takedowns were fraudulent, in this instance, he also lied about the scope of the harm I inflicted, legally or otherwise, on one of my targets. For example, suppose someone accuses me of assaulting someone else. In addition to falsely claiming that the assault was not self-defense, the accuser also publicly says that I beat my victim within an inch of his life, when in fact all the victim really got was a black eye and a broken nose. Is that also defamation? If so, then SidAlpha also defamed me in this instance as well.

59.     During the smear video, while discussing my DMCA Takedowns that he considered to be fraudulent, he claimed that one of the people I had issued a DMCA Takedown against – who goes by the alias xArtemisWolf – had accumulated three copyright strikes on her YouTube channel and therefore had her channel terminated pursuant to 17 USC § 512(i)(1)(A).

60.     This much is technically true. However, less than 24 hours after xArtemisWolf's channel was taken down, she simply created another one. In doing so, she undid 99.99% of the harm inflicted upon her by me, legally or otherwise, in an exceptionally short amount of time. This second channel is still active to this day, and can be viewed at the url of https://www.youtube.com/@xArtemisWolf.

61.     SidAlpha lied by omission when he failed to include this fact. By omitting this fact, he egregiously overstated the injury that xArtemisWolf actually suffered.

62.     On February 15, 2022, SidAlpha admitted to me, over private email, that he knew about the creation of the new channel. Instead, he insisted that (A) my actions were wrong as a matter of principle, and (B) her having a second channel does not hurt anybody.

Complaint

63.     In admitting to these two things, SidAlpha admits that he knowingly lied when he
omitted this fact. Furthermore, he appears to implicitly concede that (A) most people would be
significantly less angry at me if they knew the full truth and how much she had managed to undo
99.999% of the damage done to her in less than 24 hours, and (B) he intentionally withheld this
extenuating circumstances for that exact reason, specifically in order to maximize the amount of
public outrage against me.

### III-5: Defamation #4 - I offered to pay to dox InitiativeKookie

64.     Aside from the false allegations of DMCA fraud, this is perhaps the most important count
of defamation included in this complaint, because this is the one thing I allegedly did that
supposedly began the entire domino effect of everyone harassing and dogpiling me. While my
DMCA Takedowns form 90% of the public outrage against me, this is the one that started it all.
In other words, were it not for this accusation, 90% of all other public outrage against me – even
that which is based on true statements against me – would cease to exist like a grandfather
paradox.

### III-5-A: What is doxxing?

65.     First, we must ask ourselves: What exactly does it mean to dox someone? And what is the
difference between doxxing someone and simply talking about him in a way that just so happens
to also reveal his true identity?

66.     Prior to the smear video, I complained that I was being doxxed by many people and many
YouTube channels. During the smear video, SidAlpha attempted to counter this complaint by
pointing out that all of my personal information is available publicly via a simple Google search,
and that nobody broke any laws by acquiring this information. In other words, SidAlpha appears
to believe that, as long as the information is already publicly available in any capacity, and that
people are able to procure the information without violating the law in its own right, then it is
automatically not doxxing to share the information for literally any purpose whatsoever, even if
the information can be used to identify me personally. However, the definitions I am about to
give – which come from disinterested, professional sources – clearly show otherwise.

67.     The website of merriam-webster.com (the official website of the Webster Dictionary)

defines "dox" as "to publicly identify or publish private information about (someone) especially as a form of punishment or revenge." See https://www.merriam-webster.com/dictionary/dox. This, in turn, begs the question … what counts as "private" information?

68.     Well, when we go to that site's page for the word "private" (found here: https://www.merriam-webster.com/dictionary/private), it contains many definitions for the word "private" as an adjective. However, these multiple definitions are grouped into four general categories. Categories 2 and 4 are entirely inapplicable to the instant case. However, while category 3 does indeed seem to define the word "private" as adjective to mean "the opposite of public," category 1 includes such definitions as "intended for or restricted to the use of a particular person," "belonging to or concerning an individual person," and "restricted to the individual." For the remainder of this complaint, whenever I use the word "private" and need to specify which category of definitions I am referring to, I will say "private1" to refer to the first category of definitions, and "private3" to refer to the third category of definitions.

69.     So what version of private does merriam-webster.com use when giving the definition of "dox?" Does that definition refer to private1 or private3? Well, I would argue that it refers to *both* definitions. In other words, the information being published by the publisher only has to fit into one category, not both, in order for the publication to be considered "doxxing."

70.     If we absolutely have to pick between private1 and private3 to be the one sole, iron-clad meaning of "private" for purposes of determining whether someone is being doxxed, then I believe that private1 we use. This is evidenced by the definition given by another dictionary website, this time simply called dictionary.com. That website defines the word "dox" as "a person's identifying information, [such] as address, phone number, name, or alias, when maliciously posted online to target that person for pranks, fraud, or other harassment." See https://www.dictionary.com/browse/dox. The use of the words "identifying information, [such] as address, phone number, [or] name" clearly indicate that private1, not private3, is meant to be the true meaning of "private" for the purposes of defining the act of doxxing.

71.     But here's the real gut-punch to this whole controversy: At the end of the day, it ultimately doesn't matter! Yes, even if private3 is the exclusive meaning of "private" in the

Complaint

definition of the word "dox," that is ultimately a minor detail in the grand scheme of things. Why? Because the *real* element of the definition of "doxxing" isn't whether the information was public or private to begin with; it's the motive behind the act of publishing it.

