David Stebbins (pro se Plaintiff)   123 W. Ridge Ave., APT D   Harrison, AR 72601
(870) 212-4947   acerthorn@yahoo.com

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA

DAVID STEBBINS,                                                    PLAINTIFF

VS.                           Case 4:23-cv-00321-DMR

SYDNEY REDFIELD, d.b.a. SIDALPHA                                   DEFENDANTS

### RESPONSE TO [012] SHOW CAUSE ORDER

Comes now, pro se Plaintiff David Stebbins, who hereby submits the following Response to the Court's Order to Show Cause for Proper Venue and Personal Jurisdiction (Dkt. 12).

### I: TABLE OF AUTHORITIES

| Section | Page |
|---|---|
| I. **TABLE OF CONTENTS** | i |
| II. **TABLE OF AUTHORITIES** | ii |
| III. **ARGUMENT** | 1 |
|    A) The Defendant published in California. Therefore, a substantial part of the events (in fact, all of the events) occurred in California. | 1 |
|    B) Redfield specifically targeted YouTube as the forum for his publication. | 2 |
|    C) Redfield conducts substantial business in California. | 2 |
|    D) My reputational injury was felt primarily in California, and in fact, the Court can even take judicial notice of this. | 4 |
|    E) A good portion of allegedly-wrong conduct that Redfield defamed me over occurred in California, specifically in the U.S. District Court for the Northern District of California. | 7 |
|    F) Redfield's video almost certainly was distributed in California. | 8 |
|    G) Redfield used at least a few California sources (namely, Twitter and Discord) to draft his smear video about me. | 11 |
|    H) Bradley v. T-Mobile's logic is dubious and the Court should reject it. | 11 |

- I) Bradley is distinguishable, almost to the point of being completely inapposite.   13
- J) Bradley didn't result in full dismissal; jurisdictional discovery was permitted.   14

IV. **CONCLUSION**   16

## II: TABLE OF AUTHORITIES

**Case Law**                                                                                   **Page(s)**

- Batzel v. Smith, 333 F. 3d 1018 (9th Cir. 2003)                                               1,2,12
- Mavrix Photov. Brand Technologies, 647 F. 3d 1218 (9th Cir. 2011)                             2,4
- Walden v. Fiore, 134 S.Ct. 1115 (2014)                                                        passim
- Zehia v. Superior Court, 45 Cal. App. 5Th 543 (2020)                                          5
- Calder v. Jones, 465 US 783 (1984)                                                            passim
- Keeton v. Hustler Magazine, Inc., 465 US 770 (1984)                                           8,12,15
- Bradley v. T-Mobile US, Inc., No. 17-CV-07232-BLF, 2020 WL 1233924 (N.D. Cal. Mar. 13, 2020)  passim

## III: ARGUMENT

1. Before I begin, I want to point out that it has recently come to my attention that there is a slight possibility I might have identified the wrong person with Dkt. 11. The defendant has since posted a video hinting at the possibility that I got the wrong man with that identification. He intends to give me the run-around and make me jump through multiple hoops, just to get this case in the door.

2. A motion to this effect is being filed simultaneously alongside this response. But for the purposes of this response, it also has the potential to invalidate this response. At this point, we might as well be back to where we were previously, as of Dkt. 10, with me not knowing the defendant's true identity, and we should proceed accordingly.

3. This is especially important for the immediate issue. After all, the Court says that "none of the parties reside in the Northern District of California," but now, there is still the possibility that he may reside in California, and so we should proceed accordingly.

### A. The Defendant published in California. Therefore, a substantial part of the events (in fact, *all* of the events) occurred in California.

4. The Court says that I do "not allege that Defendant published the video at issue in this district," but this clearly is not the case. The Defendant published his smear video *on YouTube*. That qualifies as publishing *in California*. It's like I said in the Complaint: If he were to solicit a Californian TV station to run his smear video as a documentary, that would create minimum contacts in California and no one would dare question that. That doesn't change just because it happened on the Internet. Unless there is an express statutory declaration to the contrary, then "[t]here is no reason inherent in the technological features of cyberspace why … defamation law should apply differently in cyberspace than in the brick and mortar world." See Batzel v. Smith, 333 F. 3d 1018, 1020 (9th Cir. 2003). The Court acknowledged this argument in its show-cause order, but it never explained exactly what's wrong with it.

