David Stebbins (pro se Plaintiff)    123 W. Ridge Ave., APT D, Harrison, AR 72601
(870) 212-4947                       acerthorn@yahoo.com

UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA

DAVID STEBBINS,                                          PLAINTIFF

VS.                         Case 4:23-cv-00321-DMR

SYDNEY REDFIELD, d.b.a. SIDALPHA                         DEFENDANTS

## BRIEF/MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE ISSUE OF LIABILITY FOR DEFAMATION #1 AND #2

Comes now, pro se Plaintiff David Stebbins, who hereby submits the following Brief/Memorandum of Points and Authorities in Support of Motion for Partial Summary Judgment on the Issue of Liability for Defamation #1 and #2.

### I: TABLE OF CONTENTS

| Section | Page |
|---|---|
| I. TABLE OF CONTENTS | i |
| II. TABLE OF AUTHORITIES | iii |
| III. STATEMENT OF FACTS | 1 |
| IV. SUMMARY OF ARGUMENT | 2 |
| V. ARGUMENT | 3 |
| V-1: Summary Judgment Standard | 3 |
| V-2: Defamation by Incorrect Legal Argument | 3 |
| V-3: Defendant admits to facts which legally absolve me of DMCA misrepresentation. | 6 |
| V-3-A: The actual legal standard for DMCA misrepresentation | 7 |
| V-3-B: Legal opinions vs. legal facts | 9 |
| V-3-C: The Defendant's admission of facts | 11 |
| V-3-D: This applies to Defamation #2 as well | 12 |

V-4: On Defamation #2, he incorrectly states that    12
the stream was a joint work.

    V-4-A: Even if Skibbidy's a co-author, my DMCA    14
    Takedown against him is still valid.

V-5: Defendant's refusal to hear my side of the story privately    15
before posting the smear video constitutes burying his head in
the sand and, thus, actual malice.

V-6: Refusal to Retract    16

VI. RELIEF REQUESTED    16

VI-1: Declaration of Liability & Malice    16

VI-2: Injunctive Relief    17

    VI-2-A: Injunction #1: Remove the slanderous content    17

    VI-2-B: Injunction #2: Convince everyone of the truth    17

    VI-2-C: Injunction #3: End all related harassment    18

    VI-2-D: How violations of injunctions should be identified.    18

VI-3: Other Relief    19

VII.    CONCUSION    19

## II: TABLE OF AUTHORITIES

**Statutes & Rules**                                    **Page(s)**

- 11 USC § 523                                           16
- 17 USC § 512                                           passim
- Fed.R.Civ.P. 56                                        3
- "When Can an "Opinion" Become a Defamatory             10
  Statement?" by Todd McMurtry;
  www.hemmerlaw.com/blog/when-can-an-opinion-become-
  a-defamatory-statement/

**Case Law**                                             **Page(s)**

- Ashton-Tate Corp. v. Ross, 916 F. 2d 516 (9th Cir. 1990)        14
- Community for Creative Non-Violence v. Reid, 490 US 730 (1989)  13
- Garcia v. Google, Inc., 786 F. 3d 733, 744 (9th Cir. 2015)      13
- Lauro v. Charles, 292 F.3d 202 (2nd Cir. 2000)                  6
- Liebeck v. McDonald's                                           17
- Lenz v. Universal Music Corp., 801 F. 3d 1126 (9th Cir. 2015)   passim
- MCI Tele. Corp. v. Exalon, 138 F. 3d 426 (1st Cir. 1998)        5

### III: FACTS OF THE CASE

1.      I am a YouTuber who goes by the alias "Acerthorn." In late 2021, I began issuing DMCA Takedowns to people who I felt were improperly using my copyrighted material. The people whose videos I had taken down disagreed with my interpretation and accused me of DMCA fraud.

2.      On February 12, 2022, defendant published a video about me, dedicated to smearing me ("the smear video"). During the smear video, he repeatedly accused me of issuing multiple DMCA Takedowns without considering fair use in violation of 17 USC §512(f) and the case of Lenz v. Universal Music Corp., 801 F. 3d 1126 (9th Cir. 2015). In making these accusations, he made it abundantly clear that he was accusing me of breaking the law, not merely doing something he, in his personal opinion, considered to be unethical. See https://www.youtube.com/watch?v=WB-Xd1qDKIY. Prior to publishing the smear video, the Defendant admitted over X (known at the time as Twitter) that I genuinely and sincerely believed that the videos that I had taken down were not fair use, just that he personally disagreed with my interpretation of the law. See **Exhibit A**.

3.      On December 18, 2021, I did a collaborative, livestream debate with another YouTuber who goes by the alias "SkibbityDibbity," or just "Skibbity" for short. During this livestream, Skibbity spoke a lot of lines, but I was the one solely responsible for fixing the debate stream into a tangible medium of expression. See www.twitch.tv/videos/1236975840 and www.twitch.tv/videos/1237211543. After this collaborative livestream concluded, Skibbity contacted me over email, announcing that he was going to post the stream on his own YouTube channel. This email also stated "because I was part of the stream you literally cant do anything to me so dont expect to take it down." See **Exhibit B**. During the smear video, Defendant proclaimed that Skibbidy was a co-author of the livestream, and therefore was legally entitled to repost the stream, in its entirety, without my permission and without even having to follow fair use. His entire basis for claiming that Skibbidy was a co-author was the fact that Skibbidy had participated in the stream in any capacity, not that he had contributed to actually recording or streaming it. See smear video at timestamp 41:39 – 42:03.

