EXHIBIT 2  - STEBBIN'S FIRST AMENDED COMPLAINT

Dear Benton County Circuit Court,

Please find attached my First Amended Complaint to be filed in Case 04CV-26-489 in this court.

Sincerely,

David Stebbins
123 W. Ridge Ave.,
Apt D
Harrison, AR 72601
870-204-6516
stebbinsd@yahoo.com

**RECEIVED**
*By Brittany Cadell at 10:35 am, Mar 02, 2026*

IN THE CIRCUIT COURT OF BENTON COUNTY, ARKANSAS
CIVIL DIVISION

DAVID STEBBINS                                              PLAINTIFF

VS.                             CASE <u>04CV-26-489</u>

PREMIUM RETAIL SERVICES, LLC
ACOSTA, INC.
WALMART, INC.
JOHN DOE #1                                                 DEFENDANTS
JOHN DOE #2, aka "appledude"
JOHN DOE #3, aka "Canonevent"
JOHN DOE #4, aka "darrinsdabomb"

## <u>FIRST AMENDED COMPLAINT AND JURY DEMAND</u>

Comes now, pro se Plaintiff David Stebbins, who hereby submits the following Complaint with Jury Demand in the above-styled action.

For the most part, this Complaint will be identical to the Original Complaint. So if the Court has already reviewed that, it can skim over most of this. The only sections that are new are Section IV-7-E (starting at the bottom of Page 20), Section V-1-D (starting at the bottom of Page 27), and Section V-2-A (starting at the top of Page 29). To further highlight the new sections, I will bookend their headers with triple asterisks (***) to make them even easier to spot.

## I: POTENTIALLY MORE CLAIMS TO COME

1.      As of the time of this writing, a tentative settlement agreement is currently being disputed. It is unclear if the agreement is actually final and binding. If it is, that may mean that my right to sue for a violation of the Americans with Disabilities Act under federal law may be barred. See Section IV-8: below for more details.

2.      The reason I am filing this defamation complaint right now is simple: Because the statute of limitations for defamation in Arkansas is only one year. If I wait until the EEOC finishes its investigation before I file this complaint, I risk the statute of limitations running out.

## II: IDENTITIES OF THE PARTIES

3.      Premium Retail Services, LLC – or "Premium" for short – is the "Main Defendant" in this case. They are a company who I worked for, who are in the business of selling mobile phones and mobile phone accessories inside Walmart stores. They can be served with process at the following registered agent: Corporation Creations Network, Inc., 609 SW 8TH St., #600, Bentonville, AR 72712

4.      Acosta, Inc. - or "Acosta" for short – is Premium's parent company. Acosta's HR department handles all of the HR-related business on Premium's behalf. They can be served with

1

process at the same registered agent as Premium.

5.      Walmart Inc. is the owner and operator of the eponymous chain of retail stores, the largest retailer in the world. They can be served with process at the following name and address: CT Corporation System, 320 S. Izard St., Little Rock, AR 72201

6.      John Doe #1 is an unknown individual. Once this claim gets filed, I intend to ask the Court for early discovery, so that the corporate defendants can be compelled to produce his real name and address so that he can be served with process.

7.      John Doe #2, #3, and #4 (collectively known as "the Kiwi Farms posters") are all unknown individuals, but they all have represented publicly that they work for Premium and/or Walmart. As such, they can be served with process at the same address as mentioned in ¶¶ 6 & 8 above. Barring that, the corporate defendants can be compelled to product their legal names and addresses in early discovery.

## III: PERSONAL AND SUBJECT-MATTER JURISDICTION

8.      "The courts of this state shall have personal jurisdiction of all persons, and all causes of action or claims for relief, to the maximum extent permitted by the due process of law clause of the Fourteenth Amendment of the United States Constitution." See AR Code § 16-4-101B.

9.      Meanwhile, "Circuit courts shall have original jurisdiction of all justiciable matters not otherwise assigned pursuant to the Arkansas Constitution." See AR Code § 16-13-201(a). Under the United States Constitution, one way to establish personal jurisdiction is to file a lawsuit in a district where at least one of the defendants primarily resides, as long as all defendants reside in the same state. See 28 USC § 1391(b)(1). Therefore, the Benton County Circuit Court may exercise personal jurisdiction over a case as long as one of the defendants is headquartered in Benton County.

10.     One of the Defendants in the instant case is Walmart, Inc. Their principle place of business is at the address of 1 Customer Drive, Bentonville, AR 72716, according to the Arkansas Secretary of State's Business Entity Search. See **Exhibit A**.

11.     Meanwhile, the other two corporate defendants – Premium and Acosta – both have registered agents in Bentonville, thereby making them "residents" of Arkansas for purposes of personal jurisdiction. Therefore, all of the corporate defendants are residents of the same state. Since the Doe defendants are unknown, we must assume they that they too are residents of Arkansas until proven otherwise.

12.     Under the aforementioned federal statute, that creates personal jurisdiction and proper venue in Benton County, which in turn creates personal jurisdiction under state law pursuant to AR Code § 16-4-101B. Therefore, jurisdiction is proper in this court.

## IV: FACTS OF THE CASE

13.     The following facts are necessary to understand the case.

2

14.    The short version of the facts is that defendant John Doe #1, acting pursuant to the express directions of the corporate defendants, publicly accused me of stealing nude photos of his girlfriend/wife off of his phone, when I did nothing of the sort, in order to get me fired from my job in retaliation for me requesting accommodations for my disability. But even after that damage had been done, the corporate defendants and their employees continued to spread the lies about me publicly for their own demented pleasure.

15.    That's the short version. The long version can be found below:

### IV-1: My Aspergers and how it impairs major life activities.

16.    In fifth grade, during the 1999-2000 school year, I was diagnosed with Asperger Syndrome. Ever since, my life has revolved around managing the symptoms of this disability. I receive Supplemental Security Income from the federal government because of this disability, which means that it is proven to the satisfaction of the federal government that my disability significantly impairs my ability to find gainful employment.

17.    Aspergers Syndrome is, at its core, a mental impairment that makes it extremely difficult for me to comply with social conventions. It impairs the major life activity of interacting with others, whether that interaction be in a social, commercial, formal, or other setting. Outside of work, this has resulted in me having no friends. Although I can get along with my neighbors okay, that is only in short, controlled bursts, but I rarely interact with them for more than a few minutes at a time. This is not because I *cannot* interact with people for long stretches, but because, if I do, I will almost always annoy them in some capacity. This has resulted in me becoming "friendless by choice," because it is best if I spend the majority of my time alone, so I don't offend anybody.

18.    In the workplace, my disability means that it is usually best if my interactions with customers are limited to short, controlled bursts, such as the time it takes to process a sale and get them approved. Meanwhile, if I made a social faux pas while interacting with coworkers (for whom it is not plausible for me to only interact with them in short, controlled bursts) and annoy them accordingly, the best accommodation is to educate them of my condition, while also explaining to me, in clear and unambiguous language, exactly what I did wrong and exactly what I should have done instead.

### IV-2: My employment with Premium

19.    From November 24, 2024 until May 14, 2025, I was employed by Premium in the role of a "wireless sales pro," or WSP for short.

20.    In laymen's terms, I was a mobile phone salesman. I worked inside Walmart's electronics department. My job description included selling phones and phone accessories (such as cables and protective cases), as well as performing numerous post-sale services to customers who purchased new phones. One of the services I was expected to perform after selling a new phone was the "transfer of data," where I took all the personal data (contacts, passwords, pictures and videos, etc.) from their old phones and copied them onto the new phone.

3

21.     I worked under the management and supervision of Territory Manager Haleigh Holt and District Manager Ryan Chamberlain. John Pete – who managed an adjacent territory – would occasionally fill in for Haleigh whenever she was taking time off.

22.     I made $12 per hour at the job, plus I also got commissions on sales. The commissions were smaller during the first three full months of employment. For me, that was December 2024 through February 2025. Remember, we're talking *full* months, so even though I began work in November, that didn't count. Beginning in March 2025, I made full commissions on my sales. For the month of March 2025, I made approximately $392 in commissions, which were paid to me on April 18, 2025. For the month of April 2025, I made approximately $374 in commissions, which were paid to me on May 30, 2025. From these two examples, it appears that "estimated commissions" of $360 per month are reasonable for purposes of calculated loss of income for purposes of damages.

23.     I consistently met my sales quota at this job. Full-time WSPs are expected to meet a monthly sales quota of 21 or more postpaid[1] sales (or "posts," for short) per month. Beginning on January (aka the second full month I worked there, after I had finished learning the ropes), I consistently met that quota, each month from January until May, despite only working part time. Meanwhile, a WSP's productivity, for both full and part time, is measured by the number of posts we made, divided by the hours we worked, each month. A productivity of 0.10 or higher (aka at least one post for every ten hours worked) was necessary to avoid a "performance improvement plan" (or PIP, for short). Except for December (aka my first full month at the company, when I was barely learning the ropes), I consistently got productivity of more than 0.20 (aka *double* the minimum) for each month at the company. My highest productivity score was in January 2025, when I ended the month with a productivity of 0.298, a hair's breath away from *triple* the minimum.

24.     I was only late for work one day for my entire duration at the company. That happened on December 27, 2024 (aka when I was still brand new at the company), and it wasn't because I simply overslept, but because I had made it all the way to the parking lot at work and realized I had forgotten my phone at home. Without that phone, I could not access the company app and therefore could not clock into work. So I had no choice but to go all the way back home to get my phone. The company policy states that any attendance points I receive will expire after 90 days. Since I was fired on May 14, 2025, that only attendance point had long since expired by the time I was fired.

25.     On December 27, 2024, John Pete told me over text (so I have written proof thereof if the corporate defendants try to deny it) that there were no factors determining my job performance other than attendance and meeting my sales quotas. This, combined with the facts mentioned in ¶¶ 24-26 above, definitively prove that I absolutely was not fired for "poor performance," and if the corporate defendants say I was, they are necessarily lying. Any attempts to claim I was fired for "poor performance" is necessarily pretextual.

---

[1] "Postpaid" is the opposite of prepaid phones. I often used the following rehearsed line to explain it to customers: "Prepaid is where you pay for the time, and then add it to your phone after you've paid. Postpaid means you'll get coverage immediately, but you won't get your first bill until about a month from now. It's kind of like being at a restaurant; you eat first, and *then* you pay."

4

### IV-3: My request for accommodation

26.    I have Asperger Syndrome. You may have heard of it. So, on April 4, 2025, I sent an email to the email address of askhr@acosta.com (which is the email address for employees to contact Acosta's HR department) and requested a reasonable accommodation for my Aspergers: Whenever I make a social faux pas, to tell me in clear and unambiguous language (preferably in writing) exactly what I did wrong and exactly what I should have done instead. I also CC'd my two managers, Haleigh and Ryan, so they would receive notice of this request as well.

27.    Immediately after sending that email, I received an automated email from Acosta HR, acknowledging receipt of the email and automatically opening a ticket.

28.    Three days later, on April 7, 2025 (aka one business day later), I received another email, stating that my ticket had been updated. I tried to log into HR's ticket website in order to view and respond to the ticket, but my login and password didn't work. My account with HR's ticket system had been terminated.

29.    Three days later, when I didn't respond to the ticket (because I *couldn't*), I received another email, stating that my ticket had been closed due to a lack of response from me.