72.    Bear in mind … the *reason* doxxing is considered immoral and unethical is because it is a form of harassment. So what counts as harassment? Well, harassment can take on many, many forms. However, the most essential element for harassment is the fact that the harassers engage in their harassing conduct *solely* to harass. If there is any legitimate motive behind their conduct, such as news coverage , debt collection, or law enforcement, then it is not harassment, even if the subject of the conduct *feels* harassed by it. It only becomes harassment when the person committing the act does so *exclusively* to inflict as much pain and suffering on his target as possible, entirely for its own sake.

73.    As an example, allow me to present a clip from a famous country music song, called "How Do You Like Me Now" by Toby Keith. You can view that music video at the following url: https://www.youtube.com/watch?v=3umaLe37-LE. At timestamp 0:56 - 1:14 of that video, Toby talks about how he wrote his high school crush's phone number on the football field, followed by a sexually provocative message.

74.    If this happened on the Internet, it would be doxxing. Toby obviously broke no laws in acquiring her phone number (though he obviously committed a crime by breaking into the stadium, that's a different law entirely that has nothing to do with doxxing someone). He probably got the number through the simple expedient of looking it up in the phone book.

75.    But that's not the point. The point is that he *used* this otherwise-lawfully-obtained information, not for any legitimate purpose, but in order to pull an extremely cruel and malicious prank on this girl.

76.    That right there is the biggest factor that causes your actions to go from legitimate use of someone's personal information, to malicious and immoral doxxing.

77.    So, with that finally being thoroughly explained, let's finally take a look at what SidAlpha accused me of doing.

Complaint

### III-5-B: The defamation

78.     On March 21, 2021, I was being harassed and cyberstalked across multiple websites by a person who goes by the alias InitiativeKookie. So on March 1, 2021, I published a video on my YouTube channel that has since been removed, where I publicly requested assistance from anyone willing to help in locating this individual so I can either sue him or report him to the police for cyberstalking under 18 USC § 2261A(2). I also offered a fee of $100 to anyone who adequately did this job for me.

79.     The service I was requesting was fundamentally no different than what this private detective was offering on this website, only at a much lower price than what they would charge: https://www.nathans-investigations.com/cyber-harassment-investigations/. Alternatively, the assistance I publicly requested was fundamentally no different than what this woman was publicly requesting from her own fanbase: https://www.youtube.com/playlist?list=PLpL3n7W6QqgDavHIknoPUxa-eRP5LP67Y.

80.     However, during my own video, I explicitly made it clear that (A) I did not want anyone to break the law in order to acquire this information, (B) I only wanted this information so I could hold him accountable for the harassment, (C) I would only *use* his information for that sole, exclusive purpose, and (D) I would not post his information anywhere on the Internet. Therefore, it was not doxxing, because I had a legitimate motive behind the conduct (law enforcement), rather than just to inflict pain and suffering for its own sake.

81.     Despite this, during the smear video, SidAlpha publicly accused me of trying to dox InitiativeKookie. He explicitly used the word "dox" in order to stir up as much public outrage against me as possible To support his accusation, he only played brief excerpts from my video that only showed the parts where I offered to pay money in exchange for InitiativeKookie's real name and address, completely omitting the parts of that video mentioned in ¶ 80 above that kept my behavior from being doxxing. There was no reason for omitting these details, other than just to falsely paint me as a doxxer. If he had included these details, and especially pointed out the similarities between what I was publicly requesting and the legitimate law enforcement that I described in ¶ 79, he wouldn't have been able to turn the masses against me, except for a handful

-17-                                                                    Complaint

of exceptionally malicious people, and he knows it.

### III-6: Defamation #5 - I tried to bully him (SidAlpha) personally

#### III-6-A: The defamation

82.    On at least two occasions during the smear video, SidAlpha stated that I attempted to "intimidate" or "bully" him in an attempt to get him not to publish the smear video. This is blatantly false. The "bullying" that he is referring to is a private email sent to him on January 16, 2022, where I said the following to him:

> "I doubt this will do very much good, since you seem to already have your mind made up about me. But I feel compelled to at least try.
>
> People have been sending you highly cherry-picked information about me, and you have been regurgitating it on your Twitter account, almost verbatim. You should have reached out to me and asked for my side of the story first before you just assumed that what you were getting was the full picture.
>
> Please cease and desist."

83.    That was the entire email. I did not remove anything for this Complaint, so there is no possibility that I lied by omission just now.

84.    No reasonable person could possibly look at that email and assume that I was attempting to bully or intimidate him. In fact, I wasn't even demanding that he not spread his smear content about me. Literally, all I asked was that he *hear my side of the story before doing so*. There is nothing even remotely unreasonable about such a request.

85.    Therefore, SidAlpha defamed me when he accused me of trying to bully and intimidate him.

#### III-6-B: General showing of actual malice

86.    In addition to that, SidAlpha's refusal to hear my side of the story before committing to making the smear video is an act of actual malice for purposes of defamation law, with regards to all other counts of defamation in this Complaint. It would have been extraordinarily easy for him to reach out to me and get my side of the story before posting the smear video, but he made the conscious choice not to, not due to any logistical difficulty in doing so, but simply because he didn't think I was worthy of his time. For this reason, he should be presumed to have acted in

Complaint

"reckless disregard as to the truth" of any matters which I could easily have provided to him, had I been given the opportunity to do so.