5. If posting a publicly-visible video to YouTube (and therefore, California) does not count as publishing it, then what does? And if the video being distributed by YouTube does not count as the conducting "occurring in" California, then what does?

6.      Bear in mind: It was the publication of the video, not simply the video's mere existence, that constitutes defamation. If he created the video, but had a change of heart at the last minute and did not post it, and so it laid dormant on his computer's hard drive, that would not be defamation. Therefore, the *tortuous conduct* occurred on YouTube and, therefore, occurred in California.

7.      For this reason, in the even that the rest of this response is unpersuasive, then I ask the Court to give me one final chance to show cause, only this time, please explain exactly why posting a video on YouTube does not count as publishing it, so I can address that specific problem.

### B. Redfield specifically targeted YouTube as the forum for his publication.

8.      Again, it is unclear to me how posting a video on YouTube does not count as "specifically targeting" YouTube as the target forum. In addition to the clarification requested in ¶ 4 above, I also ask the District Court to clarify its position here if the rest of this Response is unpersuasive.

9.      Redfield undoubtedly cherry-picked YouTube, out of the dozens of other social media websites, as the place where his smear video would be published, because it was the one where he had the largest following and, therefore, would be best situated to circulate his smear message. Therefore, his actions count as "specifically targeting" a Californian website, and that the defamation "arose out of his activities within" a Californian website.

10.     As I explained in the Complaint (and which the Court even acknowledged in its show-cause order, but never fully explained exactly what was wrong with the argument), if this were done using a Californian TV station, it would absolutely create minimum contacts in California, and absent an express statutory distinction like Sec. 230, "[t]here is no reason inherent in the technological features of cyberspace why … defamation law should apply differently in cyberspace than in the brick and mortar world." See Batzel, supra.

### C. Redfield is a member of the YouTube Partner Program, and has various other fundraising accounts set up with other Californian-based websites. Therefore, he conducts substantial business in California.

11.     Mavrix Photo, Inc. v. Brand Technologies, Inc., 647 F. 3d 1218 (9th Cir. 2011) sets the controlling precedent in this section of the brief. Like here, that case involved a non-Californian plaintiff suing a non-Californian defendant in California federal court. The Ninth Circuit Court of Appeals found that the defendant had engaged in sufficient economic activity to subject itself to specific jurisdiction in California. Specifically, they held that the Defendant's website …

> "courts a national audience, not restricted to California. However, the website has some specific ties to California. [Defendant] makes money from third-party advertisements for jobs, hotels, and vacations in California. The website also features a "Ticket Center," which is a link to the website of a third-party vendor that sells tickets to nationwide events. Some of these events are in California. Brand has agreements with several California businesses. A California Internet advertising agency solicits buyers and places advertisements on celebrity-gossip.net. A California wireless provider designed and hosts on its servers a version of celebrity-gossip.net accessible to mobile phone users. A California firm designed the website and performs site maintenance. Finally, Brand has entered a "link-sharing" agreement with a California-based national news site, according to which each site agrees to promote the other's top stories." Id at 1222.

12.     At Brand's behest, the Court conceded that it "has no offices, real property, or staff in California, is not licensed to do business in California, and pays no California taxes." Id at 1222. However, that was ultimately not enough to save it from specific jurisdiction.

13.     So, with that established, let us look at Sidney Redfield.

14.     Redfield's YouTube channel – SidAlpha – is part of the YouTube Partner Program. You can see this for yourself by going to nearly any page on his YouTube channel, where you will find a "join" icon like this one:



15. This icon gives his viewers the opportunity to become "channel members," those who provide monthly donations to him to support his content. The only way he can have access to this feature is if he were a member of the YouTube Partner Program. This means that all of his YouTube videos are eligible for monetization and profit. This means that he "conducts substantial business" on YouTube and, therefore, in California.

16. In addition, Redfield also has a Patreon page where he receives monthly donations independently of his YouTube memberships. See www.patreon.com/sidalpha. Therefore, Redfield conducts substantial business with Patreon. Patreon is also headquartered in San Francisco, CA. See https://craft.co/patreon/locations. Therefore, he who conducts substantial business with Patreon also conducts substantial business in California.