4.      Prior to publishing the smear video, I contacted the defendant over private email and asked him politely to hear my side of the story privately before judging me and running my name through the mud. He declined to do so with no explanation given. See **Exhibit C**. Immediately after the smear video was published, we spent three days  arguing over private email, where I demanded he retract his smear video, but he refused to, insisting that "it wasn't defamation." See **Exhibit D**.

5.      On February 4, 2023, Defendant made a video reacting to the defamation lawsuit I had filed against him ("the lawsuit reaction video"). See https://www.youtube.com/watch?v=3CbgDzEkkn8. In this lawsuit reaction video, he never once denied that I sincerely believed in the validity of my own DMCA Takedowns, instead doubling down on his assertion that, because he disagreed with my interpretations of the law, that alone rendered the takedowns in violation of § 512(f). See timestamp 3:24 – 13:20. Also during the lawsuit reaction video, he never asserted that SkibbidyDibbity had participated in recording or streaming the livestream debate, or that he made any contribution to the stream other than speaking lines which my streaming software captured and recorded. Instead, he tried to argue minutia in the law to try and redefine "fixation" under copyright law to try and justify that SkibbidyDibbity made some nominal contribution to the fixation. See timestamp 13:20 – 15:32.

### IV: SUMMARY OF ARGUMENT

6.      Because the defendant publicly accused me of breaking the law, rather than doing something merely unethical, he should be held liable for defamation as long as his interpretations of the law are incorrect.

7.      Because the Defendant egregiously misstated the scope of my legal duty to consider fair use under Lenz v. Universal Music Corp., 801 F. 3d 1126 (9th Cir. 2015), he has therefore slandered me.

8.      This applies to both Defamation #1 and Defamation #2, despite the latter count of defamation having nothing to do with fair use, because the law clearly states that I only commit DMCA misrepresentation if I make a *knowingly* false claim, and since the defendant cannot prove that it was *knowingly* false (even if he could ultimately prove it to be false), he still

slandered me when he accused me of committing DMCA fraud.

## V: ARGUMENT

9.    For the following reasons, I should be entitled to judgment as a matter of law on the issue of liability for Defamation #1 and #2.

### V-1: Summary Judgment Standard

10.    "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." See Fed.R.Civ.P. 56(a).

11.    There are two ways for a movant to resolve a factual dispute on summary judgment: Either show that the disputed fact is immaterial, or show that the factual dispute is not "genuine," that is, that there is nothing more than mere metaphysical doubt as to its truthfulness. See Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 US 574, 586 (1986) ("[T]he issue of fact must be genuine. When the moving party has carried its burden under Rule 56, its opponent must do more than simply show that there is some metaphysical doubt as to the material facts"). In other words, if the defendant has only a one in a million chance of being able to produce any admissible evidence to support his factual contention, summary judgment is still appropriate, even if it isn't literally impossible for him to prove it.

### V-2: Defamation by Incorrect Legal Argument

12.    For Defamation #1 (where he accuses me of issuing numerous DMCA Takedowns without considering fair use) and Defamation #2 (where he also accuses me of issuing a false DMCA Takedown, but this time, because I did not recognize the uploader as a co-author), he has made it clear in his smear video that his accusation against me is that I broke the law. He is not accusing me of doing an unethical thing, but an illegal thing. He could very easily have transparently disclosed to his audience that my actions were in fact legal if he wanted to. Plenty of other social media content creators do that all the time. Here are just a few examples:

(a)    https://youtube.com/clip/Ugkxs8E9dq_aWDNtjF7Wui3FGQDAQaKD60u7, acknowledging that private corporations have the legal right to do what they're doing, before arguing that they *shouldn't*.

(b)     https://youtube.com/clip/Ugkx6tiIfsTwqwP6UpVH4vXDpt7YOvyoj1Fr, where even I openly acknowledge the legality of someone's actions before giving the opinion on the morality thereof.

13.     The defendant, in his smear video, could very easily have made a similar disclaimer, unambiguously clarifying that he accepts that I am acting squarely within my legal rights, but he, in his personal, non-binding opinion, believes I have a moral or ethical duty to do more than what the law strictly requires of me. Instead, he chose to clothe his smear video in language that made it absolutely clear that he was accusing me of ***breaking the law***!