### IV-4: The previous attempts to manufacture reasons to get me fired.

30.    On May 7, 2025, Walmart's head of the electronics department, named JJ, informed me that my bag of work supplies was against store rules. He likened it to a woman bringing her purse onto the sales floor, which I believe (and I even said as much to JJ) to be a patently absurd comparison. These were not just my personal belongings; they were my *work tools* (notebook, pens, cables of various sizes to fit various phones, power bank for customers' depleted phones, etc.), and I needed these supplies in order to do my work.

31.    Moreover, I didn't even have my bag with me on the sales floor. At the start of every shift, I emptied my supplies out of the bag, placed them on the counter, and then stashed the empty bag into a shelf, out of sight and out of mind. Moreover, requiring me to not have a bag to carry the supplies in means that I would be required to carry each item individually, risking dropping (and possibly damaging) them. Allowing me to have a bag to carry them in is absolutely reasonable, and expecting me to not have a bag to carry them in is absolutely unreasonable.

32.    I immediately texted Haleigh, and she immediately took my side. She proposed a "compromise" where she proposed "What if you just took the materials out of the work bag and then it's just your work supplies, no bag to cause concern with? That shouldn't cause any grief." I replied by saying "Why does the BAG cause any real grief?! And how am I supposed to bring my supplies with me if it's not in a bag? Just carry them all individually and risk dropping them?" She replied, saying "Noo, I meant bring it in like normal, and then organize your supplies in the drawer. Just set the empty bag aside."

33.    Bear in mind that I was *already doing that!* What Haleigh considered a "reasonable compromise" is literally what I was *already doing*, and JJ was still complaining about that! I even took a picture of where I had stashed the bag and sent it to her. A screenshot of this

5

conversation is hereby provided:



34.    As you can see, Haleigh reacted to my text with the "100" emoji, signifying that she fully took my side on the issue.

35.    At the time, I was prepared to let it go, since nothing ever came of it. But now, looking back from a position of hindsight, it seems as if the corporate defendants were actively fishing for an excuse to give me write ups.

36.    On May 9, 2025, I received harassing and threatening texts from an anonymous person (most likely planted by the corporate defendants) who was texting from the phone number of (870) 416-4798. This person said that I "sold [him] some bogus bulshit" and telling me that I "need to quit [my] job at premium wireless," saying that "everyone at that company fucking hate [me]" and that he's "already talked to [my] boss." I asked him who he was, but all he said was that he was "the guy that's going to make the rest of [my] life a living hell if [I] don't straighten [my] fucking ways."

37.    I immediately sent screenshots of these texts to Haleigh, seeing as he claims to have already talked to her. She denied having spoken with him.

38.    Haleigh took over the situation, texting that number and receiving his complaint instead. He accused me of various fake behaviors, including but not limited to (A) stealing people's phone numbers and taking them for myself, (B) ruining his credit because I signed him up for an expensive plan, and (C) blocking the pathway at Walmart so people can't get straight talk cards.

39.    Haleigh was able to diffuse the situation, explaining to him that, because he did not

6

purchase a new phone but instead brought his own phone, he was free to cancel the service plan with no obligations or cancellation fees.

40.    However, it's also worth noting that he accused Haleigh of not wanting to fire me because she (and, by extension, the company) were afraid of getting sued by me.

41.    Again, Haleigh diffused the matter.

42.    Then, on May 10, 2025, near the end of my shift, one of Walmart's "Coaches" (aka middle management) instructed me to set up a customer's Tracfone for them. This was outside of my job description. Tracfone is a prepaid carrier, and as a WSP for Premium Retail Services, I was expressly forbidden from handling prepaid phones beyond selling them[2].

43.    I attempted to explain this to the coach, but she refused to listen. She demanded that I set up the phone for the customer, because it's my job to do so, because I was "the phone guy." She then walked off before I could say another word.

44.    I immediately called Haleigh on my work phone and asked her what to do. She affirmed that I was not to handle the prepaid phones besides just selling them. When I asked her what I was supposed to do now that the Walmart Coach had given me explicit orders to set up the phone, she offered to speak to the Coach herself. I handed my work phone to the coach, and Haleigh explained my job description to the coach, once again diffusing the situation.

45.    It seems that the Walmart Coach was actively searching for an excuse to put me in a lose-lose situation. Had I disobeyed and refused to service the phone, they would have written me up for insubordination. But if I had obeyed, I would have been written up (if not outright lost my job altogether) for doing something I was expressly forbidden from doing. It was only because I had called Haleigh immediately to have her diffuse the matter that I was able to avoid both punishments. In other words, it was used as an excuse to give me write-ups, just like the previous two attempts.

46.    So now, three times, the defendants have attempted to make stuff up in an attempt to get me fired (or at least written up), and three times, Haleigh took my side, so they had to let it go. So now, if they want to manufacture an excuse to get me fired, it has to be something so serious, and so heinous, that it simply goes over Haleigh's head, something that Haleigh simply wouldn't have the authority to diffuse, or at the very least, wouldn't have a chance to diffuse before they could fire me over it. That transitions me to the next section:

### IV-5: Defamation #1: John Doe #1's knowingly false complaint

47.    On the morning May 14, 2025, I showed up to work, on time, ready to work my shift, only to find a customer who I do not recognize lodging a complaint to two Walmart employees:

---

2   I would often use the following analogy to explain it to customers: "Imagine if you're having car trouble, and you take it to a mechanic, versus if you go to Auto Zone. Auto Zone can sell you the parts that you need, but it's entirely up to you to figure out which parts you need and what to do with those parts once you have them. That's basically us with the prepaid phones: We sell them, but that's ALL we do. But if you were to take a postpaid plan with us, we'd be the 'machanics' for your phone if it ever goes haywire."

7

A Walmart Coach[3] named Cody, and a complaint investigator named Jason. He accused me of something so vile, and so heinous, that Walmart had no choice but to ban me from the employee section of the store until their investigation of the matter was definitively resolved.

48.    He said that I had previously sold him a phone a few weeks prior. I do not recognize this man, but I concede that might be my memory just being fuzzy. Anyway, he alleged that, during the aforementioned post-sale transfer of data, I had taken a nude photo of his girlfriend off of his old phone and, rather than transfer it to his new phone, I had instead put it on *my own phone* for my own personal use!

49.    This is absolutely a false accusation.

50.    As soon as I heard it, I immediately pulled my phone out of my pocket and offered it to him so he could look through it and see for himself that there is no nude photos at all (let alone of his girlfriend) on it. He refused the offer, yet still insisted that I had stolen the nude photo.

51.    In fact, not only is this accusation not true, it is literally impossible, at least on Android phones. When transferring data onto an android phone, you cannot transfer individual pictures. You have to either transfer all the pictures on the phone, or none of them. There is no in between.

52.    Not only that, but a few minutes later, when I was fuming in the back section of the store, investigator Jason assured me that a cursory review of the CCTV footage would definitively show one of two things: Either it will definitively catch me in the act, precisely as Doe #1 described it, or it would definitively prove that I am innocent, no in between, and I *know* it would not have done the former.

53.    In addition to this being false, it is most certainly *knowingly* false. Think about it: What makes Doe #1 think I did this? Did he physically see me do it, with his own eyes? If so, why did he wait several weeks to speak up? Why didn't he raise hell to the other Walmart associates the moment he saw me do it? I definitely would have remembered him if he had done that! The fact that he didn't do that immediately is in itself smoking gun evidence of mendacity, or at a minimum, that he didn't physically catch me in the act in real time.

54.    But if he didn't physically catch me in the act, and only thinks I did it because of some circumstantial evidence he noticed after the fact (e.g. some sort of digital paper trail), then what was that evidence? And how could he be so sure that I did it, on that evidence alone, that he didn't think he needed to even look at my phone when it was offered to him?

55.    The only explanation that makes sense is that he *knew* he was making it all up in an attempt to get me fired.

56.    And get me fired it did. In fact, even though Jason assured me that a cursory review of the CCTV footage would have definitively shown that I didn't do it, they never actually got around to pulling the footage. Instead, Premium and Acosta went ahead and fired me later that same day, just on the accusation alone, before Walmart even had a chance to properly investigate it.

---

3    A "coach" is a middle management, someone who supervises the bottom-rank Walmart associates while reporting to the store manager.

8

57.    I promptly filed a charge of discrimination with the EEOC. However, we did not reach an agreement. We agreed on an amount of money to be paid to me as settlement, but we never agreed to any other terms besides that, and so we are still technically trying to finalize the settlement agreement.

### IV-5-A: Doe #1 was almost certainly put up to it by the corporate defendants.

58.    Proving that the accusations were knowingly false is good for winning compensatory and punitive damages from Doe #1, but proving that he was acting pursuant to a civil conspiracy with the corporate defendants (aka proving that he is a "corporate plant") is essential to making the corporate defendants jointly liable for the first count of defamation.

59.    Please note that, at this time, I do not know for sure if the individual defendant was *employed* by the corporate defendants, or if he was just some guy they found and solicited for this one task. However, it doesn't matter which one it is, because there are adequate legal theories to make the corporate defendants liable for the defamation either way. If Doe #1 was employed by the defendants, and the Court finds the statement was made in the course and scope of his employment, then they are presumed vicariously liable under the doctrine of respondeat superior.

60.    While there is a privilege for defamatory statements made in the course and scope of employment, that privilege does not apply to knowingly false statements (See Section V-2 below). Since the defamation mentioned in Section IV-5 above was knowingly false, there is actual malice here, and since it was done in an attempt to manufacture an excuse to fire me, there is certainly "ill will." Therefore, there is no qualified privilege in the event Doe #1 was the corporate defendants' employee.

61.    Meanwhile, even if Doe #1 isn't an employee (or, alternatively, if the Court finds that the statement was not made in the course and scope of his employment), the corporate defendants are still jointly liable as long as I establish a civil conspiracy. That is what this section will do.

62.    As I allege the facts to prove this civil conspiracy, please understand that I do not have to prove this beyond a reasonable doubt, only by a preponderance of the evidence. This means that I need only show that the "Corporate Plant Theory" (for lack of a better term) is the theory that *best* explains *all* the data. A theory doesn't even have to *perfectly* explain all (or any) of the data; it just has to be the theory that *best* explains all the data, and "best" is inherently relative. This means that, even if the defendants and/or Court can come up with a few hypothetical theories as to what happened, and even if those theories are not ludicrous on their face, that still isn't enough. That might be enough in a "beyond a reasonable doubt" standard of evidence, but in a "preponderance of the evidence" standard, these competing theories need to *actually surpass* the Corporate Plant Theory in terms of explanatory power in order for the corporate defendants to prevail.

63.    Think about it this way: We're in Arkansas, aka the Bible Belt. So maybe this YouTube video will help illustrate what I'm talking about: https://youtu.be/A0iDNLxmWVM. In that video, theologian and philosopher Mike Jones argues that Jesus's Resurrection from the dead "best explains all the data." He juxtaposes the Resurrection Theory alongside three other competing theories – the Mythic Theory, the Conspiracy Theory, and the Hallucination Theory –

9

to demonstrate how each of these competing theories pale in comparison to the Resurrection Theory in terms of explanatory power. Notice how he occasionally gives yellow checks to some competing theories, thereby conceding that those theories have *some* explanatory power in *some* areas, but that alone isn't good enough; the Resurrection theory has significantly *more* explanatory power, even in the few areas where competing theories have *some* explanatory power, and so the Resurrection theory is still the best theory.