### III-7: Defamation #6 - I will sue literally anyone for literally any reason

87.     This one requires me to walk a rather tight rope. After all, couldn't the very fact that I am filing this very lawsuit only serve to prove, in the minds of the defendant and his allies, that this statement made about me was correct?

88.     To that end, I offer the precedent of Rhodes v. Robinson, 408 F. 3d 559, 569 (9th Cir. 2005)[4], which holds in pertinent part …

> "The district court's further holding that Rhodes's filing *this very lawsuit*[5] somehow precludes relief ... goes even further afield. Indeed, were we to adopt such a theory, ... plaintiffs would be stuck in an even more vicious Catch-22. The only way for a[ plaintiff] to obtain relief ... would be to file a federal lawsuit; yet as soon he or she does so, it would become clear that he or she cannot adequately state a claim for relief. Like its fictional counterpart, this catch exudes an elliptical precision about its perfect pairs of parts that is both graceful and shocking. Unlike Colonel Cathcart, however, we are unwilling to indulge a rule that would result in the anomaly of protecting only those individuals who remain out of court." (citations and quotations omitted).

89.     Another case that is slightly more on point would be the case of Hosseinzadeh v. Klein, 276 F. Supp. 3d 34 (SD NY 2017), which was cited earlier in this Complaint. In that case, Hosseinzadeh sued for defamation, claiming that Klein falsely over-exaggerated his willingness to sue at the drop of a hat. However, while the District Court ultimately ruled in the defendants' favor, and one of the biggest reasons for said ruling was a private email containing a threat of litigation (see id at 48), one thing that neither the Court nor even the defense appeared to entertain was the notion that the very filing of that defamation lawsuit in the first instance necessarily proved the defendants' public accusations of the plaintiff's litigiousness to be true, and therefore not defamatory. Apparently, the idea of that Catch-22 was so ludicrous on its face that even the defense counsel did not see fit to seriously make an attempt to argue it.

90.     So, the very fact that I have filed this very lawsuit cannot be used to disprove my claim of

---

4   Although this case law pertains to prisoner civil rights, rather than defamation, it is no less valuable as persuasive precedent than my offering of Kuehl v. Burtis above, or the 7th Circuit Court of Appeals' use of prostitution case law in the case of in re Aimster.
5   Emphasis in original

defamation. But that still begs the question: Did SidAlpha even defame me in the first place?

91.     To answer that question, we must first understand what exactly he publicly accused me of. Unlike in Hosseinzedeh v. Klein, he didn't just accuse me of suing people "when [I'm] criticized" (supra). He publicly stated that I will literally sue *anyone* for literally *any reason* whatsoever, no matter how big or small, no matter how much they were legally in the right to do what they did, not just that I will file suit if I genuinely believe in good faith that I have been legally harmed, but even if they did me a good deed, I will still find some reason, *any* reason, to sue them for it. He is not simply saying that my propensity for litigation is above average; he is saying that propensity for litigation is literally infinite.

92.     Indeed, many people have even assumed as much, and began harassing me accordingly while hiding behind the anonymity of the Internet like cowards. Examples of the types of harassment include, but are not limited to, the following:

(a)     At one point, the video game Minecraft was adding a new patch to its game, called "version 1.19." At the time, I was confused about the way I had Minecraft, developed by Mojang Studios, installed on my computer, and I was concerned that I may not be able to get the new version of the game. So I posted on the website Reddit, asking as much. People who monitor my social media like vultures immediately responded to the post, saying "If they don't give it to you, are you going to sue them" and "if Mojang doesn't give you the new version, you should knife them in the face." Bear in mind that Mojang's EULA explicitly states that the game's service is provided as-is, meaning I have no recourse if the game stops working for any reason, and even barring that, I would still have access to version 1.18 of the game. Despite me understanding both of these things, everyone assumed that I would simply sue them if I didn't get exactly what I wanted.

(b)     In April of 2022, I was hospitalized with a lethal case of pneumonia. When I got out, I made a post on YouTube explaining that I was hospitalized and that's why I hadn't made any videos in a while. People immediately began asking me if I was going to sue the hospital. Sue them for what?! They literally *saved my life*! But because they were told that I literally sue anyone who crosses my path for literally any reason or no reason, they automatically

accused me of wanting to find literally any excuse I could find in order to sue them.

93.    There are plenty of other examples besides these. As you can see from these examples, the description given in ¶ 90 of what he accused me of is not hyperbole. Rather, the public accusations themselves are the true hyperbole. Unlike Hosseinzadeh's case, this public accusation is much more outlandish and, therefore, much easier to disprove. All I have to do is provide a handful of circumstances where people or corporations have done me dirty, in any capacity, in the past decade, where a person who really was super-litigious would have filed suit (if only in small claims court), but where I didn't, and this public accusation is proven false.

94.    I can very easily provide multiple examples of times when I could have filed suit, and maybe even have had a nominal case, but didn't, including but not limited to …

(a)    The last three times I was let go from my job,

(b)    One time, in 2016, when a computer I had purchased online broke down less than 90 days after purchase, and the retailer who sold the computer insisted that the warranty was only for 30 days when it clearly said 90 days, as an excuse to not have to foot the bill to repair or replace it.

(c)    Being denied admission into my local community college for reasons I considered to be discriminatory.