17. Redfield also started an account with www.gofundme.com to raise money for defending against me in the case of Stebbins v. Rebolo, Case 4:22-cv-00546-JSW. See https://www.gofundme.com/f/sidalpha-defense-fund. Requesting donations for a legal defense fund is recognized by the 9th Circuit Court of Appeals as being a commerical activity. See Hustler Magazine, Inc. v. Moral Majority, Inc., 796 F. 2d 1148, 1152 (9th Cir. 1986) ("There is ample evidence that the defendants distributed copies of the parody as an integral part of a financial appeal. All of the letters and television displays involved outright appeals for donations to the Moral Majority to support Falwell's lawsuit against Hustler"). GoFundMe is headquartered in Redwood City, CA, and four out of five of its USA-based offices are all in California. See https://craft.co/gofundme/locations.

18. In other words, Redfield conducts *substantial* commercial activity in California. He may never have set foot there, but "a nonresident's physical presence within the territorial jurisdiction of the court is not required." See Walden v. Fiore, 134 S.Ct. 1115, 1121 (2014).

19. Because Redfield conducts so much business with Californian corporations and services, there is more than enough grounds, under the Mavrix precedent, to subject Redfield to specific jurisdiction in California.

### D. My reputational injury was felt primarily in California, and in fact, the Court can even take judicial notice of this.

20. The Court says that I did not "suffer any injury resulting from the video in this district." This is not true.

21. In online defamation cases, personal jurisdiction is often determined by examining where the plaintiff's "reputational injury" was most suffered. See Calder v. Jones, 465 US 783, 789 (1984) ("the brunt of the harm, in terms both of... injury to her professional reputation, was suffered in California"). See also Walden v. Fiore, 134 S.Ct. 1115, 1224 (2014) (citing Calder v. Jones) ("the 'effects' caused by the defendants' article—i.e., the injury to the plaintiff's reputation in the estimation of the California public—connected the defendants' conduct to California, not just to a plaintiff who lived there"). See also Zehia v. Superior Court, 45 Cal. App. 5th 543, 558 (2020) (holding that the defendant establishes minimum contacts in California when his defamation is committed "for the alleged purpose of... causing reputational injury in California").

22. That being said, my injury to my reputation occurred mostly in California.

23. I have business connections in California. In fact, I have many of the same connections as Redfield himself has, as mentioned above. I am a member of the YouTube Partner Program; I have a Patreon account which I use to receive donations for my content, and I am a member of the Twitch Affiliate Program.

24. While I have not had any of these California-based business connections terminated, my reputation with YouTube and Google has significantly tanked since Redfield's smear video. The Court can even take judicial notice of this loss in reputation, as Alphabet Inc. and its subsidiaries, Youtube LLC and Google LLC have even filed briefs in this very district repeating the accusations that Redfield and his allies made against me: That I am using the DMCA Takedown and copyright infringement litigation for the sole, exclusive purpose of silencing criticism. See…

    (a) Case 4:21-cv-04184-JSW, Dkt. 174, p. 5, lines 16-17 ("the new case follows the same abusive pattern as Polano and Rebolo: Plaintiff's use of copyright law to silence fair use criticism of him")

    (b) Case 3:23-cv-00322-LJC, Dkt. 18, p. 4, lines 3-5 (referencing my alleged "abusive

efforts to mute criticism" and insisting that I "uses the courts and copyright law to silence his critics").

(c) Case 3:23-cv-00322-LJC, Dkt. 31, p. 10, lines 18-19 ("Plaintiff Has Filed a Barrage of Bogus Copyright Claims Against Google and YouTube in An Effort to Silence His Online Critics"). See also p. 13, lines 9-10 ("The present lawsuit is Plaintiff's latest attempt to wield copyright law as means of stifling fair use criticism")

  i. Please see Dkt. 32, ¶¶ 15-21, Dkt. 36, ¶¶ 4-12, and Dkt. 39, ¶ 11 for my sharply-worded rebuttals to these blatantly false accusations.

25. That is a California-based entity that I have fallen out of favor with, as a direct result of the defamation that Redfield and his cronies perpetrated. That is a clear "reputational injury" that establishes minimum contacts in California.

26. In fact, this is perhaps one of the most important reputational injuries I have suffered. Much more than any other person who thinks less of me as a person because of the smear video, Alphabet and its subsidiaries have both the power and the resources to thoroughly stamp out the harassment I have suffered by issuing permanent bans to anyone who participates in it from YouTube, Gmail, Google Docs, Google Chat, etc. But because they have drunk Redfield's Kool-Aid, they are not doing that.