14.     It's understandable why the Defendant wanted to go this route when smearing me: Because it is exponentially easier to paint me in a negative light and turn the court of public opinion against me if what I did was actually illegal. If he conceded that it was legal, but unethical, he would then have to justify why, exactly, his preferred ethical standard is a good one. Take, for instance, the example provided in ¶ 12(a) above, where a creator acknowledged that Game Jolt (the company he was criticizing) had the legal right to take down whatever content from their site they wanted. He spent less than 30 seconds conceding to the legality of the matter, but then spent the entirety of a 13-minute video making his case for the ethics of censorship of sexual content, emphasizing the ruination of numerous livelihoods, the double standards regarding male vs female sex workers, and the hypocrisy of banning adult content while gleefully engaging in countless other types of unethical corporate behavior. Same with the example provided in ¶ 12(b) above: I quickly conceded that she was legally allowed to block me, but then spent nearly 40 minutes explaining in-depth why people should treat her actions as suspicious and unethical despite her actions being legal.

15.     But if you accuse someone of illegal content, then 90% of your attempts to smear that person is done for you. Why should I have to adhere to the standards that Redfield demands of me? Because it's the law, that's why. Case closed.

16.     However, if you're going to go that route, and use the easy method of getting people to hate me, you need to take care to ensure you're citing the law correctly. More than any other count of defamation, these two accusations should be presumed false until Redfield affirmatively

proves them to be true. He should hold the burden of proving that I, in fact, violated § 512(f), the same as if he were filing a counterclaim against me and suing for that directly.

17.     Why? Because if you accuse someone of breaking the law, the burden of proof generally lies with the accuser. The one accused of breaking the law (me) is innocent until proven guilty. That's how it has worked for centuries. That's how it's *supposed* to work. It's a *good thing* that this is how it works. More importantly, if the accusations of § 512(f) misrepresentation were ever put before the Court in a standalone cause of action, that is precisely how it *would* work.

18.     But if a defendant is permitted, under defamation law, to simply spread his accusations about me to the court of public opinion, and then put the onus on me to sue for slander, only to then force me to prove that the allegations are false, rather than him having to prove that the allegations are true, then he has essentially flipped the tables on me at no cost. At that point, I am effectively guilty until proven innocent of violating § 512(f), which is wholly contrary to public policy and express Congressional intent. "It is unlikely that Congress intended to allow the provisions of [the law] to be bypassed so easily." See MCI Telecommunications Corp. v. Exalon Indus., 138 F. 3d 426, 430 (1st Cir. 1998) (referencing a similar effort to "flip the tables" on the opposing party and force that party to proactively file suit and bear the burden of proof accordingly, when it should have been that party's constitutional right to merely react to a suit being filed against them and enjoy the presumption of innocence accordingly).

19.     Moreover, such a precedent would effectively deputize private citizens to engage in acts of vigilante justice against me. By spreading these accusations against me everywhere they possibly can *except in court*, they can use shame and public humiliation (not to mention the onslaught of harassment, cyberstalking, death threats, and other forms of stochastic terrorism that would inevitably result from the distribution of this slander) in order to extrajudicially punish me for this perceived wrongdoing, without ever having to *actually prove* one bit of it. That is just another form of taking the law into your own hands.

20.     As I explained in the Complaint, the stress and anxiety I suffered as a result of the harassment caused me to become afflicted with an illness that *could have killed me*! I have suffered far, far more from their (Redfield and his allies) decision to be my judge, jury, and

executioner than I would have suffered if they had done what they should have done all along and taken me to court for § 512(f) misrepresentation, proven their case in court, forced me to pay damages, and then left it at that.

21. At that point, why would anyone bother to take me to court and use the proper methods to resolve legal disputes? Shaming me in the court of public opinion is easier, cheaper, faster, doesn't require they provide even a scintilla of evidence, doesn't give me the chance to offer rebuttal evidence to refute their claims, doesn't matter if they get the law completely wrong, doesn't require that they give up the power to decide their case to an impartial tribunal, and imposes a much harsher punishment than what a court would impose. There is literally no benefit to doing it the legitimate way!

22. At that point, a smear video like the one in this case effectively becomes little more than a cyber perp walk: Showcasing the "perp" so he can be pilloried by the online community. Perp walks have long been declared unconstitutional for this exact reason: In the absence of an external law enforcement motive (such as transferring to and from court), perp walks effectively amount to little more than extrajudicial punishment. See Lauro v. Charles, 292 F.3d 202 (2nd Cir. 2000). See also https://www.nytimes.com/1994/10/30/magazine/the-big-city-walking-the-walk.html:

> "Is there any redeeming social value to the [cyber] perp walk?
>
> Well, it does perform some social functions. A community shaken by an act of deviancy wants reassurance that moral order has been restored, and a perp walk accomplishes this much more quickly than the courts can. But, then, so does a lynching.
>
> The [cyber] walk can also serve to provoke an emotion that is otherwise alien to [the Internet]: shame. For one brief moment, the perp loses the [Internet]'s protective anonymity and feels, like Hester Prynne, the moral claustrophobia of a righteous community. Puritans can argue that this is good for the perp's soul, but let's not pretend we're doing it for his benefit. The perp walk is for everyone else. It honors the police, sells papers, boosts television ratings and entertains the public -- all at the expense of a person who is supposed to have the presumption of innocence."