64.    So too should that be the standard here.

65.    That said, the data which the Corporate Plant Theory is best at explaining, and which other theories postulated by the defense and/or Court must explain better than the Corporate Plant Theory, are thus:

(a)    The CCTV footage, once subpoenaed, will clearly show that I did not do what Doe #1 accused me of doing (steal the nude photo).

(b)    Why didn't Doe #1 raise the issue immediately when he saw me do it? And if he only thinks I did it because of some digital paper trail he noticed after the fact, what is that evidence that makes him think I did it?

(c)    Why didn't Doe #1 go through my phone when I offered it to him?

(d)    Why hasn't he pursued any legal action against me?

(e)    There's a very good chance I never made a sale to him in the first place (it will depend on if Walmart, when subpoenaed, will be able to produce the CCTV footage for it), so I never even had the *chance* to steal any nude photos, even if I wanted to.

(f)    What could possibly have possessed Doe #1 to make up such horrible accusations about me, a man who had presumably met only once in his life (if even that much, seeing as I don't recognize him from any prior sale)?

(g)    How could he possibly have known I was going to be working that day, so he could have timed his visit so perfectly in order to cause me the greatest possible amount of public shame and humiliation?

(h)    He had to have known the CCTV footage would have quickly and easily exposed him as the liar he knew he was. So why did he make the accusation in the face of such exculpatory evidence?

(i)    The corporate defendants agreed to a mediation with me. Remember: the fact that they agreed to mediate *at all* is still admissible, even if the contents of said mediation are not.

66.    The Corporate Plant Theory best explains all of these points. The theory that Doe #1 was making a willful and malicious lie, but acting independently of the corporate defendants, may adequately explain points (a)-(d) above, and possibly points (e)-(f), but utterly lacks any explanatory power at all for points (g)-(i). But the Corporate Plant Theory explains all nine.

10

67. Think about it: In response to point (f), what was Doe #1's motive? Easy: He most likely didn't have one. Instead, it was the corporate defendants who had a clear and obvious motive to make me look as bad as possible: So they could have an excuse to fire me, and the reason they wanted to fire me is because I requested accommodations for my disability. Since I wasn't giving them any excuse to fire me on my own (as explained by ¶¶ 24-27 above), they had to manufacture some outrage in order to give themselves an excuse to fire me. After JJ and the anonymous complainer both tried and failed to create an excuse to fire me, they finally used Doe #1 to do it.

68. This theory is only further bolstered if, upon subpoenaing the CCTV footage, it is ultimately revealed that I never sold a phone to Doe #1 in the first place, as suggested in point (e) above. Then, Doe #1 really really *really* has no motive to make up such horrible lies about me, even less so than if I had actually sold him a phone previously.

69. In response to point (g), if Doe #1 was acting independently of the corporate defendants, then it was one hell of a good guess that he just happened to pick a day I was working to make the complaint in order to maximize my public humiliation and shame. However, if he was sent there by the corporate defendants, then this complete shot in the dark wasn't a shot in the dark at all; he knew I'd be working that day because the corporate defendants *told him* I'd be working that day.

70. In response to point (h), he would have to be crazy, if he were acting independently alone, to make up such horrible lies about me, knowing that he would quickly be proven to be lying. However, if he were in cahoots with the corporate defendants, his boldness suddenly makes sense. He made these lies, even though the CCTV footage would instantly expose him, because he knew it would never get that far. He knew that the corporate defendants were going to fire me before Walmart even had a chance to pull the footage.

71. And the only way he could possibly have known that the corporate defendants were going to do that is if... you guessed it... the corporate defendants *told him* they were going to do that!

72. In response to point (i), we must ask ourselves: If you are the corporate defendants, and you have deep pockets so you can afford the expense of litigation, and you genuinely believed Doe #1's complaint to be true (that I genuinely stole the nude photo), would a reasonable person in that position agree to a settlement conference at literally the first opportunity? No, the only thing a sane person with any moral code whatsoever can possibly do at that point is stand their ground against the creep and pervert, and litigate no matter the cost, because that may be expensive, but they can afford it, and it's the lesser of two evils compared to letting that creep and pervert get even an ounce of validation for his heinous crimes.

73. It's kind of like how, back in 2019, when Florida police officer Zachary Wester was charged with planting drugs in people's cars so he could artificially inflate his arrest quotas, the prosecution declared that there would be no plea bargains for Wester. See https://abcnews.go.com/US/florida-deputy-arrested-allegedly-planting-drugs-traffic-stops/story?id=64265554 ("Evans does not plan to offer a plea deal and is ready for a speedy trial, he said. 'It is the policy of my office not to plea bargain cases of this nature,' he said"). By "this nature," he of course means absolutely heinous, life-ruining frame jobs where the culprit was literally caught on camera in the act.

11

74. Likewise, in the instant case, where I had supposedly committed an equally deplorable act, and I was caught *on camera* in the act, nobody with any moral compass whatsoever would be willing to even entertain the possibility of compromising. In other words, this behavior heavily implies that they do not actually see me as a creep and pervert who deserved 100% of the humiliation, shame, and unemployment that came his way. It's either that, or the corporate defendants admit to being soulless, amoral monsters in their own right, which in itself only further lends credence to them planting Doe #1 to make this knowingly false complaint.

75. This means that the Corporate Plant Theory best explains point (i) above.

76. In addition to having the best explanatory power compared to nearly any other theory, the Corporate Plant theory also handily satisfies all five of the factors that historians use when comparing theories of what happened. In the Christian video above, Mike Jones shows all five of these factors beginning at timestamp 41:36: Explanatory power, explanatory scope (meaning it explains *all* the facts, not just some), illumination, plausibility, and being the least ad hoc of all the theories. I've already explained in-depth how the Corporate Plant theory has the best explanatory power and scope, so I'll now discuss the other three factors.

77. It provides illumination because it also explains why I was locked out of HR's ticket system, as well as the multiple previous attempts to make me look bad explained in Sections V-3 and IV-4 above, because it demonstrates that the corporate defendants have been attempting to manufacture an excuse to fire me for some time now, and ultimately resorted to having me be accused of stealing nude photos because, if it were any less serious than that, Haleigh would just take my side and diffuse the situation. So the Corporate Plant Theory is certainly illuminating.

78. Then there's the factor of being the least ad hoc. "To be ad hoc, ... means a number of new suppositions are made by hypothesis that are not already implied in existing knowledge. So the hypothesis adds extra assumptions in order to explain the data that is not already present." See timestamp 42:32 in the above apologetics video. Therefore, in order for a theory to be the *least* ad hoc, it must require the fewest assumptions. You may have heard of this logic before; it's also known as "Occam's razor."

79. The Corporate Plant Theory is the ideal theory in this case, as it requires we make only one assumption: That the corporate defendants are ready and willing to fire employees the minute they cease to be the ideal, complicit, good little drones that they want their employees to be, and are even willing to make up fake customer complaints in order to give themselves an excuse to do so.

80. But that is hardly an assumption. After all, as California worker's rights lawyer Ryan Stygar explains in the following videos (and many others like them if you browse through his TikTok page), this is far from an ad hoc assumption, but is in fact textbook HR behavior:

- https://www.tiktok.com/@attorneyryan/video/7447960368128724254
- https://www.tiktok.com/@attorneyryan/video/7314123438908640558
- https://www.tiktok.com/@attorneyryan456/video/7311253565824044330
- https://www.tiktok.com/@attorneyryan/video/7476536170021801246
- https://www.tiktok.com/@attorneyryan/video/7559296803867233567

12

81.    That transitions neatly into the final factor that historians consider: Plausibility. "A hist-orical theory is plausible if other areas are known with confidence and suggest the same theory yours is suggesting." See timestamp 44:29 of the above apologetics video. Here, again, it is known, textbook behavior that corporations will make up fake complaints against employees they're looking to fire. So this certainly qualifies as plausible.

82.    Therefore, the preponderance of the evidence indicates that Doe #1 was sent to that store on that fateful day by the corporate defendants in order to make a knowingly false complaint against me, specifically so the corporate defendants could use that as a pretext to fire me. If any of the defendants and/or the Court wish to postulate any competing theories, they need to be mindful of the need for these theories to not only *have* explanatory power and scope, but to actually *surpass* the Corporate Plant Theory in terms of it, and also to rival the Corporate Plant theory in the other three factors as well. Merely spitballing random theories as they occur to you[4] is not good enough. That's literally what "preponderance of the evidence" means.

IV-5-B: Pretext to fire me in retaliation for requesting accommodation

83.    Even if Doe #1 was not a corporate plant, there is still ample evidence that proves that Doe #1's complaint was used as a pretext to fire me in retaliation for requesting accommodations for my disability. Even if Doe #1 wasn't sent there by the corporate defendants, that only means that the corporate defendants were not expecting the complaint, but they still seized upon the opportunity to fire me as soon as an excuse – *any* excuse – presented itself. The fact that the corporate defendants failed to conduct even the most cursory investigation into the matter, or at least a very shallow one, is recognized in case law as smoking gun evidence of pretext.

(a)    See Ion v. Chevron, 731 F.3d 379 (5th Cir. 2013)

"Chevron's failure to conduct even the most cursory investigation, confront Ion about Peel's statements, or seek a second opinion under the FMLA calls into doubt Chevron's reasonable reliance and good faith on Peel's statements, and, at the very least, creates a fact issue as to whether it would have terminated Ion despite its retaliatory motive."

(b)    See also Deffenbaugh--Williams v. Wal--Mart Stores, Inc., 156 F.3d 581, 589--90 (5th Cir. 1998), rehearing en banc granted, opinion vacated, 169 F.3d 215 (5th Cir. 1999), and opinion reinstated on rehearing, 182 F.3d 333 (5th Cir. 1999). Affirming discrimination verdict for the plaintiff, and observing that:

"When Gipson told Deffenbaugh that she was terminated for 'shopping on the clock', she explained that the VCR had been purchased by Williams, not her; and that Gipson could verify this by asking a fellow employee who had seen Williams make the purchase. Deffenbaugh testified that Gipson told her that his 'mind [was] made up.' He did not interview possible witnesses to the sale, even after Williams approached him and told him that he had made the purchase; did not interview the

---

4    such as atheists claiming that Jesus was in fact never buried, so there was never any tomb to be found empty

cashier; and did not check to see if there was a videotape of the incident. . . . Gipson failed to investigate, even when confronted by Williams' corroboration of Deffenbaugh's version of events."

(c)    See also Rachid v. Jack In The Box, Inc., 376 F.3d 305, 308 (5th Cir. 2004), where an HR manager investigated the plaintiff for altering time--cards. She found that he had done so. Therefore, "without further investigation," the plaintiff was fired. Id. Rachid sued for age discrimination, claiming that his time card "alterations" were merely his good faith attempts to correctly submit payroll by deleting incorrect and inflated time entries. In reversing a summary judgment that had been entered for the employer, the Fifth Circuit found it suspicious that the employer "did not make any investigation to determine whether those deletions [by Rachid] were accurate." Id. at 314 n. 13.

84.    Furthermore, even if the corporate defendants had done an investigation into the matter before firing me, if that investigation clearly shows that I didn't do it (which it would have in this case), and they still fire me over that alleged complaint, that is still evidence of pretext, and even the Supreme Court has acknowledged this.

(a)    Reeves v. Sanderson Plumbing Products, Inc., 530 US 133, 147 (2000) ("Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive. In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose") citations and quotations omitted).

(b)    St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 511 (1993) ("The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination").