(d)    The countless women who have refused to go on dates with me.[6]

(e)    The countless, countless times a stranger walked passed me on the sidewalk without saying or doing anything to me, or a cashier at the grocery store rung me up, without me finding literally any excuse whatsoever to sue them for something, no matter how contrived.

95.    Again, there are plenty of other examples besides these. Rather, my external perception of being exceptionally litigious comes, not from me actually feeling entitled to things I am not entitled to, but because people like SidAlpha and his allies hear about my alleged litigiousness, proceed to harass me to no end as punishment for being so litigious (and, in the process, taking the law into their own hands to boot), forcing me to file suit to try and get the harassment to stop. It's basically the Internet equivalent of hearing rumors that I am a trigger-happy person who

---

6    And if you think that a truly litigious person would not sue for that, take a look at this  news article: https://www.usatoday.com/story/news/nation/2022/07/21/michigan-woman-sues-man-date/10115610002/

Complaint

shoots people at the slightest disagreement, trying to attack me in my own home as punishment for this alleged trigger-happiness, getting shot for burglary, and then using that as so-called "proof" that I am indeed as trigger-happy as the rumors claim. We will definitely be going into this in more detail when we get to Section III-9.

96.     For time being, however, suffice it to say that SidAlpha's accusations of how litigious I am are extremely over-exaggerated, and therefore defamatory.

**III-8: Defamation #7 and #8 - I expect to be shown civility while reciprocating none of that civility. Also, anyone who disagrees with me for any reason is automatically harassing me, in my opinion.**

97.     This is another instance where he makes a public accusation that is so outlandish and over-the-top that it is very easy to disprove. These two counts of defamation will be addressed at the same time, because they can be disproven with the same counter-evidence.

98.     During the smear video, SidAlpha publicly stated that I refused to show any civility to anyone, but expected everyone to show civility to me. In other words, he accused me of holding myself to a blatant double standard.

99.     Also, he accused me of thinking I am being harassed any time anyone disagrees with me, for any reason, no matter how civilly. This is not simply his opinion; he is telling everyone what *my* opinion is. At least in Hosseinzadeh, supra, the allegedly defamatory statement began with the words "I think," thereby qualifying it as "a quintessential statement of pure opinion." See id at 47. SidAlpha's accusation against me did not include that language. In other words, when he accused me of having this opinion, he is making a statement of cast-iron objective fact. I either have that opinion or I don't.

100.    Both of these accusations are extraordinarily easy to disprove. There are multiple comment threats on my YouTube channel where people have disagreed with me, and I have accept the disagreement with grace and civility. There are also plenty of instances where two or more people were arguing with each other in the comments of my videos, and I swooped in and told the person *defending me* to knock it off, because the other guy was merely exercising his right to civilly disagree with me. Here are just a few comment threads to this effect:

(a)      https://www.youtube.com/watch?v=TQmrAv9cP-

k&lc=UgzGukaHfeyHyhqgT794AaABAg

(b)      https://www.youtube.com/watch?

v=lgW8vsiRKcw&lc=Ugz0u0T_fUsIEbFeIgd4AaABAg.8iSO-d5J1Lb8iTTVxxzHxB[7]

101.    And there are plenty more where that came from.

102.    Rather, my allegedly uncivil retorts were done in response to genuine harassment,
genuinely uncivil criticism (including cuss-filled insults), and objectively inaccurate statements
of fact surrounding said criticism that border on defamation themselves.

103.    Therefore, because SidAlpha egregiously underestimated the threshold before I consider
their criticism to be harassment, he defamed me by painting me as far more thin-skinned than I
actually am.

### III-9: Defamation #9 - Losing my temper against other YouTubers while undermining, or ignoring completely, the fact that they provoked me into this response.

104.    This count of defamation ties nicely into the last two sections. In order to make his
accusations against me *appear* justified by the evidence, he has to either severely undermine, or
outright ignore, all the actions that his allies took in order to provoke me into this response.

#### III-9-A: Reactive Abuse

105.    Psychologists and other behavioral science experts actually have a term for this
phenomenon: "Reactive abuse." It is honestly a misnomer to call it "abuse," because it is no
more a type of "abuse" than self-defense is a type of murder. In laymen's terms, it means that a
person (the abuser) targets another individual (the target) for prolonged harassment and torment.
Each individual act of harassment, taken in isolation, may seem banal and insignificant to an
outside observer. However, it is not simply one or two incidents happening in isolation. The
abuser keeps it up over an objectively unreasonable period of time. They harass and harass and
harass you, until you push back and defend yourself. They do not let up. They will pick pick pick
pick pick pick PICK at you, until you completely lose your mind. So now, at this point, the target
has lost his mind. He's yelling. He's screaming. He's completely done with the abuser. So now, in

---

7   In this thread, it appears that King_Derpy has deleted his comments. However, the comments from Morogoth
     and myself clearly show that King_Derpy's comments used to exist.

this moment, the abuser calms down, centers himself, and says "Look at you. Look at how toxic and abusive you are. It's just like I said. You're completely out of control." They then proceed to tell third parties (e.g. police, co-workers, or in this case, other YouTubers and the general public) the same thing.