27. Speaking of filings in other cases in this District, that leads me to my next example of Californian reputational injury: District Judge Jeffrey S. White. In Case 4:21-cv-04184-JSW, Dkt. 20, p. 4, lines 24-25, Judge White publicly accuses me of "manufactur[ing] and pursu[ing] … claims in an effort to silence online criticism."

28. For what it is worth, he eventually vacated this order and re-opened the case. See Dkt. 30. But he still made this accusation in the first instance, and even when he vacated the order, he did not vacate this portion of the accusation.

29. There is absolutely no evidence to support this egregious accusation. There is certainly no evidence *on the record* to support this accusation. At the very least, Judge White doesn't *point to any* evidence! In fact, as I demonstrate in Case 3:23-cv-00322-LJC, Dkt. 32, ¶¶ 17-21 (and especially ¶ 20), such an accusation is downright ludicrous when you think about it for more than

a second.

30. So if he doesn't have any admissible evidence to justify where he got this idea, then he has to have gotten it from listening to Redfield's smear video and all the other defamatory smear content that the other individual defendants have made about me, specifically Defamations #1, #2, #7, #8, and #9 in the Complaint in this case, all of which include, by necessity, the implication that I just wish to silence online criticism about me.

31. So this counts as two separate sets of examples of California-based entities who I have suffered a loss of reputation with due, in large part, to Redfield's smear video and all the other defamation that he and his allies have spread about me.

32. If we take every person who dislikes me as a result of Redfield's defamation, and count them once each, these examples probably amount to an infinitesimal amount of the total number of people who now hate me. But this is a case of quality over quantity. After all, courts and juries would undoubtedly give substantially more weight to reputational loss suffered by the plaintiff's wife (who divorces him over the rumors) or his boss (who fires him over the rumors) than they would a random co-worker or distant member of the family. Likewise, in this case, these two sets of examples are the *most important* reputational loss I have suffered. The reason for this is because these two sets of entities are best situated to stamp out and put an end to the harassment, doxxing, death threats, and copyright infringement I have suffered over the years. Alphabet & Co. can achieve this by permanently banning anyone from using their services who engages in this reprehensible conduct, and Judge White can achieve this by issuing injunctions, orders, and awarding damages against those people to punish them for doing it. But because of the defamation spread by Redfield and his allies, these potentially powerful allies were instead converted into powerful enemies, all because he falsely accused me of DMCA abuse when I didn't commit DMCA abuse.

33. Therefore, about 95% of the most important reputational loss I have suffered was in fact suffered in California, which, according to most case law on the matter, is sufficient to establish personal jurisdiction in California.

### E. A good portion of the allegedly-wrong conduct that Redfield defamed me over occurred in California, specifically in the CAND District Court.

34. In addition to the reputational injury, let us also not forget about what exactly Redfield was defaming me over. Sure, he was defaming me over my DMCA abuse, and the Court has expressed skepticism about whether "on YouTube" still qualifies as "in California" (a skepticism I have already expressed frustration over due to the Court's lack of explanation, and will certainly go into more detail on in the next section), he was also defaming me about the lawsuits I had filed. Specifically, he was defaming me over Case 4:21-cv-04184-JSW (Stebbins v. Polano) and Case 4:22-cv-00546-JSW (Stebbins v. Rebolo), both of which were filed in the U.S. District Court for the Northern District of California. In neither case was venue or personal jurisdiction ever disputed or even given reason to be called into question.

35. According to Calder v. Jones, 465 US 783 (1984), this is a factor that weighs in favor of long-arm jurisdiction. See id at 788 ("The allegedly libelous story concerned ... California activities").

36. More than any other factor, this defamation case absolutely deserves to be heard in the same District as the *cases that are related to it*. This, more than anything else, justifies venue and jurisdiction in this district.

### F. Redfield's video almost certainly was distributed in California.

37. This is a relevant factor under Keeton v. Hustler Magazine, Inc., 465 US 770 (1984). Like here, that was a defamation case where a citizen of one state (New York) sued a defendant from another state (Ohio) in a third state (New Hampshire) that had absolutely nothing to do with the libel in question or either of the parties. Despite this, the Supreme Court nonetheless found minimum contacts in the state of New Hampshire, simply because the defendant had a sizeable audience in New Hampshire. See id at 772-74 ("Respondent's contacts with New Hampshire consist of the sale of some 10,000 to 15,000 copies of Hustler Magazine in that State … Respondent's regular circulation of magazines in the forum State is sufficient to support an assertion of jurisdiction in a libel action based on the contents of the magazine"). This meant that at the libel occurred, at least partially, in that state, which was enough to secure minimum

contacts.