23. Of course, unlike with perp walks, smear videos made by private citizens still enjoy First

Amendment protection, so we cannot simply outlaw smear videos entirely, and it is long established, black letter law that truth is an absolute defense to defamation. So... what to do?

24.     The quickest and easiest way to safeguard against this type of vigilantism, while still protecting the Defendant's First Amendment right to report the truth, is to require a defamation defendant who accuses his plaintiff of breaking the law (rather than simply doing an unethical thing) to prove his allegations were true, not just as a matter of fact, but also as a matter of law. Proving that the law is what he says it is would have to be just as important as proving the facts to be as he described them, as that is precisely what he would have to prove if he went through the Courts like he should have, and as I explained above, that is not something he should be allowed to simply pass onto me through the simple expedient of making the accusations against me publicly outside of a courtroom without due process of law.

**V-3: Defendant admits to facts which legally absolve me of DMCA misrepresentation.**

25.     During the smear video, the Defendant repeatedly made clear that he believed I had committed DMCA misrepresentation simply because the videos that I had taken down were in compliance with copyright law. In other words, he insists that, as long as an underlying copyright infringement lawsuit would be resolved in the defendant's favor should one be filed, any corresponding DMCA Takedown of the same video is necessarily illegal under 17 USC § 512(f). This is how the defendant has accused me of breaking the law, and therefore, this is what must *actually be the law* if the defendant is to prevail on the defense of substantial truth for the first two counts of defamation.

<u>V-3-A: The actual legal standard for DMCA misrepresentation</u>

26.     Put simply, his interpretation of the law is incorrect. In fact, the very case law the defendant cites to which creates the duty to consider fair use – Lenz v. Universal Music Corp., 801 F. 3d 1126 (9th Cir. 2015) – goes out of its way to make clear that the law is not as the Defendant argues it. In fact, in terms of word count, the Lenz court spends more time hammering in the very limitations that exonerate me in the instant case than they spend actually establishing the duty to consider fair use in the first instance!

27.     The Lenz court makes clear that I only have to perform a nominal consideration of fair

use. They held Universal Music liable for not considering fair use, not because their consideration of fair use was incorrect or lacking, but because they performed no fair use consideration whatsoever. It was a categorical, wholesale failure to consider fair use in any capacity that lead to them being held liable. See Lenz, supra at 1134 ("Lenz presented evidence that Universal did not form any subjective belief about the video's fair use — one way or another — because it failed to consider fair use at all, and knew that it failed to do so).

28.     However, the vast majority of the opinion was taken up, not by the Court setting forth the duty to consider fair use, but by expressly disavowing the very misunderstanding that is at issue in the instant case: They repeatedly and clearly held that all that is required of copyright holder (or agent of same) when issuing a DMCA Takedown is a "subjective good faith belief" that the subject of the takedown was not fair use. The phrase "subjective good faith belief" appears no less than eight times in the Court's opinion, and on multiple occasions, the Court expressly contemplated the proposed precedent that an objectively unreasonable belief about fair use should trigger liability under § 512(f), only to repeatedly and explicitly reject it.

    (a)     See id at 1134-35:

> "To be clear, if a copyright holder ignores or neglects our unequivocal holding that it must consider fair use before sending a takedown notification, it is liable for damages under § 512(f). If, however, a copyright holder forms a subjective *good faith* belief the allegedly infringing material does not constitute fair use, we are in no position to dispute the copyright holder's belief even if we would have reached the opposite conclusion" (emphasis in original).

    (b)     See id at 1135:

> "[A] copyright holder's consideration of fair use need not be searching or intensive. We follow Rossi's guidance that formation of a subjective good faith belief does not require investigation of the allegedly infringing content."

    (c)     See also id at 1134 (citing Rossi v. Motion Picture Ass'n of Am. Inc., 391 F.3d 1000 (9th Cir.2004)):

> "Though Lenz argues Universal should have known the video qualifies for fair use as a matter of law, our court has already decided a copyright holder need only form a subjective good faith belief that a use is not authorized. Rossi v. Motion Picture Ass'n of Am. Inc., 391 F.3d 1000 (9th Cir.2004). In Rossi, we explicitly

held that the good faith belief requirement in § 512(c)(3)(A)(v) encompasses a
***subjective, rather than objective*** standard. We further held:
In § 512(f), Congress included an expressly limited cause of action for improper
infringement notifications, imposing liability only if the copyright owner's notifi-
cation is a ***knowing*** misrepresentation. A copyright owner cannot be liable simply
because an unknowing mistake is made, ***even if the copyright owner acted
unreasonably in making the mistake.*** Rather, there must be a demonstration of
some ***actual knowledge*** of misrepresentation on the part of the copyright owner.
Neither of these holdings are dictum.
As a result, Lenz's request to impose a subjective standard only with respect to
factual beliefs and an objective standard with respect to legal determinations is
***untenable***. Such a request grafts an objective standard onto § 512(c)(3)(A)(v)
directly in contravention to Rossi. When enacting the DMCA, Congress could
have easily incorporated an objective standard of reasonableness. The fact that it
did not do so indicates an intent to adhere to the ***subjective*** standard traditionally
associated with a ***good faith requirement***."
(emphasis added; quotations and most citations omitted).