(c)    Haire v. Board of Sup'rs of La. State Univ. Agricultural & Mech. Coll., 719 F.3d 356, 365 n. 10 (5th Cir. 2013) ("Evidence demonstrating that the employer's explanation is false or unworthy of credence . . . is likely to support an inference of discrimination *even without further evidence of defendant's true motive*") (emphasis in original).

(d)    Dister v. Continental Group, Inc., 859 F. 2d 1108, 1116 (2nd Cir. 1988) ("facts may exist from which a reasonable jury could conclude that the employer's 'business decision' was so lacking in merit as to call into question its genuineness").

(e)    In re Lewis, 845 F. 2d 624, 633 (6th Cir. 1988) ("One way for Lewis to [prove pretext] is to show that Sears' asserted business judgment was so 'ridden with error that defendant could not honestly have relied upon it'").

85.    In addition to the simple falsity of this accusation, lest we forget that the efforts to manufacture excuses to give me write-ups only began after I made the accommodation request. Prior to that, I had been working for the company for *months*, and while people may have been *annoyed* by me (par to the course for my Aspergers by this point), I hadn't actually *done* anything

14

to deserve termination or even any disciplinary action. In fact, I had done an objectively good job (coworkers being mildly uncomfortable around me notwithstanding) as evidenced by the facts stated in ¶¶ 24-27 above. But as soon as I requested the accommodation, then and only then did their idle talk suddenly become tangible actions, designed to give themselves excuses to pad my file with false write-ups, as explained in Section IV-4 above. That is classic evidence of pretext.

86.    So even if Doe #1 is proven to not be a corporate plant, the corporate defendants are still on the hook for wrongful termination.

## IV-6: Walmart's and Premium's illegal retaliation.

### IV-6-A: My legally protected conduct

87.    On May 14, after I noticed that I was removed from the company Discord server (and therefore presumably fired), I messaged Haleigh multiple times on Discord and over SMS, as well as tried to call her multiple times, but she never responded to any of my attempts to communicate.

88.    My intention with this communication was not to commit any crimes or engage in any objectively unreasonable behavior, but instead simply to protest my firing in good faith.

89.    Because she would not respond to my calls or messages, I went to Walmart in person and sought to speak to Haleigh in person, as I know she was covering my shift for that day. However, she was not in the electronics section, and I did not attempt to enter the back area that is reserved exclusively for employees to search for her, as I was acting on the understanding that, for better or worse, I was no longer an employee there. I asked many of my former co-workers where she was, but none of them claimed to know where she was.

90.    Again, my purpose for seeking her out was not to commit any crimes or engage in any objectively unreasonable behavior, but merely to protest my termination in good faith and obtain an explanation as to why I was terminated.

91.    During my visit to Walmart that day, I informed one of the investigators who I had spoken to that morning that I believed my termination to be discriminatory.

### IV-6-B: Walmart's and Premium's retaliatory behavior

92.    After a few minutes, Haleigh summoned Walmart security, who proceeded to escort me off the premises and barred me from the store for the remainder of the day. They admitted that the reason for their actions was because I was attempting to speak to Haleigh.

93.    Both Walmart and Premium are liable for this action, because Walmart committed the retaliatory act and because Haleigh, acting in the course and scope of her employment with Premium, solicited Walmart to do it.

## IV-7: Subsequent Acts of Defamation

94.    It would be bad enough if the defendants simply made that one accusation against me,

15

cost me my job, and left it at that. But the defendants didn't stop there. They continued to spread the heinous accusations well outside the scope of what might even arguably fall under the qualified privilege.

### IV-7-A: Defamation #2: Spreading the defamation
### between Walmart & Premium employees

95.     First, naturally, the corporate defendants began spreading this complaint between themselves. This is the closest the defendants can possibly come to being eligible for a "qualified privilege" defense, since there is at least a rebuttal presumption that employees within the two companies need to communicate with each other in order to properly investigate the matter.

96.     However, the qualified privilege is a limited one. The privilege only applies when "the person making the communication has an interest or in reference to which he has a duty, *and to a person having a corresponding interest or duty.*" See Wal-Mart Stores, Inc. v. Lee, 74 S.W.3d 634, 653 (2002) (emphasis added). This means that, if the corporate defendants repeat the defamatory accusations to *even one person* who doesn't have an interest in receiving the information, the privilege is lost.

97.     Here, the corporate defendants spread the accusation against me like it was mere gossip, telling loads of people who worked for the company, and even posting the accusations on the company's Discord server, where even bottom-level employees such as other salesmen (people like Appledude, Canonevent, and Darrinsdabomb below) could see it. These bottom level employees do not have "a corresponding interest" in hearing these accusations. They are not management or HR. They are not investigators or police. Therefore, there is no more of a qualified privilege for telling them than there is for those three people reposting it publicly on Kiwi Farms (see below for more details).

98.     Barring that, the qualified privilege is still lost. "The qualified privilege is lost if it is abused by excessive publication; if the statement is made with malice; or if the statement is made with a lack of grounds for belief in its truthfulness." See Lee, supra at 654. Only one of those three grounds need to be met in order for the privilege to be lost, and all three are met here.

99.     First, posting the accusations on the company's discord server, where they have very little (but not no) ability to control who sees it would most likely qualify as "excessive publication."

100.    Second, lest we forget that the CCTV footage would definitively prove my innocence to the exclusion of all other factors. The fact that this controversy lasted longer than one day necessarily proves that either (A) they saw the footage, knew I was innocent, and continued to spread the defamation anyway, knowing it to be false, or (B) they refused to even look at the CCTV footage, despite knowing it would solve the case instantly and singlehandedly one way or another. The former would obviously defeat the privilege, but even the latter would still constitute "burying their heads in the sand," which, under defamation law, is still sufficient to establish actual malice (see New York Times Co. v. Sullivan, 376 U.S. 254 (1964)), thereby defeating the privilege.

101.    Last but not least, the fact that they had such a quick and easy way of knowing that I was

16

innocent means they necessarily lacked a good faith, reasonable grounds for belief in the truthfulness of the statement.

102.    Therefore, the Defendants have met all three criteria for losing the privilege, assuming it ever applied at all despite the arguments contained in ¶¶ 98-99 above.

#### IV-7-B: Defamation #3: Appledude republishing the defamation on Kiwi Farms

103.    From this point on, there is not even an arguable basis for qualified privilege. From this point on, employees of the corporate defendants are posting the accusations, not on a discord server locked to company employees, but on a publicly visible website that you don't even need to create an account in order to view, meaning the accusations are now effectively broadcast to the entire world, with no ability at all to control who sees them.

104.    First, there is John Doe #2, who goes by the alias "Appledude." On May 25, 2025, he created an account with Kiwi Farms for the express purpose of spreading the defamatory accusations onto that website. You can see his post history by going to the following URL: https://kiwifarms.st/members/appledude.203899/.

105.    As you can see from his first post[5], Appledude states in no uncertain terms that I was indeed fired because I stole the nude photos. He does not state merely that I *had a customer complaint* accusing me of stealing the nude photos[6], but stating outright that "David (while working on a gentleman's phone) decided to transfer the dudes wife's onlyfans photos to his own phone."

106.    Later, in a subsequent post[7], he represented that he worked with me under the same boss (aka Haleigh Holt). In other words, he was the same rank as me, so he was not entitled under the qualified privilege to be privy to the customer's accusations for reasons described in ¶¶ 98-99 above.

107.    In another post[8], he said he could provide a screenshot of the company discord server to prove that I am no longer a member of that server. This proves that the corporate defendants reposted the defamatory accusations on their discord server as described in Section IV-5-A above.

108.    It is worth noting that Kiwi Farms is not just any ordinary message board website. It is one of the most vile and toxic communities on the entire Internet. The entire website is dedicated almost exclusively to harassing, doxxing, and cyberstalking their victims; Barnes & Noble sells

---

5    Found here: https://kiwifarms.st/threads/david-anthony-stebbins-acerthorn-stebbinsd-fayettevillesdavid.116370/page-233#post-21527063

6    Even if he did say that, it wouldn't have saved him. "Under the libel law republication rule, repeating false and reputation-injuring allegations is generally itself libelous, even if the repetition accurately summarizes the allegations: saying 'A said that P stole money from petty cash' is libelous if P didn't steal the money, even if it's accurate that A said that P stole the money." See Eugene Volokh, *Libel by Omission of Exculpatory Legal Decisions*, 97 Notre Dame L. Rev. 351 (2021). Available at: https://scholarship.law.nd.edu/ndlr/vol97/iss1/7 (citing the Restatement (Second) of Torts ¶ 578).

7    Found here: https://kiwifarms.st/threads/david-anthony-stebbins-acerthorn-stebbinsd-fayettevillesdavid.116370/page-233#post-21527231

8    Found here: https://kiwifarms.st/threads/david-anthony-stebbins-acerthorn-stebbinsd-fayettevillesdavid.116370/page-233#post-21527288

books, Playboy produces pornography, WWE produces professional wrestling shows, and Kiwi Farms harasses, doxxes, and cyberstalks people for its users' demented amusement. It's literally what they do. It's literally their entire business model. See www.motherjones.com/politics/2023/02/kiwi-farms-die-drop-cloudflare-chandler-trolls/ ...

> "Kiwi Farms is a forum similar in design to 4chan or 8chan, where anonymous posters gather. But instead of just spreading noxious discourse, Kiwi Farms users turn to the site to plan and coordinate. They work to make the lives of their targets a living hell. Their tactics include doxxing, SWATing, defaming, encouraging self-harm, and stalking, online and sometimes off.

> Kiwi Farms harvests anguish. It thrives on pain and revels in death. Users of the innocuously named forum prey on the vulnerable and marginalized—people who are transgender, neurodivergent, disabled, financially struggling—with persistent and twisted harassment campaigns... reporters are wary of becoming targets themselves. The users call their victims "lolcows" because their pain can be milked for laughs. *The group made its purpose clear on its Twitter page before it was taken down: 'Gossip and exploitation of mentally handicapped for amusement purposes.'*

> Kiwi Farms users deploy slightly different tactics for various victims, but the rough beats are the same. First, the group assembles extensive dossiers. Then they use the information (some true, some contorted, some fabricated) to torment their targets." (emphasis added)

109.    In fact, back in 2022, it got so bad that their server host Cloudfare had terminated its service for Kiwi Farms. The reason they did that is because the harassment, doxxing, and cyberstalking had gotten so bad that it literally presented an imminent threat to people's lives! See www.washingtonpost.com/technology/2022/09/03/cloudflare-drops-kiwifarms/

> "'As Kiwi Farms has felt more threatened, they have reacted by being more threatening,' Prince said. 'We think there is an imminent danger, and the pace at which law enforcement is able to respond to those threats we don't think is fast enough to keep up.'

> Prince said contributors to the forum were posting home addresses of those seen as enemies and calling for them to be shot."

110.    Of course, this alleged "threat to life" has been going on for quite some time now. In fact, the website has been known to harass at least three different people to the point where those people kill themselves![9] In fact, that website is so gleefully dedicated to driving their victims to

---

9    See https://www.motherjones.com/politics/2023/02/kiwi-farms-die-drop-cloudflare-chandler-trolls/ ("Its victims reportedly include Julie Terryberry, who in 2016 took her life after being targeted by users of the site. Two years later, after years of harassment from Kiwi Farms trolls, Chloe Sagal lit herself on fire in a public park. In June 2021, an American video game developer based in Japan, named David Ginder, took their life amid a campaign of Kiwi Farms abuse").

suicide that they *literally have a counter* on their website (known as the "Kiwi Kill Count") dedicated to keeping track of how many people they've managed to make kill themselves! See See https://www.motherjones.com/politics/2023/02/kiwi-farms-die-drop-cloudflare-chandler-trolls/ ("Most websites aren't known for having a 'kill count.' Kiwi Farms is... Users gleefully imagined Ginder's death: 'Here's hoping for a +1 to the kiwi kill count' ... Everyone will get a point on their counter if he does it, and I only need two more to get free a milkshake").