106.    Here are few online sources to give the Court a brief introduction to reactive abuse:

   (a)    https://www.choosingtherapy.com/reactive-abuse/

   (b)    https://www.aconsciousrethink.com/18895/reactive-abuse/

   (c)    https://breakthesilencedv.org/reactive-abuse-what-it-is-and-why-abusers-rely-on-it/

   (d)    https://www.garbo.io/blog/reactive-abuse

107.    In order to be effective and achieve the intended result, reactive abuse necessarily requires the abuser to lie by omission, if not outright lie completely. The goal is to convince everyone else that the target is in fact the real abuser, and in order to do that, the abuser must make it seem like the target's reaction is entirely unprovoked and completely out of nowhere. If the abuser told the whole truth (that the target's reaction was the result of weeks and weeks, if not months and months, of sustained – and entirely unjustified – harassment and torment by the abuser), nobody would side with the abuser. So the abuser has to lie (by omission or otherwise) in order to get people to side with him and rally against the target.

108.    In other words, reactive abuse necessarily involves defaming the target.

<u>III-9-B: SidAlpha's defamation</u>

109.    So with that explained, how did SidAlpha defame me in this instance? Well, he publicly accused me of acting in an exceptionally aggressive and hostile manner towards his own allies. One specific example he gave was when I sent a private email to SkibbityDibbity (the man who I had the debate stream with, which formed the basis for Defamation #2 in this Complaint), where I told him "By all means, issue that DMCA counter notification. By all means, give me an excuse" in response to one of his rants about my alleged DMCA abuse. According to SidAlpha, the phrase "give me an excuse" was crossing the line.

110.    However, in doing this, SidAlpha completely ignored the literal dozens of messages sent to me by Skibbity, both over email and on Discord, cussing me out and calling me nearly every

-24-                                                                                              Complaint

name and insult he can think of (including, but not limited to, "idiot," "sperg," "lunatic," "coward," "disgrace," "loser," "manchild," and "pathetic douche"), repeatedly creating new accounts after I blocked his old ones in order to continue harassing me, and generally all-around being exponentially more toxic and crossing many more personal lines with me than I ever acted towards him.

111.    SidAlpha completely omitted all of Skibbity's behavior in order to portray me as some overly-aggressive and bitter man who treats everyone with rancor and disrespect by default. In doing so, he defamed me by lying by omission, by claiming that my reactive abuse was instead entirely unprovoked.

112.    Then, there was the harassment inflicted upon me by InitiativeKookie. Unlike with the argument with Skibbity, SidAlpha at least paid lip service to the harassment done by InitiativeKookie. However, he only acknowledged a very small portion of the harassment inflicted upon me. Entire weeks worth of unsolicited harassing messages would be glossed over in only 1-2 sentences. The net result was to make it appear that I was making mountains out of molehills. While a reasonable person, watching the smear video, would not believe that my reactive abuse came entirely out of thin air, per se, he would assume that I had an egregious overreaction to something that wasn't all that big of a deal.

113.    This still qualifies as defamation. Because SidAlpha omitted a vast majority of things that InitaitiveKookie did in his malicious campaign to push me over the edge (including, but not limited to, sending countless harassing messages over email, Discord DM, Reddit DM, and Twitch's live chat, creating countless throwaway accounts to get around when I blocked him on various platforms, hacking into and sabotaging my YouTube channel, and hacking into and sabotaging my Discord server), SidAlpha falsely and maliciously painted me as much more sensitive and thin-skinned than I actually am.

114.    Now, maybe you could argue that SidAlpha reported on what he genuinely believed to be the full story. He only reported on what he was able to find. Well, to that end, I defer you to the arguments contained in Section III-6-B of this Complaint.

### III-10: Defamation #10 - I was convicted of domestic battery.

Complaint

115.    The last count of defamation I wish to bring suit for include a statement that, in 2011, I was arrested and indicted for domestic battery.

116.    While this is technically true, it is important to note that I was exonerated of that charge. I was not merely found not guilty on a technicality, like O.J. Simpson in 1995. My charges were dismissed under conditions that included the State affirmatively admitting that the underlying conduct did not occur, and without me being even so much as "officially" convicted (in name only, or otherwise). In addition, the records of the case were sealed against public inspection, meaning that nobody except judges and prosecuting attorneys would have any first-hand evidence (except for the  news articles and other sources written at the time the charges happened) that the criminal case ever even happened in the first instance.

117.    The prosecution agreed to dismissal under these terms after it was pointed out in a motion to suppress evidence that their case was actually so terrible that it is honestly a miracle the prosecuting attorney didn't become a laughingstock as a result of it. Flaws in the prosecution's case include, but are not limited to, (A) the fact that the alleged victim in this domestic battery case never even went to the hospital for his injuries, despite allegedly being *literally stabbed in the face*, and (B) when the police confiscated the knife that was allegedly used, my fingerprints were not found on the knife's handle!

118.    Instead, the prosecution's sole evidence against me was the fact that I had committed some entirely unrelated act of domestic battery many years ago … an act of battery that I was never never even charged with in the first place, let alone convicted of. And when I say "many years ago," I meant it was almost as long ago, at the time of the 2011 battery charge, as the 2011 charge is to us today. This alleged battery (and I say "alleged" because I was never even so much as charged) happened in a completely different state than the 2011 alleged battery happened, and I was not even old enough yet to even be tried as an adult (meaning I was on another plane of criminal accountability to begin with).