38. As of the time of this writing, Redfield's smear video about me has over 168,000 views:



39. It is inevitable that at least *some* of those views will be from California. This is especially true for California specifically, as it is the largest state in the nation.

40. To put this in perspective for the Court, my channel – which is a fraction the size of Redfield's – received ***more than four thousand views from California*** in the past 28 days (as of the time of this writing), according to my YouTube analytics, despite the channel receiving less than a third the views that Redfield's smear video about me has received:



41. So it is a near certainty that Redfield's smear video about me has received at least that

many California views. Even in the already unlikely event that his smear video about me received next to no California views, as I have just demonstrated, Redfield could easily prove that through the simple expedient of producing a copy of his YouTube analytics.

42.     Right now, the Court is probably thinking of at least one glaring problem: Hustler magazine had to actively go out of their way to get contracts with New Hampshire retailers and take other active steps in order to sell their magazines in New Hampshire. By contrast, Redfield's smear video was automatically distributed in California, simply by reason of it being on YouTube at all. YouTube does not allow channels to restrict distribution of their videos based on region. At best, they sometimes will region-lock some videos themselves in order to placate foreign copyright holders such as Toie Animation. See www.techdirt.com/2022/02/01/youtube-dusts-off-granular-national-video-blocking-to-assist-youtuber-feuding-with-toei-animation/. But as for Redfield, he didn't "choose" California, per se; California simply came with the package.

43.     However, we must remind ourselves that this is due to the way YouTube is set up, not because Redfield made a conscious choice. Therefore, we must ask ourselves … if Redfield had the choice – if he had the option, when uploading the smear video, to select which regions he wished the video to be viewable in, possibly with "select all" and "deselect all" options thrown in for convenience – would he have manually opted to have the smear video distributed in California?

44.     The answer to that question is obvious: Of course he would. Why wouldn't he wanted it distributed in as many regions as possible? The goal of the smear video is to … well … *smear me*. That obviously requires getting as many eyes on his video as humanly possible!

45.     Because Redfield almost certainly would have opted to distribute in California if he were given the option, we should treat this case as if that's what he did all along. Only if Redfield can give a plausible[1] reason why he would have opted out of California if he had the option to do so should he be allowed to argue that he should not be treated as having "constructively targeted" (for lack of a better term) the California market.

---

1   The key word being "plausible." If he gives a strained, ad hoc reason that makes very little sense, the Court should presume this excuse to be pretextual, made up in response to litigation in order to artificially get out of Caifonria jurisdiction, and should reject the excuse accordingly.

46. Redfield may argue that this doesn't mean he would have "targeted" California, per se, in this scenario. Even if he had the option to opt out of various regions, he wouldn't have opted into the California market because he saw anything special about California in particular (except maybe that it's the largest state and therefore the most potential viewers). Rather, he would have opted into the California market simply because it makes sense, simply from a business standpoint, to distribute all of your videos (not just smear videos) in as many regions as possible. That's just common sense business strategy. California may be the biggest state, but considering it from that angle, California is no more special than Wyoming.

47. That might be true, but the same can also be said about Hustler Magazine. When they opted to sell their magazines in New Hampshire, they obviously didn't see anything special about New Hampshire in particular. There just was no good business reason *not* to sell in New Hampshire … or any other state for that matter. And yet, that clearly didn't save Hustler from being sued in that state by a plaintiff who didn't even reside there!

48. If it wasn't good enough for Hustler Magazine, it shouldn't be good enough for Redfield.

**G. Redfield used at least a few California sources (namely, Twitter and Discord, possibly more) to draft his smear video about me.**

49. This is a relevant factor under Calder v. Jones, 465 US 783, 788 (1984) ("The article was drawn from California sources").

50. While compiling information to use against me in the smear video, Redfield used Twitter and Discord, among other resources, to confer with informants. Both of these websites are owned by their eponymous companies, both of whom are located in California. See https://sunbeltcontrols.com/project/twitter-hq-control-solutions-for-social-media-giant/ and https://craft.co/discord/locations, respectively.

51. If that is not enough to satisfy the Court that Redfield used "California sources," then we should conduct jurisdictional discovery to find out what other sources Redfield used.