29.     There's no way around this. The Lenz court could not have been clearer. The duty to

"consider fair use" as outlined by Lenz is so low of a legal threshold that it is honestly far more

difficult to violate this law than it is to comply with it. Only by utterly ignoring, wholesale, entire

sections of ***the very case law*** that the Defendant and his followers cite in support of their

accusations against me, can they possibly reach the belief (good faith or otherwise) that I am

breaking the law by issuing any of these DMCA Takedowns!

### V-3-B: Legal opinions vs. legal facts

30.     Opinions are never defamation. Full stop. No ifs ands or buts, even when they result in

grave reputational harm. Sometimes, conclusions of law (e.g. evaluating what someone's rights

or duties are) are mere opinions and, therefore, not actionable defamation. However, in the

instant case this is not a valid defense.

31.     Bear in mind that I'm not suing him for claiming that the videos I had taken down were

fair use; that is a nuanced, multi-factored analysis and it can almost never be considered a

foregone conclusion whether or not something is fair use until a court of law says it is. Instead, I

am suing him today because he accused me of committing DMCA misrepresentation by insisting

that I *did not consider fair use*. That is far less vague of a legal concept than simply whether or

not the videos were fair use in the first place. Therefore, he cannot just pass that off as his opinion; it is well-established law in the 9th Circuit (whether this case ultimately ends up in California or Idaho) that the law of Lenz v. Universal is not as the defendant claimed it to be. Therefore he made a statement of fact when he argued the law, not an opinion, and therefore can be held liable for defamation.

32.    To support this, I cite this lawyer's website: https://www.hemmerlaw.com/blog/when-can-an-opinion-become-a-defamatory-statement/. He references (and directly links to) the William-Mitchell Law Review article "The Fact-Opinion Dilemma in First Amendment Defamation Law" to support his explanation, but he breaks it down in laymen's terms better than the article does.

33.    There is a four-factor test that Courts typically employ to determine whether or not a statement was one of fact or opinion. I will address each factor one at a time.

> "**Precision of wording** — Courts evaluate whether the language used implies an assertion of fact. If the language is loose, figurative or exaggerated, it may lean toward being an opinion. On the other hand, if the statement contains specific details, it might be treated as an assertion of fact."

34.    At no point in the smear video (or even the lawsuit reaction video) did the Defendant ever use any figurative or exaggerated language. Everything he said was entirely matter-of-fact. One such example is timestamp 34:51 of the smear video, where he says "Such external factors might help lend credence to support an argument within a lawsuit to be sure, but it in no way invalidates the requirement to consider fair use." That is not hyperbolic, but a plain, matter-of-fact statement of law.

35.    Therefore, this factor weighs in favor of his legal arguments being classified as assertions of fact.

> "**Verifiability** — Factual statements are typically capable of being proven true or false through external sources. Opinions, by contrast, convey the speaker's own sense of morality, propriety or other personal standards."

36.    This is the easiest factor to pass. As I said earlier, I'm not suing him because he claimed that the videos I had taken down were fair use. I'm suing him because he insisted that I had a legal duty not to issue the DMCA Takedowns as long as the targeted videos were fair use. That,

however, is a statement of law that can be definitively proven to be false. As I demonstrated in Section V-3-A above, his statements of law are verifiably false (whether he agrees with the law is irrelevant) and therefore, lean towards being considered non-opinion.

> "**General context** — Courts consider how and where the statement was made, taking into account the medium and its audience. Statements made in an editorial, commentary or opinion piece may be more likely to be considered as expressions of opinion, while statements presented as news reports are typically treated as assertions of fact."

37. The smear video is clearly classified as a news report, as evidenced by the numerous things he has said in the video that are undeniably factual, such as the other 8 counts of defamation I'm suing over in this case.

> "**Broader context** — This level of analysis seeks to ascertain the credibility that might be accorded to the statement by any reasonable reader."

38. At multiple points in the smear video, the Defendant insisted that he is "intimately familiar" with the standards for fair use. In later videos, he insisted that he "is not lawyer, nor do[es he] claim to be; [he is] merely a mook with a mic expressing [his] opinion on such matters" (see Dkt. 19, ¶ 21), but he never said anything of the sort in the smear video. Therefore, people are likely to accord a lot of credibility to him.

39. Therefore, all four factors favor the defendant's statements of law being classified as facts rather than opinons.

### V-3-C: The Defendant's admission of facts

40. The defendant has admitted over X (formerly known as Twitter) that I do indeed hold a subjective good faith belief in the validity of my DMCA Takedowns, including whether or not the underlying videos were fair use. See Exhibit A.

41. Therefore, facts which constitute an absolute defense to DMCA misrepresentation are proven by the Defendant's own admission, and therefore are proven beyond genuine dispute.

42. Therefore, the Defendant slandered me in the smear video when he accused me of DMCA misrepresentation and of not considering fair use.