111.    I say all of that to say this: John Doe #2-#4 all could not possibly have chosen a worse place for them to repost the accusations. It eliminates any possibility that they were acting in good faith, because the site they were posting to is inherently bad faith in everything it does. Their posts were malicious, they were sadistic, and they were absolutely spiteful.

112.    This means that the Defendants' culpability (all of them, corporate and individual alike) are the highest they could possibly be. They fully deserve seven digit (possibly even eight digit) punitive damages because of how malicious they were.

### IV-7-C: Defamation #4: Canonevent republishing the defamation on Kiwi Farms

113.    On May 26, 2025, John Doe #3 created his own Kiwi Farms account with the username "Canonevent." You can see his post history by going to the following URL: https://kiwifarms.st/members/canonevent.203946/.

114.    In his first post[10], he reaffirmed what appledude had already said about the circumstances surrounding my . However, he went a step further and provided screenshots of customers' text messages!

115.    These screenshots are especially important because they necessarily prove that the corporate defendants' management, HR, and/or investigations departments are much more active in the spreading of this defamation than they otherwise would be. Think about it: Without Canonevent's post, you could postulate the theory that Appledude and Darrinsdabomb merely learned about the circumstances of my termination through uncorroborated workplace gossip that just happened to end up being right, not that the corporate defendants were actively telling them directly. But if that were the case, then where did Canonevent get those screenshots from?! You can't get evidence like that just from he-said-she-said workplace chatter. The only way he could possibly have gotten them is if he was, or got them from, an employee of the corporate defendants' management, HR, and/or investigations division(s).

116.    In the final line of his first post, he claims he claims that he is "Someone that worked with [me]." This means that he is also an employee of either Premium or Walmart. Meanwhile, in his final post[11], he references "our store manager," aka the Walmart store manager (whose name is Austin Vasquez), implying that he might work for Walmart.

117.    Either way, it isn't good for the corporate defendants. Even if he works for either comp-

---

10 Found here: https://kiwifarms.st/threads/david-anthony-stebbins-acerthorn-stebbinsd-fayettevillesdavid.116370/page-234#post-21533903

11 Found here: https://kiwifarms.st/threads/david-anthony-stebbins-acerthorn-stebbinsd-fayettevillesdavid.116370/page-237#post-21628261

any, the act of telling him these things and even giving him the screenshots is not covered under qualified privilege unless they can prove that he was someone who had an interest in being privy to this accusation. If he was, there might be a presumption of privilege (subject of course to the exceptions described in ¶¶ 100-103 above), but then, he still turned around and reposted it publicly. Even in that case, the corporate defendants are still vicariously liable for his reposting under the doctrine of respondeat superior, since he used company resources and insider information in order to make that post, even if he technically acted without mangement's knowledge or consent.

118.    But if he did not, in fact, work for either company in any capacity, or if he only worked as a bottom-level grunt employee who does not "have an interest" in being privy to the customer complaint, then that is honestly even worse for the corporate defendants, because at that point, it is the corporate defendants themselves (not simply the Kiwi Farms posters) who are telling the defamatory accusations to a complete rando for whom it is absolutely none of his business. At that point, the corporate defendants become *directly liable* (no respondeat superior necessary) for the defamation themselves, even if it cannot be proven that they directly solicited John Doe #1 to make the original complaint!

119.    The corporate defendants will have to prove who Canonevent is in order to create a prima facie showing of qualified privilege, which will save me the trouble of having to find out who he is via early discovery as one usually does with John Doe defendants. If they cannot prove who he is, then they cannot prove qualified privilege, which means they are necessarily liable for defamation anyway.

IV-7-D: Defamation #5: Darrinsdabomb's restatement of the defamation on Kiwi Farms

120.    And finally, on May 26, 2025, John Doe #4 created an account with Kiwi Farms under the alias "Darrinsdabomb" for the express purpose of further spreading the defamatory statements. You can see his post history by going to the following URL: https://kiwifarms.st/members/darrinsdabomb.204037/.

121.    In his *second* post[12] (not his first), he replied to Canonevent's post and "confirm[ed] that it happened." By "it happened," he either means that I stole the nude photo, or that I was accused of stealing it. Even if the latter is what he meant, he is still liable for defamation pursuant to the Republication Rule, as I explain in Footnote #5 above.

122.    In his *first* post, he verified that he is indeed one of my former co-workers, proving that he is either a Premium mobile phone salesman or a Walmart Associate.

***IV-7-E: Defamation #6: Canonevent's February 25, 2026 Kiwi Farms Post***

A)    On February 25, 2026, John Doe #3 (aka "Canonevent") made a new post on Kiwi Farms. You can see the post at the following URL: https://kiwifarms.st/threads/david-anthony-stebbins-acerthorn-stebbinsd-fayettevillesdavid.116370/page-291#post-23813278.

---

12 Found here: https://kiwifarms.st/threads/david-anthony-stebbins-acerthorn-stebbinsd-fayettevillesdavid.116370/page-235#post-21544061

20

B)    Having apparently seen this lawsuit on public record, he then proceeded to state the following:

> "David is trying to sue because *he actually stole images from someone's phone on camera and it was shown and recorded. Our employees found it and we took action.* Walmart and Premium won't lose the lawsuit he made. He is embarrassed because he was caught and is trying to say he could have a career for 5 years. What a joke. He would have been fired soon after regardless because he couldn't follow any rules and too many customers complained about him. His smell, his attitude, the way he handled businesses. All of it was trash and Walmart would have stopped it soon enough. What a sad human. **We used to watch him stare at the pole In Electronics and mumble to it.** We used to laugh at him for his facial expressions that were absurd and scary and try and keep customers from interacting with him. One girl who worked with us genuinely thought she would be harmed by him and had to be escorted out with management, What an idiot."

(emphasis added)

C)    So, in the excerpt above that is underlined and italicized, he now states, in no uncertain terms, that I stole the photo. Not that I got a customer a complaint saying I did, not that I was terminated regardless of whether or not I did it, but that I "actually stole images." No longer is the republication rule necessary to hold them liable.

D)    Meanwhile, in the excerpt above that is bolded and italicized, he also admits that they were indeed actively searching for an excuse to fire me, and that a real or perceived mental health disorder, or at least a symptom of one (e.g. talking to an inanimate object) was, at a minimum, a "motivating factor" in their desire to see me gone. Keep that in mind when I get to Section V-2-A below.

### IV-8:: Damages I have suffered

123.    Of course, I have lost my job as a result of this defamation. But that's just the tip of the iceberg. I suffered great shame and humiliation on May 14, when I was publicly accused, in front of my coworkers, of one of the most heinous things imaginable. That naturally subjected me to great humiliation.

124.    In addition, I have also become virtually unemployable because of this drama, because I simply cannot find another job. Every job interview I take, even one that would just pay minimum wage and require no skills (such as a cook at a restaurant), I have been unable to get hired.

125.    This is because, whenever I list my recent employment history, I also have to give the "reason for leaving." When listing Premium as a recent employer, my "reason for leaving" is given as a "knowingly false customer complaint." If I get a job interview, they'll naturally press for details, forcing me to admit that I was accused (however falsely) of stealing a nude photo. I emphasize that the CCTV footage would show that I didn't do it. But despite this, I cannot get hired. Even if the hiring manager personally believes me that I didn't do it, the fact remains that they don't want this kind of drama brought to their doorsteps.

21

126. To put this in perspective, consider this: I first got my car (and therefore my source of commute) on Halloween night of 2024. It was after sunset on Halloween, so I put off looking for a job until the next day. On November 1, 2024, I immediately began searching for a new job. I attended five job interviews, ultimately culminating with me getting a job offer from Premium on November 24, 2024.

127. In other words, once I had commute, I managed to get a new job in less than a month.

128. When I was fired on May 14, 2025, I immediately began searching for new work. As of the time of this writing, I have attended dozens of job interviews (many times more than what I had done during November of 2024), and I still haven't gotten any job offers, despite much more time passing and me attending many more interviews.

129. Furthermore, two of those interviews (not just applications, but *interviews*) were for Cricket Wireless and Tracfone Wireless, aka job openings for mobile phone sales associates, aka the job I just got out of. So I was absolutely qualified for those positions, and getting either of them would have been an ideal bounce-back job. And I couldn't even get hired *then!*

130. Virtually nothing has changed in between these two job searches. I still live in the same location, have the same source of commute, the same skillset, the same pay expectations, the same everything. The *only* difference is that, now, I have baggage because I'm known to bring drama and harassing customer complaints to my company's doorstep whether I intend to or not. That's the *only thing* that's different.

### IV-9: EEOC Mediation and tentative settlement

131. On September 24, 2025, I attended a mediation with Premium. At that mediation, I was represented by Little Rock lawyer Lucien Gillham.

132. We reached an initial agreement to settle the case, where I would dismiss claims against them under the Americans with Disabilities Act, and they in exchange would pay me $12,500. The EEOC even drafted a settlement agreement. This is the only settlement, waiver, or release that I ever signed.

133. The EEOC then proceeded to close my charge against them and will not issue me a Notice of Right to Sue. This means that, if I don't get paid from this settlement, the Defendnats will have gotten what they wanted out of the agreement (not being sued for discrimination under the Americans with Disabilities Act) but are not required to give me anything in return.

134. However, Premium insisted on also having a "supplemental" agreement in order to further spell out the terms of the settlement. Lucien Gillham advised me the following:

> "The reason there is another agreement is this. The EEOC only has jurisdiction to handle claims brought under [federal law]... So they cannot settle any other claims than those... [I]n addition to your disability claims under the Americans with Disabilities Act (ADA) for disability discrimination and retaliation, you could also sue under the Arkansas Civil Rights Act (ACRA) for those same things. The Defendant is not going to pay you $12,500 to settle the ADA claims, just so that

you can turn around and sue them under the ACRA for essentially the same theory."

135.    I conceded that this was a fair thing to request from them. However, the terms they included in their supplemental agreement were objectively outrageous. The most egregious of these terms was that I released all claims, not just against Premium, but Walmart as well, even though they were never a party to the case. Not only that, but I also agreed to never seek employment with any of the "released parties," which, combined with the aforementioned release of Walmart a a party, meant I could never even so much as apply to be a Walmart Associate ever again!

136.    There were plenty of other terms that were objectively unreasonable; this is just the worst example. Even Lucien Gillham told me over email that "wal mart as a party, releasing wal mart, and no re-employment with wal mart is bs."

137.    So of course, I did not agree to these supplemental terms. This means that I never signed anything except the tentative EEOC settlement, which, as Lucien Gillham explained in the excerpt above, means I never, even arguably, signed away my right to sue for defamation or ACRA. This is why I am holding out on suing for a violation of the federal ADA for the time-being.

138.    Instead, the Defendants are still contractually obligated to pay me $12,500 in exchange for me not suing them under the Americans with Disabilities Act. That payment has not been forthcoming. Therefore, they are in breach of that agreement.