119.    Despite the extraordinarily distant connection between that past event and the at-the-time current one, the prosecution in the 2011 case nonetheless planned to use that past, unproven event as a substitute for any/all objective evidence that I was guilty of the 2011 battery. He

Complaint

wasn't simply adding this past event as a cherry on top of an already strong case; he was actively forgoing any other evidence because, in his view, the fact that I committed this other battery necessarily meant that I acted in a similar manner on this particular occasion as well. Under both Arkansas and Federal[8] Rules of Evidence #404, this past event is wantonly inadmissible for this purpose, and yet the prosecution in my 2011 case decided to use that previous event as a complete substitute for any/all objective evidence of the contemporary criminal accusation, in place of hospital records, fingerprint forensics, or literally any other kind of actually probative evidence whose admissibility cannot be disputed.

120.     Like I said, it was a miracle the prosecutor didn't become a laughingstock.

121.     When documenting my 2011 criminal charges in the smear video, SidAlpha completely omitted all of the facts mentioned in ¶¶ 116-119. This constitutes defamation because SidAlpha lied by omission. Who cares if someone was charged with a crime he was later exonerated of? Who is going to rally against someone just for that? Even if, sometimes, the public may still suspect guilt even after acquittal (like in the case of OJ Simpson), educating people of the extenuating factors mentioned in ¶¶ 116-119 should have been enough for me to avoid even that much public outrage. But SidAlpha chose to omit these factors, and in doing so painted me as a violent psychopath.

122.     Now, to be fair, the records of that case were sealed from the public, so SidAlpha likely could not have found many of these extenuating circumstances on his own. However, to that end, I defer you to the arguments made in Section III-6-B of this Complaint.

### III-11: Demand for Retraction

123.     Immediately after posting his video, I emailed him demanding that he retract his numerous defamatory statements. After 3 days of back and forth, he finally responded to my retraction demands, insisting that his statements were not defamation. Because he has refused to retract his statements, I am now entitled to recover general damages, including for emotional distress and general loss of reputation.

### III-12: I am not a public figure.

---

8   As this court is no doubt aware

124.    Whenever the plaintiff is a public figure, a defamation claim can only succeed in the defendant acted with actual malice, that is to say, the defendant either knew his statements were false or acted in reckless disregard to the truth.

125.    However, first of all, even if I have to prove this, I have still proven actual malice for all ten counts of defamation. In addition to the general showing of actual malice described in Section III-6-B of this Complaint, there are plenty of other instances where I have proven actual malice for each individual count of defamation. For example, for Defamations #1 and #2 (the false DMCA Takedowns), I made numerous attempts to explain the actual law to SidAlpha before he published his smear video. He had ample opportunity to check the law to verify what I was telling him, but he didn't. That counts as actual malice. For Defamation #3, ¶ 62 establishes actual malice. For Defamation #4, actual malice is established by the fact that SidAlpha obviously had access to the full video I made, yet he cherry-picked the portions that supported his narrative. So on and so forth.

126.    But even barring that, I still do not qualify as a public figure as a matter of law.

127.    There are two ways to become a public figure: To either be a public figure by default (e.g. by being a celebrity, pro athlete, politician, etc.), or to be a "limited public figure" by being voluntarily or involuntarily thrust into the public spotlight due to being at the heart of some controversy.

128.    While it is true that I have a YouTube channel, that alone is enough to qualify me as a public figure. These days, everybody has a social media profile of some kind, even if they only use it to post pictures of their daily life on Facebook or post random memes on Twitter. To be considered a "public figure" solely on account of one's social media presence, you need to have a social media following so massive that you effectively become a household name solely by dint of being a "famous YouTuber," like PewDiePie or Logan Paul.

129.    I am nowhere near that famous. At the time of the smear video, I had barely over 2,100 subscribers, and even as of the time of this writing[9], I still have yet to get more than 3,000 subscribers. Even the most popular video on my channel still has less than 100,000 views. If YouTubers were movie actors, I would be an extra cast as a nameless henchmen who is only on

---

9   Not to be confused with at the time this court *receives* the complaint in the mail

screen for a split second before being dispatched by the hero with one strike and never getting a line. That is not enough to make me a "public figure" for purposes of defamation law.

130.    While it is true that I was thrust into the public spotlight due to the controversy surrounding my DMCA Takedowns, that is also the very thing that forms the basis for the defamation claim. Prior to the smear video being published, this was merely a dispute between a small handful of people on the Internet, akin to two neighbors arguing over whether or not one guy's fence intruded into the other guy's lawn. The smear video itself is what gave mainstream attention to that controversy. Therefore, I am not a "limited public figure" for purposes of defamation law, because you cannot claim that I become a limited public figure when the only reason I am the subject of this mainstream attention is because of the very defamation that I am suing over in the first place.

131.    Therefore, I am not a public figure, period. This means that, although I have proven actual malice in this case, I do not need it to prevail.

### III-13: Injuries I have suffered

132.    Because of the smear video, I, much like Alex Jones' defamation victims, have sustained an astronomical level of harassment, doxxing, and even death threats. I have sustained great stress and anxiety as a result of this harassment.

133.    In late March of 2022, I began experiencing chest pains. The weeks went by and the pains did not subside. So eventually, on April 18, 2022, I finally decided to go to the hospital, where I was diagnosed with pneumonia. I could have died from that pneumonia. I stayed hospitalized for a total of 8 days, from April 18-26, 2022.