**H. Bradley v. T-Mobile's logic is dubious and the Court should reject it.**

52. As its primary authority in support of its belief that personal jurisdiction is lacking, the Court cites the unpublished case of Bradley v. T-Mobile US, Inc., No. 17-CV-07232-BLF, 2020 WL

1233924, at *14 (N.D. Cal. Mar. 13, 2020). Specifically, it argues "That YouTube is located in California goes to YouTube's contacts with the state, not Defendant's," mirroring the Bradley court's language "That Facebook's ad platform and Facebook employees are allegedly located in this District goes to Facebook's contacts with California, not Defendants'." Id at 25.

53.     However, we must bear in mind that the case of Bradley is not binding precedent. It was never appealed to the 9th Circuit. Therefore, this Court has the discretion to reject it, and I believe it should, because if you actually stop to think about it for even a second, the Bradley court's logic makes absolutely no sense.

54.     Remember that the Ninth Circuit Court of Appeals has held that the district courts must treat cyberspace defamation the same as it treats defamation occurring in the brick-and-mortar world. See Batzel, supra. Unlike Bradley, that is published case law from the 9th Circuit, and thus is binding precedent. That being said …

   (a)     If T-Mobile had placed "help wanted" ads in a Californian newspaper, would the Bradley court have then found that it was the newspaper, not T-Mobile, that had connections with California?

   (b)     If Redfield had solicited a Californian TV station to run his smear video about me as a documentary, would the Court have determined that it was only the TV station, not Redfield, who had minimum contacts with California?

   (c)     In Keeton v. Hustler Magazine, Inc., 465 US 770 (1984), the Supreme Court found that minimum contacts had been established in New Hampshire simply because Hustler distributed in that state (as well as every other state), despite the case having no special connections to the state other than it being one state of many where they distribute. But if you think about it, Hustler doesn't really sell their magazines themselves. They solicit retailers to sell the magazines for them. So by that logic, shouldn't it be the retailers, not Hustler Magazine Inc., who have "connections" with New Hampshire? But clearly, that didn't matter.

55.     Nothing in Walden v. Fiore, 571 U.S. 277, 284 (2014) – which the Bradley court cited as controlling precedent – says otherwise. In that conversion tort case, the allegedly tortuous seizure happened in the brick-and-mortar world, it happened on Georgian soil, and it was committed by Georgian airport security. You can't even really say that the injury was "felt" in Nevada, because although it meant the Plaintiffs could not place wagers in Nevada, the actual conversion of their

money – the acts that actually *constituted the tort* – happened in Georgia, a fact which nobody disputes. This does not create minimum contacts in Nevada any more so than if a plaintiff were to get beaten up in one state, travel to another state before his injuries had fully healed, and then try to sue his assailant in the new state, simply because the plaintiff was still "in pain" in the new state.

56. In other words, the aftermath of an injury is legally distinct from the injury itself for purposes of personal jurisdiction (even though a plaintiff can still recover for both, as a matter of substantive law, once the case is filed in the proper court), and just because the aftermath is "felt" in one state does not mean the injury itself was "felt" in that same state. *That* was the precedent set by Walden v. Fiore.

57. By contrast, the tortuous conduct in this case – the defamation – happened on YouTube and therefore happened in California. That is not simply the aftermath of the injury, but the injury itself.

**I. Bradley is otherwise distinguishable, almost to the point of being completely inapposite.**

58. Even barring the Bradley court's dubious-at-best logic, that case was still highly distinguishable from the instant case.

59. For starters, neither the Bradley case nor the case of Walden v. Fiores (which the Bradley court cited as controlling precedent) were about cyber defamation. Walden was about conversion, and Bradley was about employment discrimination. This is important, because defamation has a very different set of factors to consider when establishing minimum contacts than most other torts. For defamation, factors to consider include, but are not limited to, what sources the defendant used to acquire the defamatory information[2], where the Plaintiff's livelihood was centered[3], and where the Plaintiff resided[4]. None of these appear to be relevant factors when determining minimum contacts in most other areas of tort law. In fact, whereas the Calder court explicitly calls for the Plaintiff's residence and place of livelihood to be considered, the Walden court explicitly says that those factors *aren't* relevant! See id at 1125 ("Petitioner's actions in Georgia did not create sufficient contacts with Nevada simply because he allegedly directed his conduct at plaintiffs whom he knew had Nevada connections").