<u>V-3-D: This applies to Defamation #2 as well</u>

43.    I'll discuss Defamation #2 in more detail momentarily, but even if I am wrong about the legal arguments contained in the upcoming section, I would still be entitled to judgment as a matter of law on Defamation #2 for the same reasons discussed in this section. The law clearly states that I am not guilty of DMCA misrepresentation as long as I have a "subjective good faith belief" in the validity of the DMCA Takedown, even if that belief is objectively unreasonable, even if it is downright delusional.

44.    This applies to conclusions of law as well as factual determinations. See Lenz at 1134 ("Lenz's request to impose a subjective standard only with respect to factual beliefs and an objective standard with respect to legal determinations is untenable"). So even if my legal arguments below are incorrect, I am still not guilty of DMCA misrepresentation (which in turn means the Defendant still slandered me when he accused me of DMCA misrepresentation) unless the defendant can prove that I *subjectively knew* that Skibbidy was a co-author as a matter of law.

45.    Since the odds that the Defendant will be able to prove that are one in a million, it does not constitute a "genuine" dispute of fact under Matsushita, and so I am still entitled to judgment as a matter of law on the issue of liability for Defamation #2.

**V-4: On Defamation #2, he incorrectly states that the stream was a joint work.**

46.    For Defamation #2, fair use is not a factor, as Skibbidy reposted the stream in its entirety with no modifications or edits whatsoever. Instead, the Defendant's basis for accusing me of of DMCA misrepresentation is the fact that I did not acknowledge Skibbidy as a co-author. The Defendant's logic is (A) Skibbidy participated orally in the stream, to an extent that would arguably make him "the star" of that stream; (B) although his contributions to the stream were exclusively oral, that alone makes him a co-author of the stream; (C) because he was a co-author, he was legally allowed, under copyright law, to repost the stream in its entirety without my permission and without having to follow fair use; (D) I disagreed with points B and C above and thus issued a DMCA Takedown against his reposting; and (E) because of points (b) and (c) above, said DMCA Takedown was in violation of 17 USC § 512(f).

47.    However, points B and C are incorrect. I will focus on point B for now. Put simply, you

do not become a co-author simply by speaking during a livestream. To be considered a co-author, you must do something which makes you an "author" under copyright law, and that means you must fix the work into a "tangible medium of expression." See Community for Creative Non-Violence v. Reid, 490 US 730, 737 (1989) ("As a general rule, the author is … the person who translates an idea into a fixed, tangible expression entitled to copyright protection"). See also Garcia v. Google, Inc., 786 F. 3d 733, 744 (9th Cir. 2015) (citing Community for Creative Non-Violence v. Reid) ("Garcia's copyright claim faces yet another statutory barrier: She never fixed her acting performance in a tangible medium, as required by [copyright law] … For better or for worse, Youssef and his crew 'fixed' Garcia's performance in the tangible medium … However one might characterize Garcia's performance, she played no role in fixation").

48.     For example, anyone can tell a joke to their friends at the bar. But there is no copyright to that joke until it is written down or recorded. If A tells a joke, and B records the telling of that joke with his smartphone, it is B, not A, who holds the copyright to that joke, even though A's creativity lead to the joke being told. Meanwhile, if a paparazzi photographer sees a celebrity walking down the street and snaps a photo, it is the photographer who pressed the button on the camera to take the picture, not the celebrity who posed for it, who owns the copyright. See https://www.youtube.com/shorts/JIFwhQ0OMB8 ("Just because you're the subject of a photo-graph doesn't mean that you own the underlying copyright").

49.     If that sounds unfair to and unappreciative of the creative talent that makes these copyrighted works so valuable in the first place, consider this: Earlier in Garcia, supra, explains why a contrary law is logistically impossible and would send entire industries that rely on copyright (not just creative fields, but also news journalism and many other industries) into legal death spirals. See id at 742-43:

> "Garcia's theory of copyright law would result in the legal morass we warned against in Aalmuhammed—splintering a movie into many different 'works,' even in the absence of an independent fixation. Simply put... it makes Swiss cheese of copyrights.
> Take, for example, films with a large cast—the proverbial 'cast of thousands'—such as Ben-Hur or Lord of the Rings.The silent epic Ben-Hur advertised a cast of 125,000 people. In the Lord of the Rings trilogy, 20,000 extras tramped around Middle-Earth alongside Frodo Baggins (played by Elijah Wood). Treating every

acting performance as an independent work would not only be a logistical and financial nightmare, it would turn cast of thousands into a new mantra: copyright of thousands.

The reality is that contracts and the work-made-for-hire doctrine govern much of the big-budget Hollywood performance and production world. Absent these formalities, courts have looked to implied licenses... But these legal niceties do not necessarily dictate whether something is protected by copyright, and licensing has its limitations. As filmmakers warn, low-budget films rarely use licenses. Even if filmmakers diligently obtain licenses for everyone on set, the contracts are not a panacea. Third-party content distributors, like YouTube and Netflix, won't have easy access to the licenses; litigants may dispute their terms and scope; and actors and other content contributors can terminate licenses after thirty five years. Untangling the complex, difficult-to-access, and often phantom chain of title to tens, hundreds, or even thousands of standalone copyrights is a task that could tie the distribution chain in knots. And filming group scenes like a public parade, or the 1963 March on Washington, would pose a huge burden if each of the thousands of marchers could claim an independent copyright." (cleaned up)

50.    Therefore, the only precedent the Court even could set that would be even remotely equitable is that, in order to be a co-author to the December 18, 2021 stream, Skibbidy must have done more than just participated orally in the discussion; he must have done something to actually record the conversation as a computer file, such as an mp4 file, so that it could be streamed and/or uploaded to websites.