## V: LAW AND ARGUMENTS

139.    For the following reasons, I am entitled to recover from the defendants:

### V-1: Defamation

140.    "The following elements must be proved to support a claim of defamation, whether it be by the spoken word (slander) or the written word (libel): (1) the defamatory nature of the statement of fact; (2) that statement's identification of or reference to the plaintiff; (3) publication of the statement by the defendant; (4) the defendant's fault in the publication; (5) the statement's falsity; and (6) damages." See Faulkner v. Arkansas Children's Hosp., 69 SW 3d 393, 402 (2002).

141.    "Defamatory nature" merely means that the statement damages the subject's reputation. See Ark. Model Jury Instr., Civil AMI 411. It should be obvious that accusing me of such a heinous act would damage my reputation, so this element is handily satisfied.

142.    Doe #1's complaint unequivocally referred to me, as evidenced by how he repeatedly referred to me specifically when making the complaint. So the second essential element is satisfied.

143.    "Publication" means it has to have been published to at least one third party. Since Doe #1 initially made the complaint to two Walmart associates, Cody and Jason, and because Walmart is a separate legal entity from Premium or Acosta, that counts as a third party publication, so, for Defamation #1, the third element is sufficiently plead.

144.    For Defamation #2-#5, the corporate defendants and the Kiwi Farms posters all directly

23

engaged in spreading these accusations to other people. Therefore, for Defamation #2-#5, the element of publication is satisfied, making the corporate defendants, as well as the Kiwi Farms posters, jointly liable for the defamation.

145.    Doe #1 was unequivocally at fault for making the publication, and if the Court accepts that he was sent there by the corporate defendants, that makes them at fault for the publication too. Meanwhile, the corporate defendants are at fault for Defamation #2, the Kiwi Farms posters are at fault for Defamation #3-#5, and the corporate defendants are also at fault for Defamation #3-#5 as well, either directly or through respondent superior, as I explained in above. So the fifth element is sufficiently plead.

146.    As I repeatedly made clear throughout this complaint, the accusation was absolutely false, so the fifth essential element is sufficiently plead.

147.    I was fired, as well as publicly shamed and humiliated, as a direct result of this accusation, so the sixth and final essential element has been sufficiently plead.

148.    Therefore, I have sufficiently plead all six essential elements to recover for defamation.

### V-1-A: Possible Defense: Qualified workplace privilege

149.    "A communication is held to be qualifiedly privileged when it is made in good faith upon any subject-matter in which the person making the communication has an interest or in reference to which he has a duty." See Wal-Mart Stores, Inc. v. Lee, 74 SW 3d 634, 653 (2002). "The qualified privilege is lost if it is abused by excessive publication; if the statement is made with malice; or if the statement is made with a lack of grounds for belief in its truthfulness." See id at 654. Under defamation law, "malice" means that the defendant either knew the statement was false or acted in reckless disregard to its truthfulness. See New York Times Co. v. Sullivan, 376 US 254 (1964).

150.    Here, that defense is absolutely off the table. First, and for all counts of defamation, the statements were knowingly false. The CCTV footage alone will prove that they are false, and from there, there is no plausible theory upon which any of the defendants (whether they be Doe #1, the corporate defendants, or the Kiwi Farms posters) can possibly justify that they genuinely believed in good faith that the accusations were true.

151.    For Defamation #2-#5, the defense is also lost because they continued to spread the defamatory content to other people who did not have even so much as an arguable interest in being privy to the controversy. For Defamation #4, the only way they could possibly create an arguable basis for qualified privilege is if they prove exactly who Canonevent is and prove that he works for either company's management, HR, or investigations, and even then, he can still be individually liable to me for posting it on Kiwi Farms.

### V-1-B: Civil conspiracy.

152.    "In order to prove a civil conspiracy, one must show a combination of two or more persons to accomplish a purpose that is unlawful or oppressive." See Chambers v. Stern, 64 SW 3d 737, 743 (2002).

153.    "In order to recover damages from [the corporate defendants] for conspiracy, [I have] the burden of proving each of four essential propositions: First, that [the corporate defendants] and [John Doe #1] knowingly entered into a conspiracy; Second, that [I have] proved all of the essential elements necessary to obtain a verdict against [John Doe #1] on the underlying claim of [defamation]; Third, that one or more of the co-conspirators committed one or more overt acts in furtherance of the alleged conspiracy; And fourth, that the conspiracy proximately caused damages to [me]." See AMI 714 Issues—Civil Conspiracy.

154.    The first essential element – that the corporate defendants and John Doe #1 knowingly entered into a conspiracy – "may be shown by direct evidence of an actual agreement or understanding between conspirators, but it may also be shown by circumstantial evidence. It also may be inferred from actions of alleged conspirators, if it be shown that they pursued the same unlawful object, each doing a part, so that their acts, although apparently independent, are in fact connected and cooperative, indicating a closeness of personal association and a concurrence of sentiment. Any act done or declaration made by one of the conspirators in furtherance, aid or perpetration of the alleged conspiracy may be shown as evidence against his fellow conspirators." See Chambers, supra at 743 (citations and quotations omitted). So I have a lot of options at my disposal.

155.    Here, the John Doe #1 and the corporate defendants all pursued the same unlawful object: Making knowingly false accusations to damage my reputation. The defamation, and the subsequent firing, all happened in a few hours of each other. The accusation came so far out of nowhere that it just *had* to have been motivated by someone else putting him up to it, thus evidencing closeness. Why else would he have waited several weeks to make the accusations, instead of speaking up immediately?

156.    Therefore, I have plausibly alleged the first essential element of conspiracy, and that's assuming I don't uncover *even more* evidence of conspiracy once the case actually gets underway.

157.    The second essential element is also sufficiently plead, as evidenced by Section V-1 above.

158.    The act of John Doe #1 making the complaint to the Walmart coach and investigators sufficiently satisfies the third essential element.

159.    The fact that I was fired sufficiently pleads the fourth and final essential element.

160.    Therefore, I have plausibly alleged civil conspiracy for Defamation #1.

<u>V-1-C: Liability of the corporate defendants</u>

161.    Barring the civil conspiracy claim, the corporate defendants are still liable for Defamation #2-#5. For #2, the corporate defendants directly spread the defamation to bottom-level grunt employees.

162.    For Defamation #3, #4, and #5, the Kiwi Farms posters used company resources to acquire the knowledge needed to spread the defamation online. They also represented to the other Kiwi Farms members that they worked for the corporate defendants, and that their statements

25

about me should be considered reliable because of said employment. This is best evidenced by Appledude's second post[13], where he replied to Harvey Danger's query about whether or not it was first hand knowledge in order to bolster the reliability of his claims. It is further evidenced by Canonevent's first post, and the fact that he attached screenshots he cold only have gotten from the corporate defendants.

163.    "An employee is acting within the scope of his employment if he ... is doing anything which may reasonably be said to have been contemplated as part of his employment and is in furtherance of his employer's interests, even though it was not expressly authorized and may have been specifically forbidden." See AMI 702. But notice the precise language there: It doesn't say that respondeat superior applies if the the employee's conduct is indeed in furtherance of the employer's interests. As long as it "may reasonably be said" that it is, respondeat superior applies. This sets a much lower bar for respondeat superior liability than if actual furtherance of employer interest must be shown.

164.    The Kiwi Farms posters acted in furtherance of their employers' interest in defaming me, so that criterion is met, even if the individual Kiwi Farms posters were off the clock when they made the posts and used their personal computers at home to spread it. See AMI 702 ("The test of a master's liability for his servant's [tortuous behavior] is not whether the [intentional] act was committed while the servant was in his employ, but whether... the servant was performing an act in furtherance of the master's business").

165.    Since defaming me was one of the employer's interests, that qualifies. In the case of Wal-Mart v. Lee, supra, the Arkansas Supreme Court found that Lee had failed to show an exception to the qualified privilege, thus acknowledging that there was indeed a presumption of qualified privilege, and therefore acknowledging that the defendant ... you guessed it... *had an interest* in spreading the defamatory content. That same logic applies here: They have to admit that they have an interest in spreading the accusations in order to even preserve the defense of qualified privilege in the first instance, thereby acknowledging that the postings on Kiwi Farms were in furtherance of that interest, thereby triggering respondeat superior liability. But since these postings were outside the scope of the privilege, they can't rely on that defense either. But if they try to insist that they had no interest in spreading the accusations, then they can't claim qualified privilege for Defamation #2. Pick your poison.

166.    The fact that the Kiwi Farms posters were told this information by the corporate defendants themselves (such as through the company Discord server) clearly means that the knowledge thereof was "assigned to" the kiwi farms posters. Their acquiring of the knowledge was clearly done "as part of their employment" if they got it from the company discord server. At a minimum, it means that it "may reasonably be said" that this is the case, which creates, at a minimum, a rebuttal presumption of respondeat superior.

167.    Furthermore, the act of informing the kiwi farms posters of the defamation (especially since it was none of their business) makes it obviously "foreseeable" that they would spread the defamation even further. So that factor of respondeat superior ways in my favor as well.

---

13 Found here: https://kiwifarms.st/threads/david-anthony-stebbins-acerthorn-stebbinsd-fayettevillesdavid.116370/page-233#post-21527231

168.    Lastly, the kiwi farms posters' actions served an interest of their employers: To continue to extrajudicially punish me for having the audacity to request accommodations for my disability.

169.    Now, before either the Court or the defendants say what I know they're thinking after reading that last paragraph, let me make my position clear: Yes, that is absolutely something the corporate defendants had "an interest" in, even if management had no personal desire to actually do it. As this cracked.com article explains... https://www.cracked.com/personal-experiences-1312-5-terrible-things-i-learned-as-corporate-whistleblower.html ... corporations absolutely do engage in petty revenge campaigns. As the last two sentences of that article succinctly point out, "You don't think of ... corporations as being susceptible to petty human motivations like revenge. But that's only because you don't know them well enough." The rest of the article prior to those last two sentences explain in detail how her former employer wasn't content simply firing her and moving on.

170.    Think about it this way: In criminal cases, there is a huge difference between the defendant having a motive and the defendant actually acting on said motive. For example, if someone is accused of murder, and his wife was raped by the victim a few days before the victim was killed, then yes, the defendant unequivocally had a motive to commit the murder. The Defendant will, of course, proclaim from the rooftops that he is innocent despite this motive, and he may even be *ultimately found innocent* when it's all said and done. But nobody in their right mind would argue that the defendant *didn't have a motive in the first place*, because he absolutely did.

171.    Along that same vein, even if the corporate defendants insist with their full chest that they had precisely zero actual desire to continue to torment or extrajudicially punish me after firing me, that they were absolutely content simply firing me and moving on[14], that doesn't detract from the irrefutable and cast iron objective fact that they still *had the interest in the first place!* Just like with the murder motive example, having an interest and actually wanting to pursue it are two very different things, and the former is all that is necessary for the employee's actions to be considered "in the course and scope of employment" for purposes of employer vicarious liability.

172.    And the Kiwi Farms posters' thrice reposting the defamation unequivocally and undeniably advanced said interest.

173.    Therefore, the corporate defendants are vicariously liable for all three of the kiwi farms repostings, under the doctrine of respondeat superior.

174.    And again, just to reiterate: That doesn't apply in the first place to Defamation #1 if I can prove civil conspiracy, Defamation #2 at all, or Defamation #3-#5 insofar as ¶¶ 117-121 are concerned.