134.    To treat the pneumonia, I underwent cardiovascular surgery under the care of one Dr. Robert Jaggers. Prior to the surgery, I was offered a chance to sign a DNR request, which stands for "do not resuscitate." This means that, if my breathing or heartbeat were to go out during the operation, the surgeons and nurses were instructed to just leave me for dead. Without that signature, the hospital's default policy, in the event that I flatlined, was to do everything in their power to bring me back.

135.    Obviously, as you can clearly see, it fortunately never came to that. However, I say that to

Complaint

say this: By presenting me with the opportunity to sign the DNR request, the hospital was effectively acknowledging that *the surgery itself* had a chance of killing me, in addition to the pneumonia I was there for in the first place.

136.    I was fortunate enough to have Medicaid (a federal government-funded healthcare insurance program, similar to Medicare, but for disabled people rather than the elderly) to pay for my hospital records. But if I did not have that, my out-of-pocket medical expenses for this 8-day hospital stay would easily have been over a million dollars.

137.    After being discharged from the hospital, I did some research online. I found that "chronic psychological stress" is one of the most common causes of pneumonia. See https://pubmed.ncbi.nlm.nih.gov/18571893/. The stress is said to cause "immunosuppression with a reduced antibacterial response" in the body. In other words, the stress and anxiety weakens my immune system, causing me to get infected with pneumonia-causing bacteria that my body would normally have easily fought off.

138.    On May 3, 2022, one week after I was discharged from the hospital, I returned to Dr. Jaggers' clinic and got my stitches taken out. There, I took that opportunity to ask him about whether the harassment I have endured as a result of the smear video might have been what actually caused this pneumonia. He admitted that this was indeed the most likely cause.

139.    The doctor's opinion was that it was extremely rare for a person my age (33 years old at the time) to get pneumonia as severe as I got, a feat made even more astonishing by the fact that I do not have any of the risk factors typically associated with pneumonia. Namely, I do not drink, smoke, or do drugs. While I do live in a messy apartment (something many trolls online like to remind me of every chance they get), that is almost certainly not the cause of the pneumonia. I showed Dr. Jaggers a picture of my apartment with all of its messiness, but he opined that the only "messy living conditions" that might cause pneumonia would be black mold, which exists exclusively in ventilation systems. However, since my apartment does not even have air conditioning at all, I cannot have black mold.

140.    Therefore, by process of elimination (and Dr. Jaggers agrees), the stress I have suffered due to the harassment caused by the smear video is the only remaining potential cause of the

Complaint

pneumonia that has a better-than-astronomical chance of being the actual cause thereof. If anything else could have caused it, the odds of it being the cause are one in a million, because all other likely causes (e.g. tobacco, alcohol, drug use, or black mold) have all been ruled out.

141.     Therefore, SidAlpha's defamation, in all likelihood, was the proximate cause of me suffering a life-threatening case of pneumonia, that could have killed me, and which forced me to incur over a million dollars in medical expenses, in addition to all the stress and anxiety that his smear video had undoubtedly caused.

## IV: LEGAL ARGUMENT

142.     The tort of defamation involves (a) a publication that is (b) false, (c) defamatory, and (d) unprivileged, and that (e) has a natural tendency to injure or that causes special damage. See Taus v. Loftus, 54 Cal.Rptr.3d 775, 804 (2007).

### IV-1: Publication

143.     The smear video was published on SidAlpha's YouTube channel on February 12, 2022. Therefore, the first element of defamation is satisfied

### IV-2: False

144.     For each count of defamation, I have alleged sufficient facts that cause the statements made by SidAlpha during the smear video to be demonstrably and substantially untrue. The defendant's statements are not even "substantially true," like in the case of Hosseinzadeh v. Klein. They are just false. Sometimes, they are lies by omission. Other times, they are just lies. But none of them can qualify as "substantially true."

#### IV-2-A: Subjective professional judgment

145.     The case of Taus v. Loftus does make an exception for "subjective professional judgments," which that case considers to be tantamount to opinions (and therefore, never "false") for purposes of defamation law. However, the key word there is "professional." SidAlpha is, by his own admission, not a lawyer. If he were a lawyer, maybe this defense could be applicable to Defamation #1 and #2 (the DMCA Takedowns). But by his own admission, he is not one, nor does he appear to have any professional or expert credentials whatsoever that could even remotely be relevant to this case. He's just a guy with a YouTube channel. Nothing more, nothing

Complaint

less.

146.    In fact, he probably does not even qualify as a "professional YouTuber." He uploads to his channel so infrequently that the odds that he makes a full-time income from his channel alone is astronomical. Even if he were a "professional YouTuber," that would only qualify him to make "subjective professional judgments" about the daily life of being a YouTuber (e.g. how to game the algorithm and when the best time of day is to publish your videos), not whether or not anyone is breaking the law by doing anything. Furthermore, even if he were a professional, it would only protect him from the first two counts of defamation. He would still have eight more counts of defamation he would have to defend against.

### IV-3: Defamatory

147.    The third element – defamatory – only means it is "injurious to reputation." See https://www.dictionary.com/browse/defamatory. All ten counts of defamation meet this requirement. All ten of them harm my reputation in obvious ways. Some of them (like Defamation #1 and #2) constitute acts that make me unfit to be a YouTube content creator, thereby constituting defamation per se. Others, like Defamation #10, are defamation per se because they are accusing me of a crime of moral turpitude. But all of them are defamatory in some capacity or another.

### IV-4: Unprivileged

148.    Unprivileged just means that it wasn't stated in any capacity where a speaker has the absolute privilege to publish defamatory material, such as during a Congressional floor debate or during litigation. This is obviously not present here.