---

2   See Calder, supra at 788 (1984) ("The article was drawn from California sources").
3   See Calder, supra at 788 (1984) ("It impugned the professionalism of an entertainer whose television career was centered in California").
4   See Calder, supra at 788 (1984) ("The allegedly libelous story concerned the ... activities of a California resident").

60. As such, Bradley v. T-Mobile and Walden v. Fiores are almost completely inapposite to determining whether minimum contacts are met in this, a defamation case.

61. Even barring that, Bradley v. T-Mobile is still distinguishable from the instant case, owing to the fact that the underlying conduct was not stand-alone conduct, but was only one part of a process. The allegedly discriminatory conduct was the fact that the ads telling people about the job openings were restricted to people below a certain maximum age range. That, however, amounted to only an infinitesimal part of the entire hiring process. Once those ads were impressed onto potential applicants, it was those applicants' responsibility to submit their application and resume. Once submitted, the applications and resumes would presumably be sent to the local hiring manager responsible for the district that applicant applied for employment in. From there, everything else in the hiring and employment process – from reviewing the applications and resumes, to providing job interviews, to onboarding and orientation for new hires, to even the ongoing employment that subsequently follows – would all have personal jurisdiction in the districts where those activities *physically occurred*. Simply having seen the ad for the job on Facebook would be a faint memory for those employees by that point.

62. When you think about it that way, the Bradley case wasn't even really a cyberspace case; it was 99% a brick-and-mortar case with a tiny amount of cyber commerce penciled into the margins.

63. By contrast, in the instant case, it is a cyberspace case, and there's no two ways about it. Redfield's smear video on YouTube *was the slander*, not just one step in a long and complex process. There was no other aspect of the defamation that could have established minimum contacts in any other state. It was exclusively cyberspace.

64. Therefore, the case of Bradley v. T-Mobile is wholly inapposite to the instant case and should be discarded accordingly.

**J. Bradley didn't result in full dismissal; jurisdictional discovery was permitted.**

65. If, in spite of the past two sections, this Court finds Bradley to be both relevant and controlling, it is worth noting that the Court's order in that case did not result in the case being dismissed in its entirety. The Bradley court still authorized jurisdictional discovery. See

storage.courtlistener.com/recap/gov.uscourts.cand.320649/gov.uscourts.cand.320649.172.0_1.pdf.

66.     At the very least, I believe I have established *arguable* personal jurisdiction and venue in this court. That should be enough for the time-being. At the very least, the Court would not be acting improperly if it tentatively issued service of process on Redfield, and then permitted the him to raise and litigate the issue of personal jurisdiction if he so chooses.

67.     From there, we could conduct jurisdictional discovery in order to answer such questions as …

    (a)     Did the smear video get a substantial number of impressions and/or views in the State of California? After all, that was a major factor in establishing New Hampshire jurisdiction in the case of Keeton v. Hustler Magazine, Inc., 465 US 770, 772 (1984) ("Respondent's contacts with New Hampshire consist of the sale of some 10,000 to 15,000 copies of Hustler Magazine in that State each month").

        i.      Along that same vein, how much of the smear video's revenue (e.g. from ads, super chats, super thanks, etc.) were from Californian viewers? After all, even if views alone were not enough to bestow minimum contacts, surely monetization from California should suffice.

        ii.     Also, how much of the Defendant's revenue from channel memberships and Patreon donations (which are not tied to any specific videos) were from Californian subscribers?

    (b)     What resources did Redfied use when drafting his smear video about me, and what states are they based in? This is a relevant factor under See Calder, supra at 788 (1984) ("The article was drawn from California sources").

    (c)     Does YouTube have servers in multiple states or countries? If so, which server is Redfield's smear video about me stored on, and what state or country is it located in?

68.     However, if we are to do that, we need Redfield to appear in the case, and for that, we need to issue service of process.

69.     However, I do not believe this should be required. I believe the arguments I have made, and the judicially-noticeable facts I have presented, in Sections A-G of this brief should be

sufficient to establish that the Northern District of California does indeed have concurrent jurisdiction in this case. At that point, the Plaintiff's choice of forum should be given substantial deference.

## CONCLUSION

70.     Wherefore, premises considered, I respectfully pray that the Court accept this brief as a satisfactory response to its show cause order, dissolve that order, and proceed to order service of process on the Defendant.

So requested on this, the 28th day of June, 2023.

*/s/ David Stebbins*
David Stebbins (pro se)