51.    Since it is undisputed that Skibbidy did nothing of the sort, he is not a co-author. Therefore, my DMCA Takedown against him was perfectly legally valid. Therefore, the Defendant slandered me when he accused me of DMCA misrepresentation.

    V-4-A: Even if Skibbidy's a co-author, my DMCA Takedown against him is still valid.

52.    I will now discuss the legal argument contained in ¶ 42(C) above: That, if Skibbidy is a co-author, that gives him the absolute right to repost the stream without my permission. While this is technically true, even that would not be the end of the story.

53.    The right of a co-author to distribute his work without my permission is "subject... to a duty to account for any profits he earns from the licensing or use of the copyright." See Ashton-Tate Corp. v. Ross, 916 F. 2d 516, 522 (9th Cir. 1990). In other words, if Skibbidy was a co-author, he would be legally in the clear to repost the stream if, and only if, he gave me 50% of

every single nickle that was made from said reposting. This includes both ad revenue and voluntary donations.

54.    Moreover, even if he did not monetize it himself, YouTube still would. Ever since 2020, YouTube has put ads on all videos, even those which are not part of the YouTube Partner Program. See https://medium.com/james-ssekamatte/youtube-is-putting-ads-on-non-monetized-videos-c102e19b0698. Therefore, even if Skibbidy isn't making money himself, he still owes me half of whatever YouTube is making off that stream.

55.    It is painfully clear that Skibbidy had no intention of giving me one cent form his reposting. Even a cursory review of the email he sent to me in Exhibit B clearly shows that he is doing this to harm me financially, by giving people an alternative way of seeing the stream without giving my YouTube channel any views and, therefore, any ad revenue. So of course he wasn't going to share the money with me, as that would undermine the whole reason he was reposting it in the first place. Therefore, even if he was a co-author (which he's not), I was still well within my legal rights to have that video taken down, as it was still uploaded illegally because Skibbidy still had no intention of honoring his duties to me as a co-author.

56.    Therefore, Sydney Redfield *still* slandered me when he accused me of DMCA misrepresentation against Skibbidy.

57.    And again, even if all of this is legally incorrect, it still doesn't matter. I'm still innocent of DMCA misrepresentation (and thus the Defendant still slandered me when he accused me of it) as long as I had a "subjective good faith belief" that I was legally in the right at the time that I issued the DMCA Takedown.

### V-5: The defendant buried his head in the sand.

58.    I am not a public figure, for reasons I explained in ¶¶ 124-131 of the Complaint. However, even if the Court disagrees with me, and decides that I am a public figure, I can still prove actual malice in this case: Because the Defendant refused to hear my side of the story privately (the public argument we had on Twitter doesn't count) before publishing his smear video. See Undisputed Fact #6. This constitutes burying his head in the sand.

59.    Had he given me a chance to tell my side of the story before he had made up his mind to

smear me, there is a very good chance I could have explained to him all of the stuff mentioned in this memorandum. Instead, the defendant didn't see the need to hear my side of the story because his mind was 100% made up. He outright refused to entertain any evidence that might have conflicted with the judgment he had already made about me in absentia.

60.    That is the very definition of "burying his head in the sand" and, therefore, actual malice.

## V-6: Refusal to Retract

1.    Immediately after the smear video was published, we spent three days  arguing over private email, where I demanded he retract his smear video, but he refused to, insisting that "it wasn't defamation."

2.    This satisfies my legal duty to demand retraction before suing. Therefore, I am now eligible to recover general damages, such as for emotional distress and loss of reputation.

## VI: RELIEF REQUESTED

61.    Upon partial summary judgment on the issue of liability being granted, I hereby request the following relief:

## VI-1: Declaration of Liability & Malice

62.    First, I ask that the Court declare two things:

(a)    First, that the Defendant slandered me when he accused me of DMCA misrepresentation. There was literally not one accusation of DMCA misrepresentation in the smear video that was substantially true.

(b)    Second, that the Defendant acted willfully and maliciously, with the express intention of causing hundreds of thousands of people to harass and dox me over false accusations and inflict severe emotional distress onto me.

(c)    Third, that this constitutes defamation per se, both because it accuses me of a crime of moral turpitude (DMCA fraud), and also because it accuses me of being unfit for my chosen profession of making YouTube videos.

63.    The effects of the latter declaration are two fold: First, it opens up the possibility of me recovering punitive damages against the defendant, and second, it prohibits the defendant from dissolving his damages liability to me in bankruptcy under 11 USC § 523(a)(6).