### ***V-1-D: Defamation #6 makes the republication rule redundant***

A)    As I've repeatedly made clear in this Complaint, the Kiwi Farms posts cause the corporate defendants to be jointly liable for the defamation through the "republication rule," even though they didn't outright accuse me of stealing the nude photos like John Doe #1 did. See

---

14 To clarify: I am not conceding that this is true; I am merely stating that I am not required to prove this in order to prevail on the theory of respondeat superior.

27

Nance v. Flaugh, 253 S.W.2d 207, 208 (1952) ("[T]he defendant's letter was equally a defamation whether he had fabricated the accusations himself or was simply repeating what he had heard"). Or, in laymen's terms, "[u]nder the libel law republication rule... saying 'A said that P stole money from petty cash' is libelous if P didn't steal the money, even if it's accurate that A said that P stole the money." See Eugene Volokh, Libel by Omission of Exculpatory Legal Decisions, 97 Notre Dame L. Rev. 351, 354 (2021).

B)      However, Defamation #6 suddenly makes all of that a moot point. No longer are the corporate defendants or Kiwi Farms posters couching their public statements in language where the republication rule even needs to be discussed. Now, Canonevent (and, by extension, the corporate defendants) have outright stated that I "actually stole images," period.

C)      Remember that canonevent is necessarily employed by one of the corporate defendants, as evidenced by the fact that, when he made his first post, he included screenshots that could only have come from the corporate defendants' management, investigations, and/or human resources divisions. Therefore, more so than any other of the Kiwi Farms posters, he is an employee of, and therefore representing, the corporate defendants when he makes these posts.

D)      Therefore, the corporate defendants are now liable for defamation unless they can prevail on the defense of truth, and there's no two ways about it.

### V-2: Wrongful Termination/Employment Disrimination

175.    To prove wrongful termination under the Arkansas Civil Rights Act of 1993, I must prove (1) I engaged in a statutorily protected activity, (2) I suffered an adverse employment action, and (3) there is a causal connection proving that Element 2 was done *because* of Element 1.

176.    For Element 1, I must sufficiently allege that I have a disability. The allegations of Section IV-1 above sufficiently plead this. Therefore, Element 1 is sufficiently plead.

177.    Element 2 has been handily satisfied, and I trust there is no dispute there. I have indeed lost my job and have suffered great reputational harm and public humiliation. That certainly counts as an adverse action.

178.    For Element 3, I was fired less than 6 weeks after I made the request for accommodation. Also, me being locked out of the ticket system happened *immediately* after I requested the accommodation. Therefore, this creates a presumption of retaliatory motive.

179.    The Defendants have offered a nonretaliatory reason for the termination: That I was the subject of a customer com-plaint alleging that I had stolen a nude photo off of that customer's phone. Under the McDonnell-Douglas burden-shifting framework, that means I must prove that this excuse is pretextual.

180.    The contents of Section IV-5 alleges sufficient facts upon which a factfinder could reasonably find that the knowingly false customer complaint was a pretext for their real reason for firing me, the real reason being that I requested an accommodation for a disability.

181.    Section IV-5-A explains how Doe #1 was almost certainly acting pursuant to the corp-

28

orate defendants' explicit instructions, which makes it necessarily and automatically pretextual, but even if the defendants manage to skirt by on that, Section IV-5-B explains how the objective falsity of the complaint and their failure to do even a cursory investigation into the CCTV footage means that the excuse is pretextual anyway. Therefore, the element of pretext is sufficiently alleged.

182.    Therefore, I have sufficiently plead all the elements for a claim of wrongful termination.

### ***V-2-A: Disability was a motivating factor***

A)    When it comes to proving causation in a wrongful termination case, whereas federal law uses the "motivating factor" test for discrimination and the "but-for cause" test for retaliation[A], the Arkansas Civil Rights Act of 1993 uses the "motivating factor" test across the board. See James v. George's, Inc., 646 SW 3d 238, 242 (2022) ("James abandoned her Title VII and ADA claims below, all that remain are... claims brought under the ACRA... An employee may establish a direct evid-ence *discrimination or retaliation* claim by demonstrating that an illegitimate criterion was a *motivating factor* in the employment decision") (emphasis added, citations and quotations omitted).

B)    And the thing you need to keep in mind about the "motivating factor" test is... it creates liability for the employer, even if the employer had other, nondiscriminatory reasons for the termination! See Pedigo v. PAM Transport, Inc., 60 F. 3d 1300, 1301 (8th Cir. 1995):

> "An employee is entitled to some relief if he or she proves that his or her disability was a motivating factor in the decision made, *even though other factors also motivated the employer's decision.* If *the employer proves*, however, that... it would have made the same decision absent consideration of the employee's disability, the remedies available are limited." (emphasis added; citations and quotations omitted).

C)    Here, thanks to Canonevent's February 25, 2026 post, the fact that ableism against me was, at a minimum, a "motivating factor" is proven by the defendants' own admission. They openly admit that they would have fired me, even without the customer complaint over the alleged stolen photo, and that one of the reasons for it was that I allegedly would talk to inanimate objects like poles, which is a manifestation of insanity and, therefore, mental impairment and, therefore, protected disability.

D)    This is proven by the defendants' own admission, which is legally sufficient to create the "'specific link' between the alleged discriminatory animus or protected action and the adverse decision sufficient to demonstrate that the discriminatory animus actually motivated the adverse decision," as is required under James, supra.

E)    For sure, canonevent also insists that they would have terminated me eventually anyway. However, there are two caveats to that defense: First, as the Pedigo case above explains, even if

---

A  See Univ. of Tex. Southwestern Med. v. Nassar, 133 S.Ct. 2517, 2534 (2013) ("a plaintiff making a retaliation claim... must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer").

the defendants prevail on that defense, that isn't a defense to liability generally. It merely limits the remedies. That means that the 5 (possibly 6) figure attorneys fees they'll spend defending this case, they won't get awarded back to them, since they still technically lost the case.

F)      Second, as evidenced by the excerpt above that is underlined and italicized, the defendants hold the burden of proof on this defense if they want to get even that much. This means that they'll have to *actually prove* (they can't just say it) that I did, in fact, fail to follow rules, repeatedly and consistently had a certain "smell" to me, or whatever other handful of transgressions Canonevent listed that are not disability-related. This will require (A) evidence that I was properly notified of the rules in question, coupled with (B) CCTV footage showing me acting inconsistently with those rules. In all likelihood, they won't be able to prove that.

### V-3: Unlawful Retaliation

183.    AR Code § 16-123-108(a) makes it unlawful to "discriminate against any individual because the individual in good faith has opposed any act or practice made unlawful by this subchapter."

184.    The contents of Section IV-6:A above demonstrate that I engaged in a good faith attempt to oppose my termination. Even if the Court ultimately determines that my termination was not unlawful, it is black letter law that that alone does not mean that it was not protected for me to oppose it.

185.    Meanwhile, the contents of Section IV-6-B above constitute a blatant act of discrimination against me, and the security guards even admitted that they were doing it because I was attempting to speak to Haleigh.

186.    Even if the defendants attempt to ague that my actions were not in good faith because "Haleigh clearly didn't want to talk to me," that alone is not dispositive of the matter. That just raises the question: Why didn't Haleigh want to talk to me? Is it because she knew there was a very high likelihood that I was attempting to protest my unlawful firing? If so, then my behavior is still protected.

187.    In fact, that actually constitutes an act of discrimination unto itself! After all, Haleigh refused to talk to me, but she would speak to nearly anyone else. That's discrimination, right there! Remember: Any time you are treated differently than anyone else, for any reason, is technically discrimination. If I'm passed up for a job because I have less relevant experience than another candidate, or because I have a criminal record, that still technically counts as discrimination. It's just that most forms of discrimination are legal. Remember: The law doesn't outlaw discrimination per se. It just makes it illegal to discriminate *because I in good faith opposed any act made unlawful by that chapter!* Even if I were opposing in good faith any act made unlawful by any other law besides that one chapter (aka the AR Civil Rights Act of 1993), then it would still be legal to discriminate against me because of it, unless the retaliation is made illegal elsewhere.

188.    So, because Haleigh refused to talk to me, she was technically discriminating against me unless she can show that she also was refusing to talk to literally anyone on earth. Then, because the *reason* she didn't want to speak to me is because I was seeking to protest and oppose my

30

unlawful termination in good faith, that means Premium (acting through Haleigh) retaliated against me in violation of AR Code § 16-123-108(a). Then, Walmart turned around and also retaliated against me in violation of that same law, for reasons discussed above.

189. Therefore, I have alleged a plausible claim for retaliation.

## V-4: Breach of Contract

190. To prevail on a breach of contract claim, I must prove that (A) there is a contract between plaintiff and defendant, and (B) the defendant did not honor its contractual obligations.

191. Premium and I reached an agreement to settle the federal discrimination claim for $12,500. However, that payment has not been forthcoming. Therefore, Premium is in breach and owes me $12,500 for the settlement unless they can prove a defense to their breach.

192. Although Premium had the right to request a supplemental agreement, they had a duty, when exercising that right, to be reasonable with their terms. They failed utterly in that duty. Therefore, they should forfeit the right to a supplemental agreement as a consequence for their objectively unreasonable actions. Therefore, they are still in breach.

## VI: RELIEF REQUESTED

193. I request the following relief to make me whole for the wrongs complained of in this complaint:

## VI-1: Declaratory and Injunctive Relief for the Retaliation

194. For the retaliation claim, I ask that the Court declare the following:

(a) That the corporate defendants unlawfully retaliated against me for opposing in good faith what I reasonably believed to be wrongful termination, and

(b) Had the retaliation not occurred, Haleigh Holt wold have confessed to me that the termination did, in fact, occur because I had requested an accommodation for my disability.

195. I then ask the Court to issue an injunction ordering all corporate defendants to cease and desist all acts of retaliation against me.

## VI-2: Declaratory and Injunctive Relief for wrongful termination and defamation

196. First, I seek declarations that say the following:

(A) The accusation against me that I had stolen a nude photo from Doe #1's phone was false;

(B) Doe #1 *knew* it was false at the time he made the complaint;

(C) Doe #1 was acting in cahoots with the corporate defendants when he did it and conspired with them to make this knowingly false accusation;

31

(D) Premium and Acosta used this accusation as a pretext to fire me, with the real reason for firing me being that I requested an accommodation for my disability in good faith;

(E) These accusations lead to me getting fired;

(F) All of the defendants (corporate and individual alike) acted willfully and maliciously against me; and

(G) The corporate defendants, without any legal justification, continued to spread the knowingly false accusations to other employees, through their discord server as well as through other channels, even to employees and even the general public who had no interest in hearing the accusations, all with an equal or greater level of actual knowledge of falsity as described in (B) above;

197.    The purpose of Requested Declaration (H) is two-fold: First, it opens up the option for me to receive punitive damages, and second, it prevents any of the defendants from discharging these judgments in bankruptcy, pursuant to 11 USC § 523(a)(6).

198.    From there, I ask for an injunction that the defendants (corporate and individual alike) be required to undo the reputational harm they have caused me. Not just to publish corrective statements telling people the truth, but to *actually convince them* of the real truth, such that absolutely everyone on Earth, with no exceptions, has either never heard of this controversy in the first place, or they must subjectively believe, in their own minds, that I'm the blameless victim of defamation which the defendants knowingly and maliciously perpetrated, and absolutely nothing else.