### IV-5: Natural Tendency to Injure

149.    As stated in Section III-13, the defamation has resulted in thousands of people harassing me, to the point of me suffering life-threatening pneumonia due to the stress and anxiety. As a result, this defamation absolutely qualifies as having a natural tendency to injure.

150.    Therefore, all five essential elements of defamation are proven.

### V: RELIEF REQUESTED

151.    To make me whole, I request the following relief:

### V-1: Damages

152.    First, I request compensatory, emotional distress, and loss of reputation damages totaling $1,000,000. This is not a frivolous request for damages. As I said in Section III-13, I was hospitalized for pneumonia as a result of SidAlpha's defamation. Not only was the pneumonia itself life-threatening (which would make a million dollars reasonable in itself), but the medical expenses were also more than a million dollars had I been uninsured. It is not frivolous to request a million dollars in damages when that is *literally what I suffered*, and have medical records to prove it.

153.    Second, I request punitive damages. Because I am not a public figure, the fact that SidAlpha acted with actual malice is not necessary to recover in the first instance. So instead, it can be used to increase the damages award by including an award of punitive damages. I ask that the Court award an amount of punitive damages that it reasonably believes would sufficiently deter SidAlpha and others similarly situated from failing to do their due diligence before publishing smear videos about another person.

### V-2: Injunctive Relief

154.    I also request prospective injunctive relief, requiring SidAlpha to remove his smear video and to cease and desist any/all defamation about me.

155.    In addition to that, I ask that he be ordered to publicly correct the statements he made about me in such a way that ensures that my reputation is fully restored. He should not be required simply to tell everyone that he was wrong, but to *actually convince them*, to the point where literally everyone on Earth, with no exceptions, has either never heard of this controversy in the first place, or their must *subjectively believe* that I am the blameless victim of harassment, doxxing, and defamation (and that SidAlpha willingly and maliciously participated in same), and absolutely nothing else.

156.    That sounds ridiculous, but consider this: The whole point of a judgment in civil court is to make me whole. In other words, the point is to restore me to the same position I would have been in had the tortuous conduct not happened. So what better way to restore me to that same position than to … directly order SidAlpha to simply restore me to that same position? If it

Complaint

sounds like an impossible task that SidAlpha will never able to fully comply with, then how do you explain the fact that he managed to convince all of his audience in the first place that I was such a scumbag? Clearly, reaching that many people is not impossible, since he already did it once.

157.    Last but not least, I ask that SidAlpha be ordered to bring about an end to any/all harassment made against me. Again, I am not asking that he merely be ordered to post a video telling his viewers not to harass me, but to personally ensure, under his own power, that the harassment ends. If this sounds impossible for him to do, then maybe he should have thought about that before he was publishing his knowingly false smear video about me. This is not a case of "there's nothing the defendant can do to make people leave the plaintiff alone," because there *was* something he could have done: He could have simply not posted the smear video in the first place! At this point, he has made his bed and now he should be made to lie in it.

158.    In practice, the primary means through which the injunctions requested in ¶¶ 155-157 would manifest would be to hold SidAlpha in contempt of court (complete with fines and coercive confinement) every time someone else harasses me, or posts any defamatory material about me, in connection with this controversy. After all, if someone continues to harass me, that is clearly evidence that SidAlpha has not fully complied with the injunctions to convince everyone that I'm the blameless victim and get everyone to stop harassing me, is it not?

159.    Unrelated defamation and harassment should also constitute a violation of these injunctions, as long as it is clear that the other party is only creating these new accusations against me as a substitute for the old accusations they are no longer allowed to spread. In other words, if someone were to realize that they could not continue this exact line of defamation, but still believes that I am a scumbag, so they come up with something else, no matter how out-of-the-blue it may be, to continue to harass me and *claim* that it's unrelated, SidAlpha should still be held in contempt of court for that.

### V-3: Other Relief

160.    In addition, I also pray for any/all other relief to which the Court, in its fair and just determination, believes I may be entitled to and which is necessary to ensure that justice is

served in this case.

## VI: CONCLUSION

161.    In conclusion, the defendant and his allies have gone out of their way to make my life miserable, not because I did anything to deserve it (in fact, they know full well that I have done nothing to deserve it, hence the defendant intentionally omitted so many extenuating factors that significantly reduced, if not altogether eliminated, my culpability), but simply because they, personally, do not like me. For many of these people, if I had simply died in the hospital (or even if I had killed myself), they would have been singing "Ding Dong the Witch is Dead" in celebration. These people – including the defendant SidAlpha himself – have no soul, no conscience, and no regard for the rule of law.

162.    I have but one modest wish in all of this: To not be harassed. That's all I ask. They don't have to like me. But to harass and dox me because they don't like me is not okay. And even if you are going to harass me, you do not have the right to lie to others about what you are doing. Because they have wantonly shirked that legal duty out of pure hatred, malice, and spite, they should be liable to me for all the harm they've caused.

163.    Wherefore, premises considered, I respectfully pray that the Defendant be found liable for defamation, damages and injunctive relief be issued, costs incurred be awarded, and for any other relief to which I may be entitled.

So submitted on this, the 18th day of January, 2023.

David Stebbins
123 W. Ridge Ave.,
APT D
Harrison, AR 72601
(870) 212-4947
acerthorn@yahoo.com

Complaint