64.     Upon this declaration being issued, the only thing left to litigate, in regards to Defamation #! and #2, are damages.

## VI-2: Injunctive Relief

65.     I then ask the Court to issue the following injunctions against the Defendant:

### VI-2-A: Injunction #1: Remove the slanderous content.

66.     First, he should be ordered to remove any/all references to me committing DMCA misrepresentation from his channel.

67.     Before that happens, however, I respectfully ask that the Court download[1] a copy of the smear and lawsuit reaction videos, and state in its order that it has done so, as they are certainly relevant evidence for the other counts of defamation that don't currently have motions for partial summary judgment pending about them.

### VI-2-B: Injunction #3: Convince everyone of the truth.

68.     I then ask that the defendant be ordered to publicly correct the statements he made about me in such a way that ensures that my reputation is fully restored. He should not be required simply to tell everyone that he was wrong, but to *actually convince them*, to the point where literally everyone on Earth, with no exceptions, has either never heard of this controversy in the first place, or their must *subjectively believe* that I am the blameless victim of harassment, doxxing, and defamation (and that SidAlpha willingly and maliciously participated in same), and absolutely nothing else.

69.     If that sounds impossible, it isn't. It may be difficult, and it may be expensive, but it *can be done*. It has happened before. The most prolific example of this sort of "reputation repair" (for lack of a better term) is the highly controversial case of Liebeck v. McDonald's in New Mexico. For years and years during the 1990s and 2000s, Ms. Liebeck was treated as nothing more than a greedy plaintiff who sued McDonald's over the pettiest of torts, suing for millions of dollars for what should have been only a couple hundred bucks in actual damages. But nowadays, the record has been set completely straight. Nowadays, you almost never hear the original "smear" story unless it is specifically setting up to explain how that original story was false.

70.     The same is possible here. It may take a long time for the defendant to do it, but that just

---

1   The Court can easily do so with this software: https://winx-youtube-downloader.en.malavida.com/windows/

means he'd better get started. Distributing the message may be expensive[2], but that alone doesn't excuse legal obligations. If it did, debtors would be able to get out of paying off their debts simply because they lost their jobs. I'm not talking about being judgment proof; I'm talking about the Court officially recognizing that the debtor is absolved of his official duty to repay the debt, to such a degree that, even if the debtor got a job in the future, the creditor still wouldn't be able to garnish his wages because judgment was officially in the debtor's favor. Obviously, that would be absurd, and the Court should hold likewise here.

### VI-2-C: Injunction #3: End all related harassment.

71.    Last but not least, I ask that SidAlpha be ordered to personally and by any means necessary bring about an end to any/all harassment made against me. Again, I am not asking that he merely be ordered to post a video telling his viewers not to harass me, but to personally ensure, under his own power, that the harassment ends.

72.    If this also sounds impossible for him to do, then maybe he should have thought about that before he was publishing his knowingly false smear video about me. This is not a case of "there's nothing the defendant can do to make people leave the plaintiff alone," because there *was* something he could have done: He could have simply not posted the smear video in the first place! At this point, he has made his bed and now he should be made to lie in it.

### VI-2-D: How violations of injunctions should be identified.

73.    In practice, the primary means through which the second and third injunctions would manifest would be to hold SidAlpha in contempt of court (complete with fines payable to me and coercive confinement) every time someone else harasses me, or posts any defamatory material about me, in connection with this controversy. After all, if someone continues to harass me, that is clearly evidence that SidAlpha has not fully complied with the injunctions to convince everyone that I'm the blameless victim and get everyone to stop harassing me, is it not?

74.    Unrelated defamation and harassment should also constitute a violation of these injunctions, as long as it is clear that the other party is only creating these new accusations

---

2    He probably can't just rely on the YouTube algorithm to distribute the correction. He'll probably have to subpoena the locations of everone who watched the video – all 160,00+ of them – and personally sit each of them down, individually, in order to truly ensure that this injunction is complied with.

against me as a substitute for the old accusations they are no longer allowed to spread. In other words, if someone were to realize that they could not continue this exact line of defamation, but still believes that I am a scumbag, so they come up with something else, no matter how out-of-the-blue it may be, to continue to harass me and claim that it's unrelated, the Defendant should still be held in contempt of court for that.

75.    If the contempt is punishable by fine, then those fines should be payable to me, rather than to the court. After all, the whole point of these injunctions is to put an end to the harm being inflicted on me. Therefore, I should be the one compensated for the harm that is continued to be inflicted on me.

### VI-3: Other Relief

76.    I then ask that the Court award me whatever other relief which it considers necessary to make me whole in this case.

### VII: CONCLUSION

77.    Wherefore, premises considered, I respectfully pray that this Motion for Partial Summary Judgment on the Issue of Liability for Defamation #1 and #2 be granted, and for any other relief to which I may be entitled.

So requested on this, the 30th day of September, 2025.

*/s/ David Stebbins*
David Stebbins (pro se)
123 W. Ridge Ave.,
APT D
Harrison, AR 72601
(870) 212-4947
acerthorn@yahoo.com