199.    This would have the practical effect of the defendants being held in violation of the injunction (and therefore held in contempt of court) if ...

(a)      literally anyone acts as if they believe I was fired for stealing any nude photos, or believes that there is even a one in a million chance that I might have done it, or

(b)      if any prospective employer refuses to hire me and the accusation against me cannot be proven to have played precisely zero roll in their decision not to hire me. This would include any instance where an employer "went with another candidate" but never explains exactly what made that candidate superior to me. If the defendants can't prove that my lack of baggage wasn't even so much as a nominal factor, they should be held in violation of the injunction.

200.    That sounds impossible, but it's not. One of the best examples of this happening is the controversial case of Liebeck v. McDonalds. Originally, Ms. Liebeck had been propogandad to hell and back as a greedy person who just wanted to get rich from frivolous lawsuits. But nowadays, the reality of the case is well documented. Nowadays, you almost never hear the original, propoganda version of that story unless it is specifically being set up to explain how that original version was egregiously incorrect.

201.    Well, just imagine how quickly we could achieve that level of correction if the defendants (and especially the corporate defendants with their deep pockets) were ordered to achieve it by any means necessary, meaning they had to actually put just as much effort into correcting their

own defamation as McDonalds had originally spent spreading the frivolous lawsuit propoganda in the first place. When you think about it that way, it is indeed quite doable, is it not?

202.    And even if, in spite of all of that, it is still deemed "impossible" to comply with this injunction, maybe they should have thought about that *before* they decided to make up such horrible lies about me that they knew full well to be false, and especially before they started spreading it to the general public indiscriminately!

203.    Lastly, they should be enjoined to, by any means necessary, subjectively convince any company that I apply for employment to that the odds of such drama and complaints being brought to their business if they hire me, in a manner described in Section IV-8 above, is not even nominally any greater than if they were to hire literally any other candidate.

204.    And when I say "not even nominally greater," just imagine this: If 1 billion kilograms of Earth's mass disappeared every second, it would take approximately *189,000 years* for the entire planet to disappear. Well, imagine by what *percentage* Earth's mass would increase if *just one single grain of sand* were added to Earth from space without burning up in Earth's atmosphere on the way down.

205.    If the odds of the drama mentioned in Sec. IV-8 above were even that percentage higher for an employer if they hired me as opposed to if they hired anyone else, or if any prospective employer even *thinks* it's even that percentage higher, then the final part of this requested injunction has not been complied with.

206.    An exception to this final part of the injunction can exist if the defendants can prove that the perceived higher likelihood of drama is caused by reasons entirely unrelated to the defamation I'm suing over today. Meanwhile, this injunction can permanently end if I am ever proven in court to have actually committed (an uncorroborated customer complaint doesn't count) an act as heinous or more so than the act of stealing a nude photo off of someone else's phone, such that no reasonable employer *wouldn't* fire me if I had done that.

### VI-3: Compensatory Damages for wrongful termination and defamation

207.    First, I ask for lost income in the amount of $146,400. That is five years worth of lost income. If I worked 40 hours per week, making $12 per hour, then I would earn $24,960 per year in hourly wages. But as I explained earlier, estimated commissions of $360 per month is reasonable, so multiply that by 12, and you get $4,320 per year in commissions. That makes for a total of $29,280 per year in total income that I lost as a result of this termination. Multiply that by five years, and you get $146,400.

208.    Then, I ask for damages of $1,000,000 for public humiliation, emotional turmoil, and general loss of reputation.

209.    After five years, I also seek front pay in the amount of $2,440 per month, adjusted for inflation as of May 2025, but my income from other jobs would subtract from that front pay at a 1:1 rate. So for example, if my front pay, after adjusting for inflation, in any given month is $3,100, but I get a part time job that pays $500 for that month, they would only owe me front pay

of $2,600 for that month.

210.    This front pay should begin on May 14, 2030 (five years after I was fired) and should continue forever.

### VI-4: Punitive Damages for wrongful termination and defamation

211.    Next, I would like for the Court to consider awarding punitive damages.

212.    For the wrongful termination, I request $300,000 in punitive damages (the maximum allowed by statute).

213.    For the retaliation mentioned in Section IV-6 and argued in V-6, I request another round of $300,000 in punitive damages. That makes for $600,000 in punitive damages so far.

214.    For the defamation, I ask that he consider going absolutely buck wild with punitive damages. I ask for this, not because I want to be a milli-onaire for its own sake, but because the defendants truly need to be taught a lesson for spreading such horrible lies about people. As the Supreme Court once famously wrote,

> "Punitive damages should bear a reasonable relationship to the harm *that is likely to occur from the defendant's conduct* as well as to the harm that actually has occurred. If the defendant's actions caused *or would likely cause* in a similar situation only slight harm, the damages should be relatively small. If the harm is grievous, the damages should be much greater." See TXO Production Corp. v. Alliance Resources Corp., 509 US 443, 460 (1993) (emphasis in original).

215.    Here, the defendants accused me of an absolutely heinous act, one that could have had me suffering far worse consequences than just losing my job.

(a)    I could have ended up on the sex offender registry because of accusations like this.

(b)    Even if I managed to escape criminal conviction and sentencing, there is a good chance I might get the OJ Simpson treatment and have to live the rest of my life being branded as a creep and a pervert who steals nude photos. And when I say "there is" a good chance, I mean that in the present tense; I *still* am at risk for that, unless I not only get the injunction requested in ¶¶ 192-199 above, but the defendants are 100% successful in complying with it.

(c)    I could have been disowned by my entire family.

(d)    I have (not could have, but have) become almost completely unemployable due to the fact that, even if future employers personally believe that I didn't do it, they still might be hesitant to hire someone who is likely to bring this kind of drama to their doorstep.

216.    This is precisely the sort of "harm that is likely to occur from the defendant's conduct" that the Supreme Court was talking about when it endorsed awarding disproportionate punitive damages.

34

217.    One year later, the jury in the egregiously misunderstood case of Liebeck v. McDonalds took the Supreme Court up on its offer when they awarded punitive damages of $2,800,000 despite compensatory damages damages of only $160,000. That happened in August of 1994, so that punitive damages award amounts to more than $6,000,000 in today's money, according to this inflation calculator: https://www.bls.gov/data/inflation_calculator.htm.

218.    Even then, there is an additional aggravating factor that justifies heightened punitive damages in my case, compared to Liebeck v. McDonalds: The increased culpability of the defendants. In that case, the punitive damages were awarded because of gross recklessness. McDonalds knew the danger associated with having such hot coffee and made the conscious choice to keep it that hot anyway. That was recklessness, but not actual malice. They did it to minimize free refills, not to actually harm anybody.

219.    However, imagine if a McDonald's employee, out of sheer hatred and spite towards Liebeck, had brewed her coffee to 200 degrees, which they don't normally do, and then walked up and purposefully and maliciously splashed the coffee right in her face, just to disfigure her.

220.    That is the equivalent to what happened here. Doe #1 (whether or not he was acting in cahoots with the corporate defendants) clearly wanted to ruin my *entire life* with this accusation, and regardless of what his, or the corporate defendant's, motives were, they weren't because I genuinely deserved this. Maybe if they prove that the accusations were true, but if that happens, I won't get any damages anyway, punitive or otherwise.

221.    Meanwhile, the kiwi farms posters all acted with a similar level of malice for reasons I explained in ¶¶ 110-114 above.

222.    Even Arkansas state public policy supports a disproportionate award of punitive damages in this case. AR Code § 16-55-208 sets a cap on punitive damages at either three times the compensatory damages or one million dollars, whichever is greater, but even then, subsection (b) of that statute makes an exception for cases like this, where "the defendant[s] intentionally pursued a course of conduct for the purpose of causing injury or damage" and "the defendant[s'] conduct did, in fact, harm the plaintiff." In these cases, even Arkansas public policy gives factfinders the green light to award nuclear punitive damages in order to teach the defendants a lesson.

223.    Therefore, I respectfully ask the Court to consider going completely nuclear and award absolutely massive punitive damages, possibly seven-figure or even eight-figure punitive damages, in order to properly teach the defendants a lesson about making up such horrible lies about people.

### VI-6: Damages and declaratory relief for breach of contract

224.    For the breach of contract, I ask the Court to do one of two things:

(a)    Either...

i.    Declare that Premium, by dint of its objectively unreasonable terms in its supplemental agreement, has forfeited the right to demand a supplemental agreement, and therefore the EEOC settlement we signed is a final and complete agreement all on its

own;

ii.       Order Premium to pay me $12,500 in damages,

iii.      Order Premium to pay me pre-judgment interest at a rate of 6% per annum (aka $62.50 per month) from the date the contract was signed until the date the judgment is entered in my favor; and

iv.      Order Premium to pay post-judgment interest at a rate of 10% per annum (aka $184.17 per month) from the date the judgment is entered until the date the judgment is satisfied.

(b)     Or...

i.        Declare that there was never a meeting of the minds to settle the dispute;

ii.       Therefore, the entire settlement is null and void, and

iii.      Grant me leave to amend the complaint to include a claim for the Americans with Disabilities Act, even without a Notice of Right to Sue from the EEOC.

225.    I would much prefer (a) over (b).

## VI-5: Other Relief

226.    Lastly, I request whatever other relief the Court believes is necessary to make me whole and to deter similar conduct in future.

## VII: CONCLUSION

227.    Wherefore, premises considered, I respectfully pray that that I recover justly for this horrific act.

So requested on this, the 2nd day of March, 2026.

David Stebbins (pro se)
123 W. Ridge Ave.,
Apt D
Harrison, AR 72601
870-298-1168
stebbinsd@yahoo.com

36



For service of process contact the Secretary of State's office.

LLC Member information is now confidential per Act 865 of 2007

For access to our corporations bulk data download service click here.

Corporation Name
WALMART INC.

Fictitious Names
BUD'S DISCOUNT CITY
BUD'S WAREHOUSE OUTLET
BUD'S WAREHOUSE OUTLET
FORT SMITH REMARKETING
SAM'S CLUB
SAM'S WHOLESALE CLUB
WAL-MART
WAL-MART AVIATION
WAL-MART EXPRESS
WAL-MART NEIGHBORHOOD MARKET
WAL-MART NEIGHBORHOOD MARKET
WAL-MART SUPERCENTER
WAL-MART SUPERCENTER
WAL-MART SUPERCENTER
WAL-MART SUPERCENTER #1147
WAL-MART SUPERCENTER #8
WAL-MART VACATIONS
WALTON LIFE FITNESS CENTER

Filing #
100067582

Filing Type
Foreign For Profit Corporation

Filed Under Act
For Bus Corp; 958 of 1987

Status
Good Standing

Principal Address
1 CUSTOMER DR BENTONVILLE, AR 72716

Reg. Agent
C T CORPORATION SYSTEM

Agent Address
320 S. IZARD STREET LITTLE ROCK, AR 72201

Date Filed
03/31/1970

Officers
DAVID CHOJNOWSKI, Controller
DANIEL BINDER, Treasurer
GEOFFREY EDWARDS, Secretary
SPENCER WIRTHLIN, Vice-President
C DOUGLAS MCMILLON, President
SEE FILE, Incorporator/Organizer

Foreign Name

Foreign Address
1 CUSTOMER DR BENTONVILLE, AR 72716

State of Origin
DE
Purchase a Certificate of Good Standing for this Entity
Pay Franchise Tax for this corporation

# Exhibit